# Exhibit A-3

Translation of the Rejoinder as filed with the Regional Court Munich I on 7 August 2020

HE File:                  208 748 / nlj/sja/cse

Court Docket:          21 O 11054/18

# Rejoinder

In the matter of

Palantir Technologies, Inc.
(Freshfields Bruckhaus Deringer)

**– Plaintiff –**

versus

Marc L. Abramowitz
(Hoffmann Eitle)

**- Defendant -**

further to our Response to the Complaint ("**RtC**"), we herewith respond to Plaintiff's brief of
21 February 2020 ("**Counterstatement**") as follows:

1.    **Summary** ....................................................................................................4
2.    **Facts of the Case** .........................................................................................5
2.1    Preliminary Remarks ...................................................................................5
2.2    Incorrect Presentation of the Teachings of the Applications in Suit ....................9
        2.2.1    Cyber Insurances and Role in Information Exchange Was Known ...........11
        2.2.2    The Teaching of the Priority Application ..........................................13
        2.2.3    Derivation from Defendant's Earlier Application .................................17
        2.2.4    Further Disclosure and Claims of the Applications in Suit......................19
                2.2.4.1    *Patent Application WO'919*                              19
                2.2.4.2    *Patent Application WO'049*                              22
2.3    Plaintiff's Submission as to the Alleged Conception of Invention........................28
        2.3.1    The Alleged CyberMesh "Invention" of Plaintiff .................................28
        2.3.2    The Provisional U.S. Application US 61/942,480 .................................31
        2.3.3    The Alleged Cyber Insurance "Invention" of Plaintiff ...........................31
2.4    Alleged Communication of the Alleged Conception of Invention .........................33
        2.4.1    Submissions are Unsubstantiated and Incorrect...................................33
        2.4.2    No Confidentiality Obligation .........................................................34
                2.4.2.1    *No Contractual Confidentiality Obligation*             35
                2.4.2.2    *No confidentiality obligation under California law*      36
2.5    Defendant's Own Development.......................................................................37
2.6    Lack of Patentability of the Applications in Suit................................................39
        2.6.1    Parallel Proceedings Do Not Indicate Patentability of an EP/DE .............39
        2.6.2    Lack of Protectability .................................................................40
2.7    Relationship of the Parties in the Development of the Cyber Insurance Business.......41
3.    **Legal Assessment** ......................................................................................42
3.1    Plaintiff Misconstrues Subject Matter Governed by the EPC................................43
3.2    Patent Applications Were Not Pending Either Before the EPO or Before the GPTO .........48
        3.2.1    EP Applications Not Pending – Requests 1) and 2).................................48
        3.2.2    German Applications Have Never Been Effectively Requested – Request 3) ......50
3.3    No Legal Interest in Declaratory Relief............................................................50
        3.3.1    Request 1) .................................................................................50
                3.3.1.1    *No Legal Interest in Declaratory Relief with Regard to the Present Wording of the Request*      50
                3.3.1.2    *No Legal Interest in Declaratory Relief based on Art. 60 (1) EPC*      51
                3.3.1.3    *No Legal Interest in Declaratory Relief based on Art. 61 (1) EPC*      52
                3.3.1.4    *No Legal Interest in Declaratory Relief if merely Co-Ownership*      53
        3.3.2    Requests 2) and 3)......................................................................55
3.4    No Legitimate Interest Owing to Tardiness......................................................55
3.5    The Requests for Declaratory Relief Are Unsubstantiated ..................................57
        3.5.1    Conflict-of-Law Provisions Lead to Application of U.S. Law ....................57
        3.5.2    Plaintiff's Claims Fail Under U.S. Law ..............................................59
        3.5.3    As an Auxiliary Line of Argument: No Claims under German Law..................62
                3.5.3.1    *No Violation of Plaintiff's Inventor's Rights*           62
                3.5.3.2    *No Legal Basis for Conferring a Right to the Grant*      63
                3.5.3.3    *No Right to Declaration of an Obligation to Compensate Damages*      65
                3.5.3.4    *No Right to Declaration of Restitution Claim*           66
                3.5.3.5    *Lack of Protectability Represents a Bar to the Requests*      67
3.6    No Jurisdiction............................................................................................68



3.6.1    The Protocol on Recognition Requires That Application Is Pending ..................................... 68

3.6.2    No Jurisdiction Under the General Rules .......................................................................... 70

**4.     Request for Confidential Handling / Exclusion of the Public ........................................................71**

### 1. Summary

1    Even with its Counterstatement, Plaintiff has not refuted that the legal action is inadmissible und unfounded.

2    Plaintiff still has not substantiated, let alone provided evidence that (1) it had possession of the inventions disclosed in the Applications in Suit and that (2) it had ever communicated the inventions to Defendant. The reason for those glaring holes in Plaintiff's submission is simply that the allegations are a fiction created by Plaintiff to overwhelm Defendant with a further lawsuit in addition to the pending proceedings in California and Delaware, so as to dissuade him from continuing to assert his rights against Plaintiff. At the time of the alleged communication (3) Defendant did not have a duty of confidentiality either. With a communication to Defendant, Plaintiff would therefore have made its alleged invention available to the public and would thus have forfeited any right to a patent.

3    Defendant, an investor with a juris doctorate degree from Harvard Law School and master's degree in management from Stanford University, came up with the computer-implemented business methods, as disclosed in the Applications in Suit, involving in particular the use of real-time information to dynamically assign values to various assets. In March 2014, i.e. before Plaintiff contends that it disclosed anything to Defendant, Defendant filed a patent application regarding his invention to use real-time data to dynamically price bonds. He applied this concept in further patent applications also to on cyber insurance, cyber security, drug discovery and other industries where real-time analysis of data could be helpful. That is a strategy that Defendant's patent lawyer—John Squires (to whom we shall return to below) — has used successfully in the past with other inventors whose professional backgrounds lie in business rather than in a technical field.

4    Accordingly, Plaintiff's claim that it and not Defendant holds the right to a patent regarding the Applications in Suit as its employees allegedly invented their subject matter, is therefore already lacking any factual basis.

5    Moreover, Jurisdiction of the Regional Court results neither from the *Protocol on Jurisdiction and the Recognition of Decisions in respect of the Right to the Grant of a European Patent* ("**Protocol on Recognition**") nor from the general rules (**section 3.6**).

6    A declaratory interest is also absent both regarding present request 1), specifically if based on Art. 60 (1) EPC which Plaintiff cites (**section 3.3.1**), and regarding requests 2) and 3) (**section 3.3.2**). Plaintiff in particular fails to recognize that Art. 60 (1) EPC only stipulates who is entitled to the *right to a patent*, whereas a new application pursuant to Art. 61 (1) (b) EPC requires that the applicant is conferred the *right to the grant* of the patent and that the requirements for such

HOFFMANN EITLE

conferral were deliberately excluded from the EPC in favor of national civil law (**section 3.1**). A likelihood of damage being incurred has neither been demonstrated nor is it plausible.

7        Moreover, Art. 61 (1) (b) EPC is not applicable and G 3/92 not informative here for the reason alone that the European Applications in Suit relevant for requests 1) and 2) have never become pending; until the European phase is initiated, which never happened here, only the provisions of the PCT are applicable (**section 3.2.1**). The German patent applications cited for request 3) were not even effectively applied for according to the rules of the PCT (**section 3.2.2**).

8        Owing to its tardiness, Plaintiff at least has also lost any legitimate interest (**section 3.4**).

9        In any case, the legal action is unfounded:

10       To confer a *right to the grant of a patent*, first the applicable substantive law must be determined based on the governing German conflict-of-law provisions, which in this case leads to U.S. law as the law of habitual residence of the parties. Plaintiff's arguments against this are not convincing and are contradictory to the case law of the highest court (**section 3.5.1**). According to U.S. law, Plaintiff is not entitled to the asserted claims (**section 3.5.2**).

11       However, even according to German law, discussed here as an auxiliary measure, Plaintiff has no claim to be conferred the right to the grant of the Applications in Suit. As already emphasized at the beginning, Defendant did not infringe Plaintiff's inventor rights (**section 3.5.3.1**), and moreover there is no legal basis for Plaintiff to request conferral of the *rights to the grant of a patent* with regard to the EP Applications in Suit which have never become pending before the European Patent Office (EPO), and which have in any case lapsed in the meantime (**section 3.5.3.2**).

12       Likewise, there is no right to determination of a damage claim (**section 3.5.3.3**) or claim to restitution of what has been obtained (**section 3.5.3.4**).

**2.        Facts of the Case**

**2.1        Preliminary Remarks**

13       Even Plaintiff itself seems to recognize that its legal action considerably lacks substance as regards conception of invention and communication thereof. Plaintiff attempts to conceal this in two ways. First of all, Plaintiff misrepresents the subject matter of the Applications in Suit, which is apparent already from the fact that Plaintiff eschews even a comparison with the independent claims, instead, resorting to alleged "core aspects". Secondly, Plaintiff's assertions as to



what it allegedly has invented and communicated are so unspecific that it is unclear what Plaintiff actually asserts.

14    Plaintiff's intention is clear – to pretend that the claimed inventions in the Applications in Suit came from Plaintiff by reducing the subject matter of the Applications in Suit to details taken out of context and by generalizing its alleged contributions in this regard in such a way that these could allegedly be interpreted in respect of these details. Every specialist in patent law hears alarm bells ringing if a party consistently focuses on alleged "core" aspects, because this term is a euphemistic way of saying "details without context". Plaintiff's references to "core" aspects include:

- "*Core* aspects of the Applications in Suit" (Counterstatement, page 4)

- "*Core* disclosure of the two Applications in Suit" (Counterstatement, page 6)

- "*Core* disclosures are undisputed" (Counterstatement, page 6)

- "*Core* of the cyber consortium application" (Counterstatement, page 6)

- "*Core* aspects of these inventions" (Counterstatement, page 8)

- "*Core* aspects of the inventions according to the Patent in Suit" (Counterstatement, page 9)

- "*Core* of both the 'CyberMesh' and cyber insurance inventions" (Counterstatement, page 9)

- "*Core* aspects of the inventions" (Counterstatement, page 25)

- "*Core* aspects of the two Applications in Suit" (Counterstatement, page 31, 40)

- "*Core* aspects of the inventions according to the Patent in Suit" (Counterstatement, page 33)

- "*Core* aspects of the cyber consortium application" (Counterstatement, page 40)

- "*Core* aspects of the cyber insurance application" (Counterstatement, page 42)

15    As regards its alleged conception of an invention, Plaintiff is specific and able to submit documents in only one respect, namely with regard to the CyberMesh (software) application which, according to Plaintiff, it had in its hands in October 2013 (Counterstatement, page 16). As regards the cyber insurance application that was allegedly being developed at the same time, Plaintiff's submission is vague. Not a single document from the development period has been presented. Plaintiff refers only to the email of Mr. Shyam Sankar of 9 June 2014, which does not communicate the claimed inventions in the Applications in Suit, however. Instead, it demonstrates that three quarters of a year after the alleged start of the development Mr. Sankar can only state generally known facts regarding the

HOFFMANN EITLE

advantages pursued with cyber inventions that no development had taken place and that at his point he had no finished invention in hand, let alone the invention of the Applications in Suit.

16      It is not denied that Plaintiff has worked on technologies related to cyber-attacks or on a technology called CyberMesh. On the contrary, it was already established in the Response to the Complaint that Plaintiff publicly advertised CyberMesh before the end of 2013 (RtC, margin no. 117, *Exhibit HE 4*). This remained unchallenged in the Counterstatement. Indeed, sec. 1782-discovery has shown that Plaintiff sent various advertising materials regarding CyberMesh to potential customers, confirming the general publication of its CyberMesh-Technology well before the alleged communication to Defendant. Thus, Plaintiff has robbed itself of the chance to file a patent for CyberMesh. In any event, CyberMesh could no longer be considered confidential information at the time of the conversation between Mr. Sankar and Defendant on 10 June 2014, during which Plaintiff asserts to have reported on this development, which Defendant **denies**.

17      Based on the documents that Plaintiff has submitted or which have been obtained from public sources in the course of the proceedings, CyberMesh appears to have been used to exchange information on the identifying features of cyber-attacks. It automatically combines information from third parties and from participants of CyberMesh via a central instance to warn the (other) participants against risks of a cyber-attack, thus enabling them to better defend themselves against such attacks. CyberMesh participants can also directly exchange information automatically for the same purpose. This enables synergies since if participant A is attacked and shares information about this attack, for example the IP address from which the attack originated, directly or indirectly with participants B to Z, they can better defend themselves against the attack.

18      In his email of 9 June 2014, Mr. Sankar mentions with regard to the subject of cyber insurance that

- probes and sensors would be introduced into the networks of insurance customers and not only signs of attacks but also signs of weaknesses would be actively monitored in real time; and

- minimum requirements for protection against cyber-attacks would be established, the non-fulfillment of which would result in the loss of insurance coverage.

19      The synergy effects that are achieved with CyberMesh as mentioned above under margin no. 17, are cited as an advantage.

20      In contrast to this, Defendant's Application in Suit WO'919 is directed at dynamically and automatically determining suitable insurance products and appropriate insured amounts for the IT infrastructure of the insured customers



and at offering these to the customers electronically. Indicators such as the risk inclination of the customer, the sensitivity of the stored data and the damage that may be incurred are to be determined, which are attributed to profile types or to a product or service, and which can be weighted in order to determine through a mapping the suitable insurance product or the appropriate insured amounts.

21    WO'049, Defendant's other Application in Suit, is directed at the cooperation between companies which, in the event of cyber-attacks on the computer systems of their customers, assist their customers just like an external IT service provider, either by remote access or on site. As members of a consortium, the companies support each other with technical or human resources and coordinate their work via a central consortium system.

22    There are thus very considerable differences between what Plaintiff claims are "core aspects" and what is in fact claimed and disclosed in the Applications in Suit. And it fits into the picture of Plaintiff's sparse factual statements and the strikingly generalizing, blanket statements that also in the sec. 1782 discovery proceedings which were initiated by Plaintiff, Plaintiff takes every measure not to have to disclose what it actually has "invented".

23    Plaintiff seems to think that it does not have to comply with discovery in the U.S. and in this regard claims in the U.S. discovery proceedings that the Defendant in the present proceedings "does not, and has never claimed, that Palantir did not develop the technology underlying the [Applications in Suit]" (excerpt from an Email by David Livshiz, Freshfields of July 15, 2020 to Defendant's US counsels; emphasis added):

> had a cyber business that is unrelated to the specific technology underlying the Cyber Patents. Just as importantly, while Palantir has accused Abramowitz of misappropriating Palantir's technology, Abramowitz does not, and has never claimed, that Palantir did not develop the technology underlying the German Patents. *See* Response to Complaint (ENG), ¶¶40-154. There is thus no reason—other than to impose burden on Palantir—for Abramowitz to demand that Palantir apply search terms seeking evidence that it created/invented this technology.

As the court is aware, this is a clear misrepresentation. It was and is by no means undisputed that employees of Plaintiff have invented the technology underlying the Applications in Suit (see section 5.3 of the Response to Complaint). Plaintiff thereby defies the order by the U.S. court to provide all pertinent documents.

24    Neither the Applications in Suit nor the alleged inventions described by Plaintiff are patentable according to the standard established by the EPO and the FCJ.[1] They are computer-implemented business methods that are *obviously* without any technical excess since they only use completely generic data processing concepts operated on well-known components such as processors or computer networks.

---

[1] When commenting here and in the following on the patentability of the Applications in Suit, we are exclusively referring to patentability according to the EPC and German Patent Act.



25      The Counterstatement does not support any other conclusion. Plaintiff is trying to distract by focusing solely on technicity. However, the requirement of "technicity" is not the filter where computer-implemented methods for business activities are doomed to fail. This only occurs – as is undoubtedly the case here – at the level of patentability.

26      According to the examination scheme used by the European Patent Office and the Federal Court of Justice, technicity is already given if the claimed teaching has even *one* technical feature. The mention of e.g. the term "computer network" is sufficient. Non-technical features are nevertheless not part of an invention. Under the aforementioned examination scheme they are disregarded at the level of patentability. If the remaining subject matter is only a generic computer network, as is the case here, then this is unquestionably not a patentable invention.

27      Plaintiff cannot assert that its employees were the "inventors" of these generic and well-known data processing concepts and components, and even less so can Plaintiff be the "inventor" of the business methods since fundamentally business methods are not considered an invention (Sec. 1 (3) German Patent Act).

28      The fact that the alleged CyberMesh invention of Plaintiff is not patentable for these very reasons has already been confirmed by the European Patent Office, as is further elaborated under margin no. 114 *et seq*. The EPO established with regard to Plaintiff's EP applications originating from the U.S. application US 61/942,480 (**FBD 13**), which is allegedly supposed to substantiate the possession of invention, that these do not disclose a technical teaching going beyond generic concepts and elements.

**2.2        Incorrect Presentation of the Teachings of the Applications in Suit**

29      By focusing on alleged "core aspects", Plaintiff continues to avoid a comparison of the subject matter of the Applications in Suit with its alleged "invention". This does not meet the requirements for a substantiated submission to which Defendant can respond. Plaintiff's presentation of the teaching of the Applications in Suit is also simply incorrect, as is immediately obvious when reading the Applications in Suit and as summarized below.

30      Cyber insurance had long been available on the market by 2013 and their role in the exchange of information to fend off cyber-attacks was known not only among skilled circles but also far beyond (**section 2.2.1**).

31      The subject matter of the cyber insurance application (WO'919; **FBD 1**) is directed at a dynamic and automated reassessment of damage risks so as to continuously adapt an insurability rating or the insured customer's insurance product (in detail **section 2.2.4.1**). It is this subject matter that forms the foundation of Defendant's inventions in terms of genesis and content; the priority application of the Applications in Suit was directed solely at this subject matter (**section 2.2.2**).



32    According to the teaching of said WO'919, the insurer determines indicators that are attributed via profiles to a company or to a certain product or service to be insured. These indicators are to reflect aspects such as the risk sensitivity of the company, the number and type of IT infrastructure operated by this company, the data stored on the respective IT infrastructure (e.g. patient data versus public website), the risk susceptibility of the IT infrastructure and the extent of damage in the event of a successful cyber-attack for the insured company, the insured product or the insured service. Since each of these indicators can have an impact on the amount of damage or the probability of damages being incurred and since these indicators may change all the time, a continuous, dynamic reassessment is to be carried out.

33    A dynamic and automated reassessment of influencing factors, as applied to cyber insurance risks in Defendant's priority application and WO'919, was also already the concept of Defendant's earlier application from March 2014, which shows that this is Defendant's own development (**section 2.2.3**). Plaintiff does not allege to have provided any contribution to Defendant's March 2014 application or provided any information regarding its alleged inventions to Defendant prior to June 2014, and therefore it is undisputed that Defendant's earlier application contained no contribution from Plaintiff's employees.

34    The alleged "core aspect" of the invention of WO'919, i.e. to be able to quickly alert the insured customer to an imminent attack, is literally only a side note – a single half-sentence in 21 pages of description of the priority application. Contrary to Plaintiff's submission, WO'919 does not mention a "consortium" either.

35    Plaintiff has not set forth in a sufficiently substantiated manner and does not provide any support for a claim that its employees invented or communicated to Defendant the inventions of WO'919, in particular regarding the dynamic and automatic quantifying of risks.

36    Aspects of a consortium have only and exclusively been included in the further subsequent application which Plaintiff refers to as the cyber consortium application (WO'049; **FBD 3**). The subject matter of this application is also misinterpreted by Plaintiff both with regard to the basic structure of the consortium and its function (in detail **section 2.2.4.2**).

37    The consortium consists of independent companies, each with an internal structure of central monitoring stations and local handling stations. Each of these consortium members has its own customers whom the consortium member supports in cases of cyber-attacks on the customers' computer systems, just like an external IT service provider. When doing so, the consortium members help each other, for example by fending off cyber-attacks against the customer of another consortium member, either through personnel on site at the customer's computer system or by remote maintenance. The consortium system assists the



consortium members in coordinating their mutual support activities, *inter alia* by the communication of requests and reports, information on technical and personnel resources of the members and by the provision of a data repository open to all consortium members.

In detail:

### 2.2.1      Cyber Insurances and Role in Information Exchange Was Known

38      The idea of a cyber insurance was already more than a decade old at the priority date, and such insurances had already been commercially available for a long time. This alleged "core" of Plaintiff's alleged invention (cf. Counterstatement, page 18) therefore does not come from Plaintiff, and the rights to this idea cannot have been transferred to Plaintiff from its employees.

39      Promoting the exchange of information between companies through cyber insurance for the sake of better protection was even part of a government program for system critical infrastructure companies in 2013. In this regard, we are submitting the public report of the U.S. Treasury to the President, together with a press release of the White House of 6 August 2013, which provides a link to this report, as

**Exhibit HE 6**.

40      In particular the two aspects of cyber insurance addressed in the email by Mr. Sankar (**margin no. 18** above) of (i) detecting signs of attacks and weaknesses in the systems in real time by monitoring the systems of the insurance customers (see **margin nos. 41** and **43** below) and (ii) establishing minimum requirements for the protection against cyber-attacks which lead to a lapse of the insurance if they are not observed (see **margin no. 41** below) were already so well known that they made it into this government paper.

41      The following is stated, *inter alia*, in section 7 "Cyber Insurance" (page 23 *et seq.*, emphasis added):

> "The growth of the private cyber insurance market could lead to a <u>better understanding of cyber threat patterns and improved information sharing</u> between the government and insured firms. Because insurers need credible data to appropriately underwrite and price policies, insurance creates incentives for <u>standardized data collection and reporting.</u>"

and:

> "[...] <u>insurers can help</u> establish minimum cybersecurity standards, <u>monitor market threats,</u> and play an important compliance role."



[This is followed by a German translation.]

42    In this report, cyber insurance is described as a potential instrument for improving the exchange of information between the insured companies, as described in the introductory part of said report (page 5):

> "Private firms that are preparing to defend against an impending cyber threat, or recently experienced a cyber incident, might also have specific information that could help identify potential vulnerabilities, induce other firms to make new investments in security technologies, or aid them in taking additional steps to reduce the risk of cyber events."

[This is followed by a German translation.]

43    The following conclusion is drawn in section 1, "Enhancing Information Usage Capabilities to Support Information Sharing", of this report (page 8):

> "Critical infrastructure stakeholders suggested that <u>real-time information sharing would significantly improve cybersecurity by providing firms with quicker access to knowledge they need to pro-actively bolster their defenses.</u> This means improving and increasing the flow of information among critical infrastructure organizations about security threats observed by the organizations themselves, and the government's dissemination of such information to the private sector for preventive purposes."

[This is followed by a German translation.]

44    However, there were concerns regarding the exchange of information on a too large scale or between certain companies (page 8):

> "Although private firms recognize the value of receiving such information, they indicate that they may be hesitant to contribute to an information sharing program, principally out of liability concerns. For example, firms are apprehensive that their information, if confidential and not subject to any duty of disclosure, could become a matter of public knowledge and adversely impact their reputation, financial position, or result in litigation over the appropriateness of their public disclosures. [...] Stakeholders also expressed concern that information shared in good faith could, if disclosed to competitor firms, give those competitors an advantage."

[This is followed by a German translation.]

45    According to the report, one option to address these concerns is that information is only provided voluntarily, but in an automated and direct way, and to restrict which information is shared and with whom (page 9 *et seq.*):



*"To allay the foregoing concerns, information sharing can be highly targeted to deliver actionable information only to those with a need to receive and in a form that is anonymized. [...]*

*However, the Executive Order specifically calls for the establishment of a voluntary information sharing program for critical infrastructure organizations.*

*In order to fully participate in this program, critical infrastructure organizations must have the capability to send, receive, and act upon information about cyber threats and vulnerabilities. Adoption of the Framework could lead to the creation of more standardized information-sharing practices and policies, which would help these firms and others that adopt its measures to better utilize threat information for the timely and effective mitigation of cyberthreats within their environments."*

[This is followed by a German translation.]

46    The alleged invention by Plaintiff was thus not only generally known in skilled circles at the priority date. It was already so well known that it had even arrived in the general political discussion.

### 2.2.2    The Teaching of the Priority Application

47    Notwithstanding the above, Plaintiff's submission regarding the alleged "core" of the Applications in Suit is also incorrect. Since both Applications in Suit are based on the same priority application and comprise its disclosure, it is a matter of efficient presentation to start with the similarities emerging from this common origin and to explain the aspects added in the subsequent applications later. This also clarifies what was incorporated into the Applications in Suit as late as in October 2015, i.e. in no temporal relation whatsoever to the alleged communication and also after publication of Plaintiff's cyber insurance "concept".

48    Plaintiff has already submitted the priority application of the Applications in Suit, i.e. the provisional application US 62/066,716, designated as **FBD-V 22**. It remains Plaintiff's secret why this application is supposed to be confidential. It is freely available in the U.S. patent register.



49    Defendant's priority application (**FBD-V 22**), which has the title "*Dynamic Security Rating for Cyber Insurance Products*", discloses mechanisms for the dynamic and automated assessment of insurability of cyber risks regarding computing assets of a company with a certain risk profile or regarding certain products or services. Based on the determination, an adequate insured amount and a suitable insurance product can be electronically determined and offered (cf. in particular paragraphs [0028] and [0038]).

50    To select suitable insurance products, the technology of the Applications in Suit determines numerical values for three types of profiles:

- the "asset risk profile" (Fig. 3A);
- the "asset damage profile" (Fig. 3B); and
- the risk profile of a company to which one or more assets are attributed, i.e. the "company risk profile" (Fig. 3C).

51    For this purpose, the user determines so-called indicators which influence the value of the respective profile. This is summarized as follows in paragraph [0028], for example:

> "[...] based on one or more indicators of the asset risk profile, asset damage profile, and/or company risk profile, the technology determines one or more cyber insurance policies and/or products [...]"

[This is followed by a German translation.]

52    Examples of indicators are described in paragraph [0026] (but also in paragraphs [0027] and [0034] to [0037]):

> "[0026] [...] For example and as further described below, the technology can determine that an asset (e.g., a server) has a risk assessment of 8 out of 10 (i.e., 0.8) based on various indicators in that asset's profile, such as being a public server (i.e., a first indicator) operating using an older operating system and/or other software products (i.e., a second indicator) that has known vulnerabilities (i.e., a third indicator). That asset (e.g., the server described above) is also, in one or more embodiments, associated with a damage assessment, which is a measure of a company's estimated loss of capital and/or intangible losses (e.g., loss due to an adverse effect to company reputation) if the asset were compromised by a cyber-attack. Similar to the determination of the risk assessment, a damage assessment for the server mentioned above could be, for example, 3 out of 10 (i.e., 0.3) because the server stores lower valued webpages and, if compromised, would not negatively affect the company's reputation. [...]"

HOFFMANN EITLE

[This is followed by a German translation.]

53    The indicators can additionally be weighted, as stated in paragraph [0048] (but also paragraph [0050]):

> "[0048] In one implementation, the real-time damage assessment is computed by an algorithm that uses a weighted average technique. This technique assigns a first weight to an indicator representative of a likelihood of the occurrence of the one or more cyber attacks, assigns a second weight to an indicator representative of a the likelihood of success of the one or more cyber attacks, and a third weight to an indicator representative of the measure of severity of damage to the product of service. The weights can be indicative of the importance of each of the associated indicators of likelihood and/or measure."

[This is followed by a German translation.]

54    The indicators, optionally with their respective weights, are assessed for each of these profiles and thus a value, the "assessment value", is determined. We are again referring to paragraph [0026]:

> "[0026] In various embodiments the technology determines asset risk assessments, asset damage assessments, and customer risk assessments. Assessments are snapshots of real-time asset and/or company behavior based on various indicators and expressed as simple values, such as a number, percentage, hash, etc. [...] Each asset, in one or more embodiments, is associated with one or more profiles or other data structures ("profiles") that are associated with indicators that define asset and/or company characteristics and are used by the technology as variables for calculating assessment value."

[This is followed by a German translation.]

55    These assessments of the profiles are attributed an insurance product by means of a mapping, e.g. by a "Recommendation Engine" according to Fig. 4 of the priority application:



*FIG. 4*

HOFFMANN EITLE

56      As explained in paragraph [0026] as cited above, the assessments reflect the real-time value. These values are not static but are dynamically adjusted. We are reproducing Fig. 5 to illustrate:



*FIG. 5*

57      Due to the referral in step 514, changes in a profile result in a corresponding revision of the values attributed to the respective profiles (steps 504 to 508). In step 512, the algorithm can lead to an adjustment of the recommended insurance product.

58      This is further explained in paragraph [0028]:

> "[…] In various embodiments, the technology continuously, or on a schedule, updates the profiles based on changes to the assets or company (e.g., a new asset is added or an asset is recommissioned, critical data is moved, new vulnerabilities are discovered, etc.). In response to the changes to one or more of the profiles, the technology dynamically and automatically determines a new policy tailored to the changed profiles. This feedback technique allows the company to efficiently and comprehensively understand, in real time, where it has vulnerabilities and how best to insure against losses."

[This is followed by a German translation.]



59    Paragraphs [0043] *et seqq.* and Fig. 7 further describe the determination of an insurability rating for a product or service via the above-stated indicators and also based on historical data regarding the damage from previous cyber-attacks and real-time data indicating cyber-attacks that probably impair the value of the product or service. The insurability rating is supposed to make it possible to determine an insured amount that provides adequate coverage against the risk of one or more cyber-attacks.

60    In summary, the priority application teaches the determination of indicators attributed to profile types or a product or service, which can also be weighted. Based on these indicators, an assessment is made that determines the "assessment value" or insurability rating. An appropriate insured amount or an insurance product to be offered to the customer can be attributed to these assessments by means of a mapping, e.g. by a "Recommendation Engine" according to Fig. 4 of the priority application. The specific values, and thus possibly also the insured amount or the insurance product, are dynamically and in an automated way adjusted if the underlying indicators change.

### 2.2.3    Derivation from Defendant's Earlier Application

61    Before explaining the additional teachings added to the subsequently filed Applications in Suit, in view of close context, we will first address the patent application US 14/198,015 (publication number US 2015/0254766; "**US'766**") filed by Defendant already in March 2014. It is herewith submitted as

**Exhibit HE 7**.

62    As already stated in the Response to the Complaint and left unaddressed by Plaintiff, the technical teaching of the priority application, which is comprised in both Applications in Suit, has clear conceptional parallels with Defendant's earlier US'766. This confirms that Defendant had the underlying idea of the Applications in Suit in his hands before the alleged communication by Plaintiff in June 2014. Defendant developed the subject matter of the priority application from this underlying idea himself.

63    The parallels begin with the title since US'766 has the title "System and Method for Generating a Dynamic Credit Risk Rating for a Debt Security", which already shows that this application is also based on the predictive and dynamic analysis of risks, just like the priority application (title: "Dynamic Security Rating for Cyber Insurance Products") and thus ultimately also like the Applications in Suit.



64     The parallels become more obvious when comparing Fig. 5 of the priority application, as already reproduced above (margin no. 56) and shown below on the left, to Fig. 1 of US'766 shown below on the right:



*FIG. 5*

65     Both flowcharts provide a dynamic feedback between new information (Fig. 5: step 514; Fig. 1: step 110) and their assessment with regard to the respective target parameter. In the priority application, this is a reassessment of the profiles 504 to 508, which are in turn considered in the offered insurance product (step 512). In US'766, this is a reassessment of the attributes influencing the value of the bond or the company or municipality issuing the bond, which is considered in the evaluation ("score") and thus in the bond rating.

66     The teaching of US'766 is explained in more detail in the following paragraphs of the description:

> "[0006] [...] A system and method are provided that receive credit-worthiness, structured and unstructured debt security related data from disparate sources including but not limited to general economic data sources, government data sources, and proprietary data sources. Users can specify particular attributes of the received debt security related data and can specify weights for the attributes. An debt security credit rating algorithm computes a score for each debt security using the



*weighted attributes for the debt security and then determines a credit rating from the score. [...]*

*[0031] An embodiment can be understood with reference to FIG. 2, a flow diagram of receiving bond information. At step 102a, the algorithm receive cash flows, profitability, corporate structure, and other leadership and operational information about a company, when the bond is issued by the company. [...]*

*[0032] An embodiment can be understood with reference to FIG. 3, a flow diagram of determining or receiving weights for each bond attribute and determining values for each bond attribute. At step 104a, the algorithm determines or receives weights as input for each bond attribute, e.g. as described above. At step 104A, the algorithm determine values for each bond attribute, e.g. as described above. [...]*

*[0034] [...] The weighted attributes are used by the algorithm to generate a score and the score is used to determine a bond rating."*

[This is followed by a German translation.]

67   US'766 thus provides a system, in which the user determines attributes influencing the value of a bond and allocates weights to these attributes. The values of the attributes are regularly revised and processed with the weights by an algorithm to provide an evaluation (score). A bond rating is attributed to this score by means of a mapping.

68   As shown above, this is taught correspondingly by the priority application. The attributes of US'766 correspond to the indicators determined by the user in the priority application, which are allocated to the three profile types and which can also be provided with weights. An assessment is made for each of these profiles, which determines a value, i.e. the "assessment value" or insurability rating. Thus, these correspond to the "score" of US'766. By means of a mapping, these assessments are attributed an insurance product or an insurance amount in the priority application – instead of a bond rating as in US'766.

### 2.2.4 Further Disclosure and Claims of the Applications in Suit

### 2.2.4.1 Patent Application WO'919

69   WO'919, which has the same title as the priority application, "Dynamic Security Rating for Cyber Insurance Products", only adds a new Abstract and supplements a few details to the priority application. As an aid to the Chamber, we are submitting a version of WO'919, in which the passages of the description added in the subsequent application are highlighted in yellow, as

**Exhibit HE 8**.



70 The technical teaching is also reflected in the (provisional) claims of the Application in Suit. The independent method claim 1 of WO'919 can be broken down as follows:

[0] "A method for producing insurability ratings for a product or service, the method comprising:

[1] receiving, at a processor that is implemented at least in-part by electronic circuitry and coupled to a computer network, real-time data

  [1.1] indicative of cyber attacks

  [1.2] that are likely to diminish a value of the product or service

[2] using the processor to process the real-time data to compute a real-time damage assessment associated with losses to the product or service due to occurrence of one or more cyber attacks

  [2.1] the damage assessment computed using at least a likelihood of the occurrence of the one or more cyber attacks

  [2.2] a likelihood of success of the one or more cyber attacks

  [2.3] and a measure of severity of damage to the product of service as a result of the occurrence of the one or more cyber attacks

[3] using the processor to determine an insurability rating for the product or service that is usable for determination of an amount of insurance that sufficiently insures against the occurrence of the one or more cyber attacks, wherein

  [3.1] the insurability rating is determined at least in-part based on the real-time damage assessment

  [3.2] and is changeable in response to changes in the received real-time data."

71 Plaintiff has not shown that it had an invention in its hands, which anticipates all these features, let alone the preferred embodiments disclosed in the dependent claims and the description. And, as discussed above, Plaintiff has failed to comply with a U.S. court order to produce all pertinent documents regarding its alleged invention in the sec. 1782 discovery proceedings. This prevents Defendant from demonstrating with conclusive proof (without assuming the burden of proof) that Plaintiff never possessed any such invention.

72 The CyberMesh according to **FBD 5**, **FBD-V 11** and **FBD-V 12**, to which Plaintiff referred, and Plaintiff's own application submitted as **FBD 13** are directed at the exchange of information on characteristics of cyber-attacks, i.e. combining

information from third parties and from CyberMesh participants to inform participants about the characteristics of current cyber-attacks, and thus making it possible for them to protect themselves better against cyber-attacks. In addition, CyberMesh participants can also exchange information directly for the same purpose.

73    The email of Mr. Sankar to Defendant (**FBD 6**) goes in the same direction, since he also wants to detect weaknesses in the IT systems of insurance customers by collecting information on cyber-attacks targeting them, to set minimum standards to be observed or the insurance lapses, and to provide the gathered information to the insurance customers for their better protection.

74    All of this fails to disclose the teaching of the independent claim. Where Plaintiff asserts in abstraction that the application was also "able to retrieve and provide such parameters and risk factors necessary for an assessment of the security risks and by that also of the insurance policy" (Counterstatement, section C.I.2), this is unsubstantiated and therefore cannot be commented on. It remains unclear which parameters and risk factors are allegedly provided and what "assessment" is supposed to mean in this context. As a precaution, however, <u>we are also denying this by pleading ignorance</u> that it is meant within the terms of the Applications in Suit.

75    In Plaintiff's opinion, a technical teaching and thus a subject matter which is in principle eligible for protection by a patent lies specifically in the description (Counterstatement, page 53 *et seq.*). This is incorrect (regarding lack of patentability, see **section 2.6.2**). However, in particular if this is supposed to be the technical "core" of WO'919, Plaintiff would at least have to set out conception of invention and communication to Defendant in this regard as well.

76    Plaintiff refers to real-time monitoring as disclosed in paragraphs [0007], [0008] and [0012] as well as in claim 19 of WO'919. According to the cited passages of disclosure, the real-time monitoring has to relate to data attributed to a product or service and suited to quantify a diminution in value of the product or service, i.e. providing real-time damage assessment ("real time damage assessment associated with losses to the product or service due to the occurrence of one or more cyber-attacks"; cf. claim 19 and paragraphs [0007] and [0012]). Real-time damage assessments are moreover to be computed continuously over a defined time period to enable statistical evaluations (cf. paragraph [0008]).

77    Although Plaintiff wants to recognize this as the alleged technical teaching, Plaintiff has failed to set out that it possessed the technical teaching or communicated it to Defendant.

78    Moreover, Plaintiff refers to the continuous monitoring disclosed in paragraph [0034], where the following is stated:



*"The technology can continuously or semi-continuously monitor the company's network for any changes to assets and, if changes are detected that could affect the company's exposure to a cyber attack, information associated with the detected changes is fed back to aspects of the technology that are configured to determine new/modified cyber insurance policies/products."*

[This is followed by a German translation.]

79    In this regard, Plaintiff has also failed to set-out that it possessed a technical teaching that performs such continuous monitoring of the IT assets of an insurance customer, including the information whether a new IT asset has been added or an asset has been recommissioned and whether critical data has been moved to another IT asset (see paragraph [0040]).

### 2.2.4.2    Patent Application WO'049

80    The additions in the patent application WO'049 with the title "Joined and Coordinated Detection, Handling, and Prevention of Cyberattacks" are more comprehensive. Just as in WO'919, the teaching of the dynamic insurability rating for cyber insurance products has been supplemented with a few details. Moreover, the consortium system has been added in WO'049 – and only in WO'049, not in WO'919, essentially as paragraphs [0083] to [0140] and Fig. 10 *et seqq.*

81    As an aid to the Chamber, we are also submitting a version of this application, in which the passages of the description added in the subsequent application are highlighted in yellow, as

**Exhibit HE 9**.



82      A consortium according to the teaching of WO'049, which is supposed to provide joined and coordinated detection, handling, and prevention of cyber-attacks, is described in its basic structure in Fig. 10, as reproduced below and highlighted in color so as to be recognized more easily:



*FIG. 10*

83      There are three different levels. The <u>consortium system</u> 1002 is at the top. The <u>consortium members</u> are arranged below, illustrated exemplarily as company A and company B, which in turn consist of central monitoring stations (see blue and red rectangles) and local handling stations (see blue and red ovals). The <u>client computer systems</u> (CCS) are on the third level, but they are not highlighted in color here. By way of example, this figure only shows the client computer systems of company A, 1010a to 1010f, which are thus all highlighted in gray (see paragraph [0087]: "In this example, company A has its client computer systems 1010a-1010f, and company B has its client computer systems that are not shown."). As explained below, the consortium members (i.e. company A and company B) act as external IT service providers for their customers.

84      In paragraphs [0087], [0088] and [0092] to [0101], the equipment, locations and internal network connections and internal system components of the consortium members are further described.

85      The basic idea of the consortium technology is the joint and coordinated handling of cyberattacks, as already apparent from the title of the patent application, i.e.



the provision of technical and human resources by another consortium member in case of a cyberattack, as described e.g. in paragraph [0090]:

> "The central monitoring station 1004a [of company A] determines that company B has a local handling station near the client computer system 1010e and informs one of company B's central monitoring stations 1006a of the need for human resources. The central monitoring station 1006a can then request the local handling station 1012a, which is located near the client computer system 1010e, to handle the attack. The local handling station 1012a then visits the client location and works directly with the client computer system 1010e."

[This is followed by a German translation.]

86    In case of a cyberattack on a client computer system, the central monitoring station of a consortium member determines the suitable strategy on the basis of various factors on how to react to this attack either on site or remotely with technical and human resources, and handles the attack accordingly either with own resources and/or resources of another consortium member or the consortium system (paragraphs [0115] to [0119]).

87    The consortium system registers consortium members (paragraph [0097]) and assists them in, or coordinates, the handling of a cyber-attack by one or more consortium members. For this purpose, e.g. the human and technical resources of the consortium members are determined on the basis of various factors, and the best suited member is instructed by electronic means to handle the cyberattack either on site or remotely (paragraphs [0007], [0105] to [0112], [0114]). The consortium system moreover has a database, in which e.g. requests for support by another consortium member (paragraph [0090]) or reports on how the attack was handled by the other consortium member (paragraph [0091]) are recorded. This database is available to all consortium members (paragraphs [0007], [0091], [0102], [0113], [0121] *et al.*) so that experts of the consortium members analyze the data, for instance, and can draw conclusions for a better defense against cyberattacks in the future.

88    In a summary in paragraph [0008] of the patent application, the advantages of the system are described as follows:

> "The monitoring consortium enables stronger capabilities than any individual monitoring company can offer by the combination and coordination of the efforts and resources of the members. Clients therefore enjoy a superior level of security for their computer systems, which maximizes the confidentiality, integrity, and availability of their data and business operations and minimizes their waste of resources and mental pain and suffering."

HOFFMANN EITLE

[This is followed by a German translation.]

89    This teaching is also reflected in the (provisional) claims of the Application in Suit. The independent method claim 12 of WO'049 can be broken down as follows:

[0]    "A computer implemented method of managing a consortium of monitoring systems which detect and handle cyberattacks, comprising:

[1]    registering each of a plurality of monitoring systems as a member in response to corresponding registration requests for becoming a member of the consortium of monitoring systems

[1.1]    wherein each of the monitoring systems is associated with a distinct, independent business entity

[1.2]    and each of the monitoring systems comprises one or more central monitoring stations, each of the central monitoring stations comprising

[1.2.1]    a processor and a memory

[1.2.2]    and monitoring one or more client computer systems for cyberattacks to the client computer systems

[1.2.3]    and associated with one or more specialists who can physically work with the client computer systems,

[1.3]    and wherein at least one of the monitoring systems comprises one or more local handling stations;

[1.4]    [the consortium system]

[1.4.1]    receiving a report in electronic format from a first member coupled to a computer network;

[1.4.2]    processing the electronic report to detect a cyberattack to a client computer system of the first member;

[1.4.3]    responding to the cyberattack with the first member and a second member,

[1.4.4]    wherein the second member assigns computing or human resources for mitigating the cyberattack; and

[1.4.5]    updating a repository of data related to cyberattacks accessible to members of the consortium."

90    Plaintiff has not shown that it had possession of an invention that anticipates all these features, let alone the preferred embodiments disclosed in the dependent claims and the description. Moreover, as explained, Plaintiff has defied the U.S.



court order to produce all pertinent documents in the sec. 1782 discovery proceedings, which Plaintiff itself initiated. This prevents Defendant from demonstrating with conclusive proof (without assuming the burden of proof) that Plaintiff never possessed any such invention.

91    The CyberMesh application referred to by Plaintiff is solely directed at combining information of third parties and participants (directly, or indirectly via a central instance) to apprise the participants more comprehensively as to the characteristics of current cyberattacks, such as known computer viruses or IP addresses from which attacks originated, thus enabling them to better defend against such cyberattacks.

92    This does not disclose in particular the three-level basic structure of the consortium according to WO'049, with the central system that registers members (features [0] and [1]), with the members of the consortium, which are designated as "monitoring systems" and which are independent companies (features [1.1] and [1.2]), and which in turn monitor the computer systems of their clients (feature [1.2.2]). This does not disclose the internal structure of the consortium members with central monitoring stations and local handling stations either (features [1.2] and [1.3]). Nor is the joint and coordinated handling of cyber-attacks by providing technical and human resources by the consortium members disclosed (features [0], [1.4.3] and [1.4.4]). Plaintiff's CyberMesh also fails to provide a joint data repository of the participants, which is accessible to all participants (feature [1.4.5]), since the CyberMesh instances, including the central instance, decide themselves which data they make available to other instances such as the participants.

93    In Plaintiff's opinion, a technical teaching and thus a subject matter which is in principle eligible for protection by a patent lies in particular in the description also with regard to WO'049 (Counterstatement, page 53 *et seq*.). This is incorrect also in this regard (as to lack of patentability, see **section 2.6.2**). However, if this is supposed to be the technical "core" of WO'049, Plaintiff would at least have to set out conception of invention and communication to Defendant in this regard as well.

94    First, Plaintiff refers to continuous monitoring. As already stated above in margin no. 78 *et seq*., Plaintiff has failed to set out in a substantiated manner that it had possession of a technical teaching, which performs continuous monitoring of the IT assets of an insurance customer, as to whether a new IT asset has been added or an asset has been recommissioned and whether critical data has been moved to another IT asset (paragraph [0046]). The same applies to the indicators stated in Fig. 3 of WO'049, the continuous monitoring of which is also referred to by Plaintiff.



95    Second, Plaintiff refers to real-time monitoring based on which the computer system automatically and dynamically makes adapted decisions. As already stated above in margin no. 76 *et seq.*, Plaintiff has failed to set out in a substantiated manner that it had possession of a technical teaching, which monitors data attributed to a product or service in order to facilitate a real-time damage assessment of the product or service and which also would have performed it (WO'049, paragraph [0043]). Plaintiff has also failed to set out possession of any invention regarding the automatic and dynamic adaptation of an insurance product based on changes in the indicators of one of the three profiles stated in paragraph [0046] of WO'049 (cf. margin no. 50 *et seqq.*).

96    Third, Plaintiff claims technical subject matter in the criteria of how certain requests are generated in the system. Plaintiff refers *inter alia* to claim 4, according to which a first consortium member sends a request to a second consortium member for resource support to handle a cyberattack based on the criterion that a comparison of the required and available resources of the first consortium member results in that it cannot satisfy the need. Paragraph [0115] of WO'049 teaches criteria for a request to a local handling station for working on-site on a client computer system, i.e. the scope of impact of the cyberattack, the location, nature, the scale of the client computer system, and the urgency of handling the cyberattack. It is disclosed in paragraph [0118] of WO'049 that, if the consortium members do not have sufficient human resources to handle a cyberattack, a request is sent to local or national security agencies. Fig. 16 discloses a comprehensive decision tree for handling a cyberattack and the criteria for handling it on-site or remotely and, optionally, corresponding requests to local handling stations or other consortium members.

97    Fourth, Plaintiff claims technical subject matter in that certain weights are applied automatically on the basis of averages, using historical information. This includes: (i) the number of previous cyber-attacks against the product or service, (ii) the rate of success of previous cyber-attacks against the product or service, (iii) the amount of damage to the service or product caused by the previous cyber-attack(s), and (iv) the frequency of occurrence of cyber-attacks against other entities that offer products or services that are similar to the product and service (WO'049, paragraph [0070]). As regards insurability ratings over certain periods, more recent insurability ratings are to be given greater weight (paragraph [0071]).

98    Although Plaintiff argues that these subject matters are technical and thus a potential basis for patentability of WO'049, it fails to set out in a substantiated manner that Plaintiff possessed the invention regarding all these aspects.

99    Finally, as already shown, WO'049 also comprises the entire disclosure of WO'919, and therefore our further statements in **section 2.2.4.1** regarding WO'919 apply here as well.



### 2.3 Plaintiff's Submission as to the Alleged Conception of Invention

100    Thus, Plaintiff's submission as to the alleged conception of invention is insufficient for the reason alone that it did not use the actual subject matter of the Applications in Suit as a parameter. It has not substantiated the conception of invention either with regard to the features of the (independent) claims or the features of the description emphasized as potentially patentable technical teachings by Plaintiff itself, let alone the further disclosures in the description and the figures.

101    Moreover, the following is to be noted on Plaintiff's submission in the Counter-statement as to the alleged conception of invention:

#### 2.3.1 The Alleged CyberMesh "Invention" of Plaintiff

102    Defendant does not deny that Plaintiff has worked on some sort of cyber technology and marketed a software application called CyberMesh. On the contrary, according to our submission (RtC, margin no. 117) which has not been disputed, Plaintiff published this product long before the priority date of the Applications in Suit and also before the date of the alleged communication to Defendant, by the brochure submitted as *Exhibit HE 4* and in YouTube videos. Document *FBD-5* initially submitted by Plaintiff as purported proof of an alleged conception of invention is obviously and undisputedly an advertising brochure.

103    In its advertising brochure from the year 2013 (*Exhibit HE 4*), Plaintiff shows the following scheme and writes, *inter alia*:



*The Palantir Cyber Mesh is a platform for secure information sharing among peers.*

"THE CYBER MESH

*Recognizing that commercial institutions face a shared set of cyber threats, we created the Cyber Mesh, a platform for secure information sharing among peers. Drawing on successful models within the defense and intelligence communities, the Cyber Mesh enables secure peer-to-*



*peer sharing between enterprises with automatic redaction of sensitive data. A centrally hosted Palantir instance provides out-of-the-box cyber intelligence feeds, rolled up from suspicious activity patterns, third-party open source and licensed data feeds, and contextual data feeds. By letting organizations leverage the subject matter expertise of Palantir engineers and insights from peer institutions, the Mesh provides immense analytic value over automated black box solutions.*

*PALANTIR'S CYBER INTELLIGENCE FEED*

*Palantir's Cyber Intelligence Feed is a weighted data feed of Indicators of Compromise (IOCs) drawn from open source and Cyber Mesh participants. Palantir automatically correlates the Feed against customer-owned data sets and presents algorithmic-based alerts for investigation." (page 4)*

[This is followed by a German translation.]

104    This discloses that CyberMesh provided a central instance transmitting information on cyberattacks and risks to the participants in "feeds". This information originates from Plaintiff, third parties or other participants. The software allows the automated comparison of own data with the received information on cyber risks.

105    The exchange of information between the participants (peer-to-peer) is also described here, for example in the diagram shown above between Bank 1 and Bank 2, with automatic removal of confidential data. Participants can decide for themselves the extent to which they share data, so that their need for confidentiality is taken into account, as illustrated exemplarily in this diagram from the same document:

| DATA | SOURCE | BANK 1'S PERMISSIONS | BANK 2'S PERMISSIONS |
|---|---|---|---|
| SUSPICIOUS IP ADDRESS | Proxy | NO ACCESS | FULL ACCESS |
| MALICIOUS DOMAIN | Proxy | NO ACCESS | FULL ACCESS |
| SUSPICIOUS PROXY ALGORITHM | ntdn(repository) | READ ACCESS | READ ACCESS |

*The Palantir Security Model protects data from unauthorized use, allowing organizations to maintain strict access controls. Administrators can assign specific permissions to all data.*

106    The internal documents **FBD-V 11** and **FBD-V 12** designated – for whatever reason – as confidential do not add anything of relevance to the present proceedings.



They merely show additional details such as which data sources of third parties Plaintiff wanted to integrate into its feed in CyberMesh.

107    The same applies to US 61/942,480 submitted as *FBD 13* which also describes a system that collects information from participants on cyber-attacks, redacts confidential information and generates rule sets from the information, by means of which the application implemented at the participants can take security measures. As shown, all of this was already described in the advertising brochure from the year 2013 (*Exhibit HE 4*).

108    This content of Plaintiff's CyberMesh "invention" allegedly communicated to Defendant under implied confidentially, as set out in the Counterstatement in sections C.I.1 and C.I.3, was thus undoubtedly <u>not confidential,</u> but was distributed to the public in several manners of publishing by Plaintiff – undisputedly – months before the alleged communication to Defendant in June 2014. The section 1782 Discovery has confirmed that Plaintiff publicly promoted CyberMesh before and after June 9/10, 2014, through a simulation on its website and by sending brochures as the above to various potential customers.

109    The term consortium is never mentioned in the documents on CyberMesh. Obviously, it is repeated (*ad nauseam*) in Plaintiff's Brief merely to create a feigned similarity to WO'049.

110    What is in particular not apparent from the submitted documents is the assertion that CyberMesh also comprised a component "to control [...] the defense against cyber-attacks on individual clients for the consortium" (Counterstatement, page 16, but also pages 8 and 10). Plaintiff's submission is – probably with good reason – again very general. It is not rendered more precise what is meant by "controlling the defense against cyberattacks", in particular not whether this is in fact not only the transmission of information on suspicious IP addresses and other activity patterns.

111    In public documents on CyberMesh before and after the alleged communication to Defendant, CyberMesh is consistently described merely as a platform for the exchange of information. For example, we are submitting a further publication by Plaintiff from August 2014 on its entire package of applications, with which clients are supposed to handle cyber-attacks, as

**Exhibit HE 10**.

112    If the Chamber regards the submission on CyberMesh, where it goes beyond the content of the submitted documents, to be sufficiently substantiated, <u>as a precaution we are denying by pleading ignorance</u> that CyberMesh comprised a component for controlling the defense against attacks within the terms of WO'049.

HOFFMANN EITLE

### 2.3.2        The Provisional U.S. Application US 61/942,480

113    Plaintiff's U.S. application US 61/942,480 does not describe a cooperation in the handling of cyberattacks by measures on computer systems of third parties by a consortium member, but merely describes a system through which more or less structured information on cyberattacks are transmitted via a security sharing system. Thus, it is a "joined security system" only in the sense that it is a system for exchanging knowledge on cyberattacks, just as CyberMesh.

114    It is to be pointed out here that this priority and a further priority were also claimed by the subsequent application EP 2 911 078 ("**EP'078**"). The disclosure of this U.S. application was published on 26 August 2015 with EP'078, already submitted as *Exhibit HE 1*, i.e. before consortium aspects were incorporated for the first time into a patent application of Defendant with the (subsequent) cyber consortium application WO'049 on 21 October 2015.

115    The European Patent Office issued Communications regarding this and a further EP member of the same patent family, EP 2 911 079 ("**EP'079**"), which are herewith submitted as

**Bundle of Exhibits HE 11**

116    In both Communications, the EPO sets-out that the applications do not disclose technical problems or solutions going beyond general technical knowledge and therefore these applications do not contain a patentable disclosure.

117    After the summons to attend oral proceedings, Plaintiff immediately abandoned EP'079. Although the Examining Division also points out in EP'078 that – due to a lack of disclosure of a technical teaching going beyond generic concepts and elements – the objection of obviousness pursuant to Art. 56 EPC appears insurmountable ("Additionally, at least the Art. 56 EPC objection appears to be unsolvable"), Plaintiff will probably maintain the application to the bitter end in view of the present proceedings so that Plaintiff does not have to concede even more clearly that its alleged invention is not more than the software implementation of a business model based on generic computer systems.

### 2.3.3        The Alleged Cyber Insurance "Invention" of Plaintiff

118    In the Counterstatement, Plaintiff also does not rebut that its alleged cyber insurance "invention" was nothing other than a collection of ideas on a future development, but by no means a finished technical invention (RtC, section 5.3). The email by Shyam Sankar refutes the assertion that such an application had already been developed.

119    Plaintiff also had to backpedal as to who allegedly had the idea of an application for better assessment of cyber risks in the scope of an insurance. While Plaintiff



attributed this idea to itself in the Complaint (page 16), it now sets forth in the Counterstatement that unnamed customers allegedly had this idea (Counterstatement, page 16). This would confer rights – if this idea were to constitute a creative contribution or even an invention – to the customers or their employees, and not to Plaintiff.

120    We are denying by pleading ignorance as to Plaintiff's submission that in the year 2013 customers approached Plaintiff and allegedly reported difficulties in deter-mining appropriate prices for insurances against cyberattacks and that corres-ponding rights passed to Plaintiff.

121    The submission is also unsubstantiated since Plaintiff fails to name said customers and it is also not plausible since Plaintiff is a software company which has no recognizable expertise in the assessment of insurance risks.

122    We are further denying by pleading ignorance Plaintiff's submission that it developed an application able to retrieve and provide in real time such parameters and risk factors necessary for an assessment of the security risks and by that also of the insurance policy. This submission is also unsubstantiated since Plaintiff does not set forth which parameters and risk factors are provided, for example. It is also significant that Plaintiff as a professional software company which is bound to document developments cannot submit any documents regarding the supposedly market-ready application.

123    As already demonstrated in the Response to the Complaint (margin no. 130 *et seqq.*), the email by Mr. Sankar submitted as **FBD 6** is evidence that, on the contrary, Plaintiff only had a business idea in June 2014. It does not show an "application", as now asserted by Plaintiff. Mr. Sankar writes that they are <u>exploring</u> ("we are exploring") launching a cyber insurance business (emphasis added):

> is substantially more sophisticated (presents greater opportunities). We are exploring launching our own cyber insurance business (in partnership with a traditional insurer) that takes a more active role. We'd

124    For this a tremendous amount of operational know how would be needed on both the cyber end and the insurance end. According to Mr. Sankar, they are (only) confident about what they are able to do on the cyber end, but need help from third parties for the insurance end (emphases added):

> There is a tremendous amount of operational know how needed here on both the cyber end and the insurance end. We feel confident about what we can do on the cyber end (we just thwarted another attempt by the Iranian intelligence to get inside Palantir — using a sophisticated, brand new zero day exploit). But we need to partner with an entrepreneurial insurance or reinsurance company.

125    The plan was monitoring networks of customers for attacks and weaknesses, prescribing quarterly security measures for customers, and letting the insurance lapse if these are not implemented (see also **FBD 6**, page 4 and RtC, margin no. 130 *et seqq.*).



126    Mr. Sankar clearly speaks about a future development and in his email only expresses platitudes as already formulated e.g. in the above-stated report of the U.S. Treasury (margin no. 40 *et seqq.*).

### 2.4    Alleged Communication of the Alleged Conception of Invention

#### *2.4.1    Submissions are Unsubstantiated and Incorrect*

127    Plaintiff asserts that in a discussion in June 2014 Kevin Kawasaki told Defendant about "systems for the defense against and assessment of cyberattacks and related risks" that had allegedly been developed by Plaintiff (Counterstatement, page 25). The submission leaves it unspecified whether Plaintiff claims that more was said than "Palantir developed systems for the defense against and assessment of cyberattacks and related risks", which would not have been a communication of the asserted conception of invention.

128    Even if this was supposed to mean that Kevin Kawasaki communicated details regarding these systems to Defendant, the submission is still unsubstantiated since it is not specified <u>how</u> this defense was to be performed and <u>which</u> risks were allegedly assessed. As already shown, Plaintiff has not submitted any documents confirming the development of such a system, in particular not one which dynamically assesses damage risks in the manner of the Applications in Suit and in which, as taught in WO'049, consortium members collaborate with human and technical resources to handle cyberattacks against clients of a consortium member.

129    As a precaution, it is <u>denied</u> that Kevin Kawasaki communicated the teachings disclosed in the Applications in Suit to Defendant in June 2014. Indeed, in the U.S. proceedings Plaintiff has conceded that Mr. Kawasaki has not done so. Therefore, he is purported not to be relevant for the sec. 1782 discovery (excerpt from an Email by David Livshiz, Freshfields of May 26, 2020 to Defendant's US counsels; emphasis added):

> other individual should be included, please identify them and we will consider them in good faith.  As for Mr. Kawasaki, as we have previously informed you, we have determined that Mr. Kawasaki did not communicate the technology underlying the Cyber Patents to Abramowitz.  The fact that Mr. Kawasaki connected Abramowitz with Mr. Sankar does not make Mr.

[This is followed by a German translation]

130    The assertion that Shyam Sankar told Defendant about "details of the cyber insurance and CyberMesh inventions of Plaintiff" in the meeting on 10 June 2014 is also unsubstantiated (Counterstatement, page 27 *et seq.*). These alleged inventions are only very generally described by Plaintiff here and in other sections, and it has not been set forth which "details" were allegedly communicated.

131    Plaintiff's submission regarding the alleged communication of such "details" is also contradictory. Plaintiff emphasizes, on the one hand, that Defendant, as a business man and investor, did not even have the necessary knowledge to



develop the subject matter of the Applications in Suit. On the other hand, in this discussion that took approximately one hour and undisputedly dealt with other topics as well, Plaintiff allegedly communicated the comprehensive "details" of the Applications in Suit to Defendant although he could not have understood these details anyway in Plaintiff's opinion.

132    Where Plaintiff describes slightly more specifically the content of what has been communicated "in particular", this confirms that the alleged inventions of Plaintiff were limited to a system for exchanging knowledge on cyber-attacks, such as CyberMesh, which is far away from the subject matter of the Applications in Suit, and, as stated above, was not confidential information, but was then part of Plaintiff's product portfolio.

133    Defendant **denies** that details of the Applications in Suit were communicated to him in this discussion.

134    Should the Chamber hear the named witness for the one-on-one meeting with Shyam Sankar, for which there is no reason at present since Plaintiff even fails to comply with its burden of substantiation, we are requesting out of precaution that Defendant also be heard since both parties must be given an equivalent opportunity to present their case.

135    Plaintiff concedes that Defendant was <u>not</u> told that the participants were allowed to decide for themselves "which data they want to share and which they do not" (Counterstatement, page 27). According to Plaintiff, this had always been a feature of all of Plaintiff's applications commercially available at that time. However, this firstly does not mean that it was also possible in the application allegedly described by Plaintiff, and secondly this is thus also not a feature communicated confidentially.

### 2.4.2    No Confidentiality Obligation

136    As has been shown the Information allegedly communicated to Defendant were not confidential but had been shared by Plaintiff with the public months before. At the latest when communicating them to the Defendant, regarding any content of the conversation all confidentiality has been relinquished since Defendant was not under any obligation of confidentiality when speaking with Mr. Sankar.

137    Plaintiff simply asserts that its asserted communications to Defendant were confidential "since the latter had been acting as a confidant, investor and adviser to Plaintiff for many years and understood that he was obligated to use the information provided to him confidential and use it only for Plaintiff's benefit" (Counterstatement, Page 25 under II.). This is incorrect. Under the applicable U.S. law, a duty of confidentiality can only be based either on a contractual or a particular relationship between the parties. Neither is the case here.



### 2.4.2.1    No Contractual Confidentiality Obligation

138    In the U.S. action pertaining to an alleged misappropriation of trade secrets already referred to in Defendant's Response (c.f. No. 33), Plaintiff has based its allegations of confidentiality on three contracts:

- the "**2012 Transfer Agreement**", a Stock Transfer Agreement dated August 14, 2012, by and among Akkadian Ventures II, LP, Plaintiff and the Marc Abramowitz Charitable Trust No. 2 (the "**Trust**");

- a so called "**Single Visit NDA**" entered into with Defendant for the duration of a single day on July 12, 2014; and

- the "**2015 Transfer Agreement**", a Preferred Stock Transfer Agreement dated June 17, 2015, by and among Highbridge International LLC, Plaintiff und KT4 Partners LLC ("KT4").

We reserve to hand these contracts (together the "**Confidentiality Contracts**") – without accepting the burden of proof – to the court files should Plaintiff dispute their content as briefly summarized in their relevant aspects below.

139    The 2012 Transfer Agreement was signed in connection with the sale of Plaintiff's shares by the Trust. The confidentiality provision only covers (1) information that the Trust received during "the exploration, negotiation, execution, and closing of this Agreement" and (2) information that the "Seller"—i.e., the Trust—received "in its capacity as a stockholder of the Company <u>following</u> the date of th[e 2012 Transfer] Agreement." The Trust ceased being a shareholder of Plaintiff in August 2012. Thus, the confidentiality provision under the 2012 Transfer Agreement does not apply to any information that Plaintiff claims to have provided to Defendant in connection with the Applications in Suit.

140    The Single Visit NDA was signed by Defendant during a single visit to Plaintiff's office. It only covers information that Defendant received during his single visit on July 12, 2014. It does not extend to information disclosed to Defendant on any other day, and certainly does not apply to information that had previously been disclosed. The Single Visit NDA cannot retroactively apply to the alleged information that was communicated to Defendant already on June 9/10, 2014 without any duty of confidentiality, thus becoming directly available to the public.

141    The 2015 Transfer Agreement – as the 2012 Transfer Agreement – was signed in connection with the sale of Plaintiff's shares, this time by KT4. The confidentiality provision therein reflects the provision under 2012 Transfer Agreement, i.e. again only covers (1) information that KT4 received during "the exploration, negotiation, execution, and closing of this Agreement" and (2) information that the "Seller"— i.e., KT4 — received "in its capacity as a stockholder of the Company <u>following</u> the date of th[e 2015 Transfer] Agreement." Plaintiff does not claim, nor could it credibly claim, that it disclosed confidential technical



information to Defendant in connection with KT4's sale of its shares. Since the alleged communication of possession of the invention supposedly took place on June 9/10, 2014, such information does not fall under the second alternative of the information received following the date of the 2015 Transfer Agreement, and even if the Agreement were to provide this, a retroactive declaration of confidentiality would not be effective, as already stated.

142    Therefore, Plaintiff cannot rely on any of the Confidentiality Contracts to establish a confidentiality obligation of Defendant regarding the information allegedly communicated on June 9/20, 2014.

143    Should Plaintiff attempt, irrespective thereof, to use the Confidentiality Contracts to substantiate a duty of confidentiality, it would also contradict its own submission in the injunction proceedings (court docket: 21 O 2568/20), where it set forth that "the Confidentiality Contracts do not bar the German proceedings" (Plaintiff's request of 2 March 2020).

The reason for this is that in that case, the forum-selection clauses contained in all three Confidentiality Contracts would also have to be considered, which provide exclusive jurisdiction of the courts in California "for the purpose of any suit, action or other proceeding arising out of or based upon" the 2012 Transfer Agreement or the 2015 Transfer Agreement, and "for any action arising out of or relating to the subject matter of" the Single Visit NDA respectively.

### 2.4.2.2    No confidentiality obligation under California law

144    There are no other reasons for a confidentiality obligation of Defendant regarding the communication with Mr. Sankar on June 9/10, 2014.

145    The mere fact that Defendant owned some stock in Plaintiff – what is more, indirectly through an entity – does not give rise to a confidentiality obligation. Fiduciary duties that could give rise to an obligation of confidentiality do not exist for minority shareholders pursuant to the applicable law (*Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989).

146    Pursuant to California law, a duty of confidentiality does not arise from the fact that in the course of their business relationships parties gained trust in each other (*City Sols., Inc. v. Clear Channel Commc'ns*, 201 F.Supp.2d 1048, 1050 (N.D. Cal. 2002)). Trust is gained in almost any commercial relationship in which a mutually beneficial arrangement is sought (*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008)). To establish a fiduciary or other duty of confidentiality, it is necessary that the parties do not deal on equal terms ("the essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms"; *City Sols.*, 201 F.Supp.2d at 1050). A party can only invoke an implicit duty of confidentiality if it is able to assert being particularly in need of protection (vulnerable) and has to be protected since it could not effectively



protect itself ("whether one party was so vulnerable that it could not effectively protect itself"; *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, 2011 WL 3703192, at *4 (S.D. Cal. Aug. 23, 2011)).

147     Plaintiff, a large data analytics company with hundreds of employees cannot assert that it could not have effectively protected itself from Defendant, a private investor. The Confidentiality Contracts stated above show in particular that Plaintiff could easily have concluded a confidentiality agreement, had this been Plaintiff's intention. Because Plaintiff was thus never "vulnerable" to Defendant, the communication with Defendant was not subject to an implicit duty of confidentiality pursuant to the applicable law.

148     Thus, at the latest when allegedly communicating its purported inventions to Defendant, Plaintiff has disclosed its alleged inventions to the public, thereby depriving itself any and all rights to a patent in this regard.

149     Should the panel — notwithstanding the burden of proof — wish Defendant to further assist the court in its **e**x-officio investigation of US law in this or any other context, we politely ask for a respective indication by the court.

**2.5     Defendant's Own Development**

150     As shown in **section 2.2.3**, the subject matter of the priority application of the Applications in Suit, as explained in **section 2.2.2**, was conceptually clearly based on a patent application of Defendant which was already filed at the beginning of March 2014, i.e. <u>before</u> the alleged communication of conception of invention by Plaintiff in the summer of 2014.

151     During the 2008 financial crisis, Defendant lost significant amounts of money in part since the poor bond rating systems caused the rating agencies (Moody's, Standard & Poor's and Fitch) to disseminate inaccurate ratings for corporate and municipal bonds. Defendant identified a need for a better bond rating methodology.

152     By 2012, Defendant had conceptualized using dynamic real-time data to create and disseminate accurate ratings for corporate and municipal bonds. Defendant later retained John Squires and his law firm at the time, Perkins Coie LLP to assist him in securing patent protection for his ideas.

153     John Squires, currently Chair of the Emerging Companies and IP Practices in the New York office of Dilworth Paxson LLP, was one of the foremost experts on the patenting of business methods. He co-authored several amicus briefs in the seminal Bilski-case before the U.S. Federal Circuit Court and the U.S. Supreme Court (*In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) and *Bilski v. Kappos*, 561 u.S. 593 (S. Ct. 2010), where the legal position advanced by John Squires on the patenting

of business methods prevailed. He also provided testimony on this to the U.S. Senate Judiciary Committee.

154     In 2013, Defendant and John Squires discussed Defendant's ideas for using dynamic real-time information, in particular to provide dynamic bond ratings. Based upon the inventions discussed at a meeting in November 2013, on March 5, 2014 Mr. Squires initially filed Defendant's first patent application, the application US'766 discussed above in **section 2.2.3**.

155     Accordingly, Defendant already had the underlying concept of the Applications in Suit in his hands for a long time and developed this to the subject matter of the priority application together with his patent attorney and the patent attorney's technically qualified staff.

        **Evidence:**        Testimony by John A. Squires

156     The subject matter of the priority application has been incorporated into WO'919 without significant amendments, but is also part of the disclosure of WO'049. Both subsequent applications were also prepared by Defendant together with his patent attorney and the patent attorney's technically qualified staff.

        **Evidence:**        Testimony by John A. Squires

157     The documents confirming this development of the subject matter of the Applications in Suit did not have to be disclosed in the Sec. 1782 discovery proceedings since they are subject to the attorney-client privilege. It is incorrect to allege that Defendant did not develop the subject matter of the Applications in Suit himself. Disclosing these documents in the present proceedings could expose Defendant to further abusive procedural claims by Plaintiff in the USA. We are therefore reserving the right to disclose these documents only at the hearing, if necessary.

158     Plaintiff further invokes that Defendant, as a business man and investor, could not even have developed the subject matter of the Applications in Suit himself. The Applications in Suit are business method patents and therefore are within the field of expertise of Defendant as a business person who earned a bachelor of arts degree at the University of California at Berkeley, a juris doctorate degree from Harvard Law School, and a master's degree in management from Stanford University. Moreover, Defendant employed Mr. Squires, whose law firm employed numerous patent attorneys and other technically qualified personnel who assisted Defendant with the provision of some general technical details in the Applications in Suit. In the Applications in Suit, the technical details are only accessories to the procedures and organization concepts that are computer-implemented and business-related and are, of course, comprehensible to a lawyer, business man and investor such as Defendant.



### 2.6        Lack of Patentability of the Applications in Suit

#### 2.6.1        Parallel Proceedings Do Not Indicate Patentability of an EP/DE

159     Plaintiff's submission in sections V.1 and V.2 of its Counterstatement are comple-
tely beside the point. Regarding subject matter that completely or partly compri-
ses aspects excluded from patent protection pursuant to Sec. 1 German Patent
Act or Art. 52 EPC, results from the international application proceedings before
the *Korean* Patent Office or from the U.S. proceedings do not allow any
conclusions to be drawn regarding patentability pursuant to the EPC and the
German Patent Act. An exemption equivalent to Sec. 1 German Patent Act or
Art. 52 EPC is not known in either U.S. patent law or Korean patent law. The
overview "A Global Perspective on Patent Subject Matter Eligibility and Software-
Related Inventions" by the U.S. Intellectual Property Owners Association,
herewith submitted as

**Exhibit HE 12**,

illustrates the different legal settings and practices worldwide in the field of
patenting computer-implemented inventions.

160     Due to the different legal settings in the Member States and since, pursuant to
the Patent Cooperation Treaty (PCT), international patent applications can also be
pursued as national applications in countries without an exemption equivalent to
Art. 52 EPC, the PCT does not provide for examination of such national provisions,
but with regard to certain inventions releases the national patent offices acting as
international search and examination authorities from the obligation of providing
searches/examinations (Rules 39 and 67 of the Implementing Regulations under
the Patent Cooperation Treaty).

161     Rule 39.1 reads as follows:

*"39.1 Definition*

*No International Searching Authority shall be required to search an
international application if, and to the extent to which, its subject matter
is any of the following:*

*(i) scientific and mathematical theories,*

*[...]*

*(iii) schemes, rules or methods of doing business, performing purely
mental acts or playing games,*

*[...]*



*(vi) computer programs to the extent that the International Searching
Authority is not equipped to search prior art concerning such programs."*

162        Pursuant to the penultimate section ("Subject matter that will not be searched")
of the excerpt from the PCT Applicant's Guide, herewith submitted as

**Exhibit** HE 13,

the Korean Patent Office (KIPO) essentially does not perform searches regarding
subject matter listed in sections (i) to (vi) of Rule 39.1 PCT, subject only to such
inventions which a searched under national Korean provisions.

163        As apparent from the overview submitted as ***Exhibit HE 12*** (page 64 *et seqq.*), the
Korean practice merely stipulates for computer-implemented inventions that
hardware and software elements be explicitly stated in the claim so as to be
essentially eligible for patentability. When considering the claims of WO'919 and
WO'049, it is evident that they meet the Korean requirements. Therefore, it is
understandable that the KIPO as the international search authority performed an
international search for all claims. It is also clear why the KIPO raised no objection
in the Written Opinion as to the dominance of business concepts in the claims:
the KIPO does not have a procedure corresponding to European or German
examination practice.

164        Due to the completely different legal settings and practices regarding inventions
directed at computer-implemented business activities before the U.S. Patent
Office and the KIPO on the one hand and the EPO/GPTO on the other, the
documents from the international proceedings and from the parallel U.S.
proceedings to which Plaintiff referred are not indicative for the present
proceedings.

### 2.6.2        Lack of Protectability

165        Plaintiff's submission in section V.3 of the Counterstatement is also beside the
point.

166        First, Plaintiff objects that it is not permissible to consider only individual claims
when assessing patentability. It must be pointed out, however, that in procee-
dings before the patent office claims are always regarded as a request in their
entirety so that a deficiency in only one claim leads to rejection of the entire
request. Moreover, these claims reflect what Applicant considered to be the
essential teaching. Consequently, it is also appropriate to make the analysis on
the basis of these claims.

167        Plaintiff's extensive discussion regarding the technical nature of the claims in
section V.3.b) is incomprehensible since Defendant has not denied that the claims
analyzed in the Response to the Complaint comprise technical and non-technical

features, i.e. are basically regarded as technical within the terms of German and European practice.

168    However, Plaintiff avoids commenting on the actual issue, i.e. that in a claim comprising technical and non-technical features it is the technical features alone which are able to support patentability. As explained in the Response to the Complaint, however, the analyzed claims have no technical content going beyond completely generic data processing concepts using well-known elements (processor, computer network, etc.). In other words: the technical part of the claims cannot support an invention. There are no technical problems that would be solved by technical means, which is why patent protection pursuant to the EPC and German Patent Act is out of question for the Applications in Suit. This does not change when considering the elements taken from the description, to which Plaintiff now refers. Continuous monitoring, real-time data processing, data generation depending on certain criteria as well as data weighting are also generally known standard features of computer systems. It has not been substantiated at all and it is not directly apparent how these elements could impart inventive merit to a claim that is otherwise not patentable.

169    Since Plaintiff is thus unable to cite an overall subject matter that can be claimed, which goes beyond well-known computer properties in technical terms, Plaintiff ultimately confirms Defendant's submission from the Response to the Complaint.

## 2.7    Relationship of the Parties in the Development of the Cyber Insurance Business

170    Plaintiff's repeated attempts to portray Defendant in a bad light (Counterstatement, page 28 *et seqq.*) show that the overall relationship of the parties, as illustrated in the Response to the Complaint, and the greater context of the lawsuit – which Plaintiff understandably does not wish to discuss – are important for contextualizing Plaintiff's submissions correctly.

171    Defendant's efforts to set up a cyber insurance business took place outside of Plaintiff's company with Plaintiff's knowledge. It was Plaintiff who wanted it exactly this way, as is evidenced by for example the internal communication between Shyam Sankar and Kevin Kawasaki (**FBD 7**). Therein, Mr. Sankar reports that Defendant had suggested that Plaintiff establishes a subsidiary for developing this business:

> Also, Abramowitz (directed to be KK) seems to want to be a part of Palantir (assume you guys are tracking spades). When I met him about insurance he wanted to head it up. Fixated on starting a subsidiary. Or building a building and leasing it back to Palantir.
>
> I know he is smart and a hustler. Is the guidance here to partner with him on insurance?

[This is followed by a German translation]

172    Kevin Kawasaki rejected this. He wanted Defendant to first acquire customers:

> I think we should focus Marc and our selves on getting the first customer. Once we have a deal outlined, we can then move to setting up the structure or do it simultaneously. I may be out of my realm on how long it takes to set these things up etc...but I don't see much value in partner

[This is followed by a German translation]

173    For this Defendant had to develop (at his own cost and time) a convincing offer that could have attracted the interest of a customer, which Plaintiff now absurdly characterizes as allegedly unfair conduct (Counterstatement, C.III.).

174    Alex Fishman, with whom Defendant cooperated in this regard <u>at Plaintiff's request</u>, was a former employee of Plaintiff and former member of its management. He was and is a close confidante of the CEO, Alexander Karp. This is the very same Alexander Fishman who under his company DTA was later engaged as a broker by Plaintiff to snatch the buyers for Defendant's company shares away from Defendant (RtC, margin no. 28 *et seq.*).

175    Plaintiff, as confirmed by itself (Counterstatement, page 32), started to distance itself from Defendant in October 2014. This explains why Defendant could not recognize any further interest by Plaintiff in developing the cyber insurance business together (RtC, margin no. 26 *et seq.*). Plaintiff does not seem to have developed it further on its own either and the CyberMesh project also seems to have been abandoned quickly. Plaintiff has not set-out whether it has ever licensed CyberMesh as a product and until when, or whether it ever operated in the cyber-insurance industry. The public information available creates the impression that Plaintiff either did not further pursue the two "projects" at all or at least ceased doing so a short time thereafter. There is no justification to criticize Defendant for not having given up this potential business opportunity immediately as well.

176    It is also agreed that Defendant offered Plaintiff to disclose the priority application (**FBD-V 22**), which had not yet been laid open for public inspection at that time, to Plaintiff prior to its publication, subject to a confidentiality agreement (RtC, margin no. 26; Counterstatement, page 31, **FBD-V 21**). Plaintiff's interest in this application obviously did not even go far enough to send a simple, standard confidentiality agreement to Defendant. If Plaintiff had done so, it would have obtained the application immediately from Defendant.

**3.    Legal Assessment**

177    The legal action is inadmissible and, in any case, unfounded.

178    Plaintiff has not refuted with the Counterstatement that the Court lacks jurisdiction. We have provided our submission concerning Plaintiff's arguments in this regard further below to avoid forward references (**section 3.6**).



179    For the same reasons and for the sake of (hopefully) simplified illustration, we are setting out two aspects separately in advance, namely Plaintiff's fundamental misunderstanding of the scope of the subject matter governed by the EPC and the interfaces with the civil law of the Member States (**section 3.1**) as well as the fact that European and German applications, on which the entire legal action is based, have not come into existence (**section 3.2**). After that, we will set forth the further reasons why Plaintiff's arguments regarding a lack of interest in declaratory relief (**section 3.3**), a lack of legitimate interest (**section 3.4**) and a lack of a substantive case (**section 3.5**) are not convincing.

### 3.1    Plaintiff Misconstrues Subject Matter Governed by the EPC

180    Plaintiff wants to base its request for declaratory relief on Art. 60 (1) EPC and believes that this provision, <u>without reference to national law,</u> gives Plaintiff a right to declaration of its alleged entitlement to the Applications in Suit (Counter-statement, page 40), even without causality being required (Counterstatement, page 43). This is obviously incorrect.

181    Plaintiff even fails to acknowledge its own request for declaratory relief since said request for declaratory relief is not aimed at the determination that Plaintiff is the successor in title of the (alleged) inventor, but "that Defendant filed inventions of Plaintiff <u>as a non-entitled person</u> with the filing of European patents [...] and that Plaintiff would have been entitled to the <u>claim for the granting of these European patents</u>" (emphasis added). Since it is Plaintiff's objective with the legal action to file a new application pursuant to Art. 61 (1) (b) EPC, it is correct to focus on the *right to the grant of the patent* since Art. 61 (1) EPC requires that

> "[...] by a final decision it [was] adjudged that a person other than the applicant is <u>entitled to the grant of the European patent"</u> (emphasis added).

182    A new application pursuant to Art. 61 EPC therefore requires that Plaintiff is granted the "right <u>to the grant</u> of the European patent". Art. 60 EPC, by contrast, merely establishes:

> "(1) The <u>right to a European patent</u> shall belong to the inventor or his successor in title. [...]
>
> (2) If two or more persons have made an invention independently of each other, the right to a European patent therefor shall belong to the person whose European patent application has the earliest date of filing, provided that this first application has been published.
>
> (3) In proceedings before the European Patent Office, the applicant shall be deemed to be entitled to exercise the right to a European patent." (emphasis added)



HOFFMANN EITLE

183     The EPC thus distinguishes between the *right to the patent* and the *right to the grant of the patent*. According to section (1), the *right to the patent* belongs to the inventor (or his successor in title), unless another person has independently made and filed the invention before (section (2)). As regards the *right to the grant of the patent*, the applicant is deemed to be entitled (section (3)).

184     Owing to Art. 60 (2) EPC, the sole declaration that Plaintiff is (allegedly) the successor in title of the inventors pursuant to Art. 60 (1) EPC is not even sufficient to give Plaintiff the *right to the patent*. Contrary to Plaintiff's side remark, causality is required, already due to Art. 60 (2) EPC.

185     More importantly, a determination that Plaintiff is the successor in title regarding the *right to the patent* is not sufficient to confer on Plaintiff a right to a new application pursuant to Art. 61 (1) (b) EPC since this requires the determination that Plaintiff, instead of Defendant, is entitled to the *right to <u>the grant</u> of the patent*.

186     Under which conditions the *right to the grant of the patent* is to be taken from the applicant and to be conferred on another person is not set-forth in the EPC. It was a deliberate decision by the Contracting States to leave this to the national civil laws since the national (intellectual) property laws were not considered sufficiently harmonized and it was considered to be genuinely a question of civil law, which should remain in the national civil courts' jurisdiction.

187     For example the *Protocol of the Tenth Meeting of Working Group I held in Luxembourg from 22 to 26 November 1971* shows that when creating the EPC, the (second) option of including this matter within the competences of the EPO was rejected based on these grounds, and the question of who is entitled to a patent was deliberately excluded from the EPC:

> A second solution might be to invest the European Patent Office with the central authority to decide who is entitled to the patent.
>
> Since it seems impossible to standardise the laws on ownership of inventions for all the European States which may become Contracting Parties to the Convention, rules would have to be laid down in Article 15 of the Convention



to determine which national laws would be applicable in
each case. The European Patent Office would then have the
task of applying twenty or so different national laws
according to each individual case; this would be practically
impossible if it is desired to retain the nature and
structure hitherto envisaged for the European Patent Office.

Apart from this practical objection some delegations
made the objection of principle to the idea that disputes
traditionally falling within the sphere of property law
should be dealt with by authorities other than national
civil courts.

For these reasons the Working Party considered that
the second solution should not be adopted.

[This is followed by a German translation.]

188     The German legislator, accepting this allocation of competences, rightly thought it
necessary to create with Art. II, Sec. 5 Act on International Patent Conventions a
new basis for claims, setting forth the conditions under which a person entitled to
a *right to a patent* can request a non-entitled person to transfer the *right to the
grant of the patent*. For example, the following is stated in the official justification
for the draft law of 2 June 1975 (*Bundestag* document 7/3712, page 19):

> In Artikel 60 des Europäischen Patentübereinkom-
> mens wird zwar im einzelnen festgelegt, wem das
> Recht auf das europäische Patent zusteht. Ungere-
> gelt und damit der Bestimmung durch das nationale
> Recht der Vertragsstaaten überlassen bleibt dage-
> gen, in welcher Weise der hiernach Berechtigte sein
> Recht gegenüber dem unberechtigten Anmelder
> oder Patentinhaber durchsetzen soll. § 5 des Patent-

> *[While it is regulated in detail in Art. 60 of the European Patent Conven-
> tion who has the right to the European patent, it has remained
> unregulated and thus reserved for determination by the national laws of
> the Contracting States in which way the accordingly entitled person can
> assert its right against a non-entitled applicant or patentee.]*

189     Accordingly, the administrative procedure pursuant to Art. 61 EPC, the
requirements and processes of which are within the decision-making-powers of
the EPO's decision bodies, must be distinguished from the national civil law on
which alone it can be based whether a person other than the applicant is to be
conferred the *right to the grant of the patent*. More clearly, since the Contracting
States did not transfer the competence to decide these civil law questions to the
EPO, the EPO may neither substitute nor obstruct national civil law in this regard.
The Enlarged Board of Appeal recognizes this in its G 3/92 decision, where the



competent national instance in the United Kingdom, the *Comptroller*, had already decided. We are herewith submitting this decision as

**Exhibit HE 14**.

190    The operative part of this decision reads as follows:

```
I therefore order that Latchways Limited may make a new
application under section 12(6) for a patent in respect of the
matter contained in Exhibit LBN1 to Mr Ben-Nathen's
declaration, but with the claims amended to the form
accompanying the letter of 12 January, referred to above.  I
further order that the new application shall be treated as
having been filed on the date of filing of European
application No 0163563 namely 2 May 1985.
```

[This is followed by a German translation.]

191    The Enlarged Board of Appeal therefore only had to decide whether the EPC, i.e. the administrative provisions under patent law, preclude the ownership granted to the petitioner by a national court in the form of a new application claiming priority pursuant to Art. 61 (1) (b) EPC from an application that is no longer pending.

192    It is thus the starting point of the decision G 3/92 that the EPO does not have the legal competence to decide whether an applicant has the *right to the grant of the patent*, this must be decided by the national court having jurisdiction under the Protocol on Recognition (G 3/92, grounds, margin nos. 2 and 3). Thereby, the national court decides based on the (national) law that is applicable pursuant to its national conflict-of-law provisions (grounds, margin no. 3.4). Since in the to be decided case such a decision existed, the Enlarged Board of Appeal framed the question as whether this decision of a national court is a decision within the terms of Art. 61 EPC (grounds, margin no. 4, second and third paragraphs) or whether its implementation can be denied under its administrative patent procedures.



193    In the opinion of the Enlarged Board of Appeal, it is therefore – rightly – the national court which must decide whether the time between lapse of the application and the new application is too long (grounds, margin no. 4.4). According to the Enlarged Board of Appeal, it would be incompatible with the allocation of competences between national courts and the EPO if the EPO were to refuse the implementation of a national court decisions granting a person other than the applicant the right to the grant of the patent, by denying this person the right to make use of the centralized procedure pursuant to Art. 61 (1) EPC:

> patent. This system of jurisdiction, in combination with
> the provisions of Article 61 EPC and the Rules which are
> intended to implement it, provides a co-ordinated legal
> process for granting the appropriate remedy, in a case
> where an unlawful applicant has applied for a European
> patent contrary to the legal rights of the inventor or
> his successors in title which are set out in
> Article 60(1) EPC. It would be contrary to such legal
> process if a lawful applicant who has established his
> right to the grant of a European patent in a final
> decision by the appropriate national court in accordance
> with the Protocol on Recognition, was thereafter
> excluded from using the centralised procedure of
> Article 61(1) EPC.

[This is followed by a German translation.]

194    The EPO thus acknowledges that it is not entirely within its discretion whether, after a patent application has lapsed, an entitled person can still be conferred the right to the grant of a patent. On the contrary, the EPO held that it had no competence to deny implementation of a decision under national law.

195    With Section 12 (6) Patents Act, the national law in the United Kingdom explicitly provided for such a right to apply for a patent and claim the priority date after revocation or dropping of an application (see **Exhibit HE 14**, page 2 *et seq.*).

196    Since the national law applicable in the present proceedings does not provide a legal basis for such a claim, however, Plaintiff attempts to reverse the G-decision into its opposite and argues that the national court must grant such a claim since the EPO acknowledges it. This fails to take the above-stated division of competences between the EPC and national law into account. One cannot evade the fact that the applicable national law does not provide a corresponding basis for claims by a declaratory action based on Art. 60 EPC or also Art. 61 EPC.



**3.2      Patent Applications Were Not Pending Either Before the EPO or
Before the GPTO**

197       The European Applications in Suit (requests 1) and 2)) have never become
pending since Defendant did not initiate the European phase, wherefore only the
provisions of the PCT are applicable (see section **3.2.1**). German patent applica-
tions (request 3)) could not even have emerged from the PCT applications since
the designation *DE* in the PCT application is treated as a request for a regional
(here: European) patent according to Art. 4 (1) ii), half sentence 3, PCT (see
section **3.2.2**).

### 3.2.1      EP Applications Not Pending – Requests 1) and 2)

198       PCT applications with the designation EP only come into existence as European
patent applications upon initiation of the European phase, and thus only upon
initiation of the European phase they become pending before the EPO as the
patent grant authority (cf. RtC, margin no. 152). The provisions of the EPC,
including Art. 61 EPC, only apply once an application has become pending.

199       That pursuant to Art. 11 (3) PCT and Art. 153 (2) EPC a PCT application has effect
as a European application is no more than a legal fiction which only materializes
<u>after</u> initiation of the national or regional phase (cf. Singer/Stauder/Hesper,
"*EPÜ*", 7th edition 2016, Art. 153, margin no. 196). This results from the concept of
the PCT: Before expiry of the time limit of 31 months, which is applicable
pursuant to Art. 22 (1) and (3) PCT in conjunction with Rule 159 (1) EPC, the EPO
must not process a PCT application unless explicitly requested by the applicant
(cf. Art. 23 (1) and Art. 40 (2) PCT).

200       The Legal Board of Appeal of the EPO emphasizes the differences between a
regular EP application and an international application designating EP, in its deci-
sion J 18/09 of 1 September 2010, which is herewith submitted as

**Exhibit HE 15**

> "*9. […] It is the very essence of the unitary filing system drawn up by the
PCT that in the international phase the international application is
subject to the procedural rules of the PCT and <u>not to those of the
national laws</u> (possibly divergent from those of the PCT) which may
become applicable once the international application has entered the
national or regional phase before the competent national or regional
office.*"

[This is followed by a German translation.]

201       According to the decision J 18/09, when filing a divisional application pursuant to
Art. 76 EPC one cannot claim the priority of an international (Euro-PCT) patent

application which has lapsed before initiation of the European phase. The legal fiction of Art. 11 (3) PCT does not change the fact that proceedings before the EPO only begin upon initiation of the European phase (emphasis added):

*"13. The wording in Article 11(3) PCT '...shall have effect of a regular national application in each designated State as of the international filing date...' is a legal fiction which does not lead to the result that the proceedings under the PCT become national ones. On the contrary, the proceedings in the international phase under the PCT are special ones and are governed by the provisions of the PCT. Proceedings under national law are expressly excluded during the international phase of an international application. [...] As regards an international patent application designating EP, proceedings before the PCT authorities are initiated as from the filing date and proceedings before the European Patent Office only as from the day on which the requirements for entering the regional phase prescribed by Article 22(1) PCT have been fulfilled."*

[This is followed by a German translation.]

202    Since Defendant did not initiate the European or national phase, the processing by the EPO was restricted to the finding that the fiction of the PCT application as a European application ceased (Art. 24 (1) (iii) PCT, Rule 160 EPC). The allocation of an application number and the Communication pursuant to Rule 112 (1) EPC, according to which the application is deemed to be revoked, does not make the PCT application pending before the PCT authorities a European application pending before the EPO. It is a merely declaratory reflex of the PCT application. In this respect, the Legal Board of Appeal states in its decision J 18/09 (**Exhibit HE 15**, emphasis added):

*"18. Furthermore, it is true that the European Patent Office issued a communication in relation to the earlier application indicating: 'The European patent application cited above is deemed to be withdrawn'. However, even if the use of the term "European patent application" in that statement corresponds to the wording in Rule 160(1) EPC, the statement that the European patent application was deemed to be withdrawn was not a constitutive procedural act but only a declaratory one with respect to the non-pendency of the proceedings before the European Patent Office. Such a statement did not initiate grant proceedings before the European Patent Office as is required by Rule 36(1) EPC for the International Application but made it clear that the International Application was not being proceeded with under the EPC and only informed the applicant that the International Application*



*had not become pending before the European Patent Office* to be further prosecuted as a European patent application."

[This is followed by a German translation.]

### 3.2.2 German Applications Have Never Been Effectively Requested – Request 3)

203    The alleged German Applications in Suit, which are the basis of request 3), have not even been effectively requested as international patent applications.

204    According to the provision of Art. III, Sec. 4 (1), sentence 2, Act on International Patent Conventions, the GPTO is not a designated office within the terms of the PCT if a European patent is sought at the same time, as is the case with WO'919 and WO'049.

205    Accordingly, the designation "DE" in the PCT application is interpreted pursuant to Art. 4 (1) ii), half sentence 3, PCT as a request to obtain a regional (here: European) patent instead. The designation does not even result in a legal fiction of German application, it had no legal effect whatsoever and a German application could not have emerged therefrom.

### 3.3 No Legal Interest in Declaratory Relief

### 3.3.1 Request 1)

206    Even after Plaintiff's further statements, the fact remains that Plaintiff has not shown a declaratory interest for request 1). Apart from the grounds set forth in the Response to the Complaint, the following is to be taken into account:

### 3.3.1.1 No Legal Interest in Declaratory Relief with Regard to the Present Wording of the Request

207    Plaintiff still fails to convincingly state for what reasons it believes to have a legal interest in its request to establish "that Defendant filed inventions of Plaintiff as a non-entitled person with the filing of European patents [...] and that Plaintiff would have been entitled to the claim for the granting of these European patents".

208    The request is already insufficiently specific. It is not clear for what point of time Plaintiff requests the determination of such rights.

209    A declaratory interest for such request cannot be based on Art. 61 (1) EPC. This provision requires that the person other than the applicant is **presently** entitled to the right to the grant of the patent, not that it was entitled to said right at any earlier point of time. This can be seen most clearly from the English wording of the provision ("a person other than the applicant is entitled to the grant of the European patent"). However, this is also a matter of course since a person who

was entitled to this right in the past, but who has in the meantime transferred it to a third party or otherwise lost it, is not supposed to be able to assert, as a new applicant, the rights arising from Art. 61 EPC.

210     The wording of the request rather confirms that even from Plaintiff's perspective there is no longer a present legal relationship since Defendant's right to the grant of the European patents from the Applications in Suit has finally lapsed. It is thus a concluded legal relationship, the declaration of which can only be requested if legal consequences for the presence and the future can still arise from the declaration (established case law, for example Federal Court of Justice judgment of 17 June 2016, as published in NJW-RR 2016, at 1404, margin no. 13). This is not the case here since Art. 61 EPC requires a present legal ownership.

211     As long as a European patent application is pending, it is at the discretion of the (allegedly) entitled person pursuant to Art. 60 (1), sentence 1, EPC to secure his rights to the corresponding application by way of Art. 61 (1) EPC. If he fails to do so and the application lapses, the only recourse left open to him is to request compensation of damages (cf. Federal Court of Justice decision *"Drahtbiegema-schine"*, as published in GRUR 1997, at 890 [891]). It is precisely this objective which Plaintiff also pursues with requests 2) and 3). However, this excludes a separate determination according to request 1) since there is no interest in clarifying abstract legal issues (Federal Court of Justice, as published in NJW-RR 2016, at 1404, margin no. 15). The fact that "Defendant calls into question the well-foundedness of requests 2) and 3) for various reasons" (cf. Counterstate-ment, page 37), such as that no damages have been incurred, does not substantiate Plaintiff's interest in the determination of a partial aspect.

### 3.3.1.2     No Legal Interest in Declaratory Relief based on Art. 60 (1) EPC

212     A declaratory interest for request 1) also cannot be based on Art. 60 (1), sen-tence 1 EPC since this provision only stipulates, as set out in **section 3.1** above, who is entitled to the *right to a patent*, but not a claim to the *right to the grant of the patent*.

Since Plaintiff requests the determination of a *right to the grant of the patent*, it can actually be left unaddressed whether Plaintiff has a legal interest in the determination that it is entitled to the inventor's rights or that Defendant acted as an (allegedly) non-entitled person.

213     It should be pointed out only briefly that the Federal Court of Justice decision *"Aufwärmvorrichtung"* referred to the right of the "inventor […] to acknowledg-ment of his capacity as inventor with regard to a specific invention, which is disputed" (Federal Court of Justice, as published in NJW 1979, at 269, 271), i.e. to the inventor's moral right to which Plaintiff as a legal entity cannot be entitled anyway.

HOFFMANN EITLE

### 3.3.1.3    No Legal Interest in Declaratory Relief based on Art. 61 (1) EPC

214    A declaratory interest also cannot be based on Art. 61 (1) EPC. As set out in **section 3.1** above, this provision does not stipulate under which conditions a person other than the applicant is entitled to the *right to the grant of the patent*, but merely requires that another person was conferred said right.

215    For this reason alone G 3/92 is not indicative for the present case since this decision also requires that the applicable national law allocates the *right to the grant of the patent* to the third party and that the competent court has conferred said third party this right (see **section 3.1** above). The decision G 3/92 is also not pertinent to the present case since the Applications in Suit have never become pending as European applications. The decision, moreover, does not have a binding effect for the German court and is incorrect, as set out in the Response to the Complaint (RtC, section 3.1.2.1). The arguments advanced by Plaintiff do not change this.

In detail:

216    G 3/92 is not pertinent. In its arguments, Plaintiff assumes that decision G 3/92 is also pertinent to PCT applications which have never reached the European phase. However, the Enlarged Board of Appeal did not render a decision in this regard. The Enlarged Board of Appeal merely established that a procedure pursuant to Art. 61 (1) (b) EPC does not require "that the earlier original usurping application is <u>still</u> pending before the EPO at the time the new application is filed" (headnote G 3/92, underlining added). This implies that the corresponding earlier application must have been pending at the EPO once. The Applications in Suit never became pending (**section 3.2** above).

217    The concept of pendency of a European patent application requires that the EPO handles the application in the capacity as the patent grant authority. In decision J 18/09 already cited (***Exhibit HE 15***), the Legal Board of Appeal therefore held that a (Euro-)PCT application, for which filing fees have not been paid and which is thus deemed to be withdrawn pursuant to Rule 160 EPC, cannot provide a basis for a divisional application according to Art. 76 (1) EPC. The background is that Rule 36 EPC requires a pending earlier European patent application (emphasis added):

> *"14. The reasoning of the Receiving Section that the term 'pending earlier European patent application' refers to proceedings pending before the European Patent Office as the competent authority to decide on the earlier application under the EPC is, therefore, absolutely correct. The procedural term 'pendency' in the sense of Rule 36 EPC implies that the European Patent Office <u>has become competent</u> to decide on the request for grant."*



[This is followed by a German translation.]

218    Art. 61 (1) EPC in conjunction with Art. 60 (3) EPC cannot be applied to an application which has never become pending. This is also confirmed for Art. 61 (1) (b) EPC by the fact that pursuant to Art. 61 (2) EPC the provisions for a European divisional application according to Art. 76 (1) EPC apply *mutatis mutandis* to the filing of a new European application according to Art. 61 (1) (b) EPC, explicitly "in accordance with the Implementing Regulations" (Art. 76 (1), sentence 1, EPC). Also pursuant to the Guidelines for Examination at the EPO, an application according to Art. 61 (1) (b) EPC – except for the annuities – "is [...] treated as a European divisional application and corresponding provisions apply" (part A, chapter IV, Rule 2.5; the legal provisions on which G 3/92 was based were somewhat different).

G 3/92 is moreover not binding for the German Court and also incorrect.

219    As already stated in the Response to the Complaint (RtC, section 3.1.2.1), the EPC does not give the EPO's decisions precedent over decisions by national courts. The present Court thus must come to its own decision, it cannot simply adopt the Enlarged Board of Appeal's legal reasoning unquestioningly. For the reasons set out in the Response to the Complaint this decision is also not convincing.

220    Contrary to Plaintiff's assertion, the Federal Court of Justice did not decide in its *"Drahtbiegemaschine"* decision (Federal Court of Justice, as published in GRUR 1997, at 890, 892) whether a new application can be filed pursuant to Art. 61 (1) (b) EPC since the subject matter of those proceedings was a German patent. However, the Federal Court of Justice held that the "substantial counterarguments" set out in the minority opinion in G 03/92 have a stronger weight in the context of analogy considerations. It certainly cannot be said that the decision G 3/92 was "explicitly acknowledged and recognized", as asserted by Plaintiff (cf. Counterstatement, page 38, third paragraph).

221    What is equally unconvincing is Plaintiff's argument that the Contracting States had refrained from amending the EPC in view of G 3/92 (Counterstatement, page 38). The reason for this is: Firstly, applying G 3/92 presupposes the willingness of the courts to render a decision on the entitlement to an application with regard to Art. 61 (1) EPC even if this application is no longer pending. Secondly, Defendant and his representatives simply do not know any example of a European patent actually granted on the basis of G 3/92. Finally, the fact that an international treaty is not amended does not confirm all decisions taken thereunder.

### 3.3.1.4    No Legal Interest in Declaratory Relief if merely Co-Ownership

222    Plaintiff has also no legal interest in declaratory relief if at most it can claim co-ownership in the right to be granted the patents. As already pointed out in the

HOFFMANN EITLE

Response to the Complaint under section 3.1.2.3, in such case the filing of a patent application by Plaintiff without Defendant's consent would infringe the rights of Defendant. And whether in such scenario the applicant who had let the application lapse can be co-applicant in a newly filed application which claims priority from the lapsed application, has not been decided by the Enlarged Board of Appeal in G 3/92.

223     In view of what is pointed out in sections 2.2 through 2.4. above, in particular, a full entitlement is doubtless out of the question in this case. This is further supported by the facts that in the U.S. trade secret suit Plaintiff itself does not even assert that it held confidential information regarding all patent claims, and that the Patent Trials and Appeals Board ("**PTAB**") of the U.S. Patent and Trademark Office already rejected instituting derivation proceedings with regard to the U.S. counterpart to WO'049 since Plaintiff and petitioner in this case has not even credibly shown that the teaching claimed in the patent there at issue was derived from petitioner. In detail:

224     Despite Plaintiff's contradicting description in the Counterstatement, it remains fact that in the proceedings before the California Court, Plaintiff has not asserted that the entire application was derived from Plaintiff. In its Trade Secret Disclosure Statement of February 28, 2018 to its complaint of September 1, 2016 (page 13), Plaintiff does not assert rights regarding patent claims 5 to 7, 9, 15, 23 to 25, 27, 31 and 33 of U.S. patent US 2016/0110819 (US 14/918,398, *FBD 29*) which in its claims and description corresponds to WO'919.

225     In our Response to the Complaint we have already pointed to the Derivation proceedings (there margin no. 35). These proceedings are the procedural equivalent under U.S. law to an entitlement action (as confirmed by Plaintiff, page 6 of the Complaint). The application regarded the US patent application US 14/919,506 (published as US 20160112445; *FBD 28*) which corresponds to WO'049.

226     Derivation proceedings are only instituted if the applicant has made it credible that (i) he or its predecessor in title has made an invention that is substantially similar to the granted patent claim, and (ii) he communicated this to the respondent. Plaintiff hereby relied on the affidavit by Mr. Sankar which in the present proceedings has not been submitted, allegedly due to its "particular confidentiality" (Counterstatement, page 27). That this affidavit does not prove what Plaintiff claims it does is already confirmed by the PTAB black on white in its decision of March 13, 2020, in which the legally and technically qualified judges of the PTAB rejected the petition for lack of sufficient *prima facie* evidence to initiate proceedings.

227     When Plaintiff brings itself to unravel the 'secret' of the affidavit's content, the panel will also be able to convince itself that this declaration only makes the lack

of conclusiveness of the complaint more obvious. Of course, we reserve the right to plead to this declaration which has not yet been submitted here.

228    Since the complaint lacks conclusiveness for a full entitlement and for the other reasons mentioned above, there is no interest in declaratory relief for Request 1.

### 3.3.2    Requests 2) and 3)

229    Requests 2) and 3) also lack a declaratory interest already since even the likelihood of damage to be incurred has neither been set forth nor is it plausible. Plaintiff still avoids a submission in this regard by arguing the "mere possibility" of a damage being incurred would be sufficient (cf. Counterstatement, page 37). This is firstly incorrect and it is secondly not even theoretically possible in the present case that damages will be incurred – for the reason alone that the alleged "inventions" are not patentable.

230    According to the established case law of the Federal Court of Justice, declaratory actions seeking to determine the obligation to compensate financial losses are only admissible if it is "sufficiently likely" that damages will be incurred due to the infringement (cf. Federal Court of Justice, as published in NJW 2015, at 1683, margin no. 15). Therefore, Plaintiff would have to demonstrate the likelihood of the occurrence of damage in a substantiated manner (FCJ, id.), which it has not done.

231    Plaintiff responds to this by pointing out that the mere possibility of future damage is sufficient in the context of the declaratory interest if absolute rights are infringed. Even if this should be sufficient, this is not the case here. The application of an unpatentable "invention" cannot cause any damage, in particular if Plaintiff – as in the present case – is not even asserting that it has used the subject matter of the applications.

### 3.4    No Legitimate Interest Owing to Tardiness

232    Notwithstanding the lack of declaratory interest, at least those aspects identified as requiring examination by the majority opinion in G 3/92 must be considered, since the EPO itself does not examine the entitlement of the applicant as long as the applicant presents a judgment legitimating him.

233    According to G 3/92 (section 4.4, emphasis added), it is for the national courts to decide how they,

> "when deciding under Article 1(1) Protocol in a case where the earlier application is no longer pending, should take into account any delay by the lawful applicant in commencing and prosecuting proceedings to establish his right and the possibility of consequent third party prejudice."



The phrase "when deciding under Article 1(1) Protocol" undoubtedly refers to proceedings such as the present.

234    As set-out in the Complaint, Plaintiff had ample opportunity to assert its alleged rights when the initiating the regional phase at the EPO was still possible.

235    For example, in its complaint to the California state court of September 1, 2016 Plaintiff asserted that the filing of the priority applications constituted a breach of confidentiality obligations and various statutory provisions by Defendant. However, Plaintiff did not seek a declaration of rights regarding the then still pending international applications.

236    According to its own statements, one of Plaintiff's employees had learnt even before 23 September 2014 "that Defendant had either already filed or was preparing patent applications concerning cyber insurances" (Counterstatement, page 30). Plaintiff thus had a specific reason to monitor the register and sufficient opportunity to take steps to secure its position also with regard to the Applications in Suit (for details, see RtC, section 4). Plaintiff also did not take up Defendant on his express offer to provide the applications directly after filing and before their publication, subject to a confidentiality agreement.

237    In view of the clear statements of the majority opinion in G 3/92, it is not sufficient if, as plaintiff advocates, the reasonable interests of third parties are considered only in later infringement actions, for example analogously to a prior use right. By taking this position, Plaintiff ignores the division of competences under the EPC. The European patent grants the same rights as a national patent (Art. 64 (1) EPC). This excludes the authority of the Enlarged Board of Appeal or also of the court competent under the Protocol on Recognition to obligate (other) Member States to extend their laws. The vague considerations of the majority opinion of G 3/92 in section 6 reveal at best a certain awareness of the considerable disadvantages for uninvolved third parties which the grant of a European patent based on the priority of a long lapsed application can have.

238    Even Plaintiff does not call into question that the lapse of WO'049 was apparent to everyone from the register. As regards WO'919, it is easily apparent from the register excerpt submitted by Plaintiff itself that on 11 August 2017 the EPO sent a Communication pursuant to Rule 112 (1) EPC on the grounds of non-payment of the filing fee, according to which the application is deemed to be withdrawn:

| Examination procedure | 11.08.2017 | Despatch of communication that the application is deemed to be withdrawn, reason: filing fee / search fee not paid in time |
|---|---|---|
| Public notifications | Noting of loss of rights pursuant to Rule 112(1) EPC , EPO Form 1205A dated 11.08.17. | |
| | Abramowitz, Marc Lauren<br>1029 Ramona Street<br>Palo Alto, CA 94301 / US | |
| | [2017/52] | |



HOFFMANN EITLE

[This is followed by a German translation.]

239    A "detailed study of the stored correspondence and the time limits set in the application proceedings" (cf. Counterstatement, page 39) is therefore precisely not necessary. It is clear to everyone that the application is deemed to be withdrawn and the invention described therein can be freely used.

240    The consequences of a European patent granted under Art. 61 (1) (b) EPC potentially affects all Member States of the EPC, not only possible infringement proceedings in Germany. However, even an assessment of proportionality within the terms of Sec. 139 German Patent Act, as envisaged by Plaintiff, has at most limited consequences for the cease-and-desist claim (cf. the considerations regarding a using-up period in the Federal Court of Justice judgment *"Wärmetauscher"* of 10 May 2016, court docket: X ZR 114/13, margin no. 41), but does not change anything with regard to the allegation of (intentional) patent infringement.

241    Asserting claims only after the last chance to initiate the European phase had lapsed excludes a legal interest in this case. Even if one would generally regard an assertion after this last point in time as possible, one must at least consider the legislators' judgment that this can only be possible within a very short period. In the Response to the Complaint we already pointed to the two-month preclusion time limit under the EPC for reinstatements in ignorance as to the loss of right (RtC, margin no. 115). The German legislator allows only for one month in section 7 German Patent Act.

**3.5        The Requests for Declaratory Relief Are Unsubstantiated**

242    Plaintiff still fails to present a convincing legal basis for its request. As already demonstrated, the EPC cannot provide a legal basis for conferring the right to the grant of the patent.

243    Thus, a legal basis for the claim asserted by Plaintiff could only exist under national law. For this first the applicable law must be determined, in this case California law (**section 3.5.1**). Plaintiff still has not submitted whether and pursuant to which rules its requests could be justified under U.S. and California law (**section 3.5.2**). Under German law, inventor rights have not been infringed and the law does not provide a basis for request 1). Requests 2) and 3) are unfounded since the Applications in Suit lack patentability and neither damages nor a legal basis for a claim to restitution has been conclusive substantiated (**section 3.5.3**).

**3.5.1        *Conflict-of-Law Provisions Lead to Application of U.S. Law***

244    The law applicable to all requests follows from the general conflict-of-law rule of Art. 4 (2) Rome II Regulation. Thus, U.S. law, namely California law, is applicable



as the law of habitual residence of the (alleged) liable party and the party allegedly sustaining damages, with the place of the headquarters being decisive for companies (Art. 23 (1) Rome II Regulation). Specific connecting factors are not applicable, neither the *lex loci protectionis* (Art. 8 (1) Rome II Regulation) nor the laws of the country where an infringement of a unitary Community intellectual property right was committed (Art. 8 (2) Rome II Regulation), whereby the latter would lead to the application of U.S. law as well.

245     Plaintiff accuses Defendant of having infringed its inventor rights by filing a PCT application with the U.S. Patent Office, giving rise to Plaintiff's claim to a surrender of the right to the grant of the European patents as well as to claims to damages and restitution of all which was obtained due to the European and German patent applications under the rules of *negotiorum gestio* or unjustified enrichment. As stated in **section 3.2** above, a German patent application has never been effectively requested, and at first only international patent applications came into being, which never have become pending as European applications.

246     Plaintiff argues that with regard to request 2), the applicable law follows from Art. 8 (2) Rome II Regulation since an artificial splitting of the unitary European application and thus a mosaic-like splintering into rights in various Member States is to be avoided. Therefore, it would be reasonable to take the place where the asserted infringing act was committed as a uniform connecting factor. These arguments also lead to U.S. law for two reasons:

247     First, the PCT application would have to be treated as a unitary right for the same reasons, and therefore the USA would be both the place where the asserted infringing act was committed and the place where harm is incurred. Second, the "place where the infringing act was committed" is not the place of occurrence, but the place of action. According to the European Court of Justice, "an overall assessment of his behavior must be made in order to determine the place where the original infringing act, on which the accused behavior is based, <u>was committed</u> or is imminent" (cf. European Court of Justice decision "Nintendo *vs.* Big Ben", as published in GRUR 2017, at 1120, margin no. 103; emphasis added). Defendant undisputedly acted only in the USA.

248     In its decision of 7 December 2017 (court docket: 6 U 4503/16, as published in BeckRS 2017, at 152300), the Higher Regional Court Munich did not consider an application of Art. 8 (2) Rome II Regulation convincing (margin no. 121, emphasis added):

> *"Meanwhile, European patents and other foreign applications/patents are not subject to the principle of unity; on the contrary, these are a plurality of individual IP rights which claim validity in the respective country for which protection is claimed. In view of this, <u>it seems doubtful</u>*



*whether the decision of the European Court of Justice in "Nintendo vs. BigBen" regarding Art. 8 (2) Rome II Regulation in relation to the foreign applications/IP rights at issue would claim validity here. Whether Plaintiff would have to be agreed with in that practical needs of Applicant would demand a corresponding application can be left unaddressed in the disputed case for the aforementioned reasons with regard to the statements made in section I. above."*

249  Plaintiff accordingly concurs for requests 1) and 2) that the applicable law cannot be determined based on the *lex loci protectionis* pursuant to Art. 8 (1) Rome II Regulation. This is correct since the *lex loci protectionis* precisely does not apply to the right to an invention (Federal Fiscal Court judgment of 26 August 1993, court docket: I R 86/92, as published in Federal Tax Gazette 1994 II, at 168; Busse/Keukenschrijver, *"PatG"*, 8th edition (2016), Sec. 6, margin no. 8). Neither the Federal Court of Justice in its *"Beschichtungsverfahren"* decision (see in this regard already RtC, margin no. 121) nor the Higher Regional Court Munich in its judgment of 7 December 2017 in the end applied the *lex loci protectionis* to the entitlement to rights arising from a European patent application.

250  The temporal scope of application of the Rome II Regulation, to which Plaintiff refers regarding the Federal Court of Justice decision *"Beschichtungsverfahren"*, is irrelevant for the reason alone that Art. 8 (1) Rome II Regulation is only a codification of a long established legal principle (cf. recital (26) Rome II Regulation). The reasons why the Federal Court of Justice has not applied the *lex loci protectionis*, but with Art. 40 Introductory Act to the German Civil Code the law of the country where the liable person has acted, thus persist under the Rome II Regulation.

251  In its *"Steuervorrichtung"* judgment, the Federal Court of Justice also considered the filing of foreign applications at the EPO to be an infringement of inventor rights originating in Germany "since the right to the invention also includes the filing thereof abroad" (*cf.* judgment of 18 May 2010, court docket: X ZR 79/07, margin no. 33) and thus uniformly applied German law also regarding those foreign applications. In the converse situation here, where the alleged inventor rights originated in the U.S., this excludes the application of German law.

252  Finally, it is also reasonable to uniformly apply the law of the common place of habitual residence since otherwise the requests of relief would be subject to different jurisdictions although they are all based on the same act.

### 3.5.2     Plaintiff's Claims Fail Under U.S. Law

253  As mentioned, the equivalent to an entitlement action under U.S. law is a derivation. A derivation can be submitted for a decision to the abovementioned (margin no. 223) PTAB (§ 135) or to the civil courts (§ 291). The provisions are reproduced in the here relevant scope:



*"35 U.S. Code § 135. Derivation proceedings*

*(a) Institution of Proceeding.—*

*(1) In general.—*

*An applicant for patent may file a petition with respect to an invention to institute a derivation proceeding in the Office. The petition shall set forth with particularity the basis for finding that an individual named in an earlier application as the inventor or a joint inventor derived such invention from an individual named in the petitioner's application as the inventor or a joint inventor and, without authorization, the earlier application claiming such invention was filed. Whenever the Director determines that a petition filed under this subsection demonstrates that the standards for instituting a derivation proceeding are met, the Director may institute a derivation proceeding.*

*[...]*

*(d) Effect of Final Decision.—*

*The final decision of the Patent Trial and Appeal Board, if adverse to claims in an application for patent, shall constitute the final refusal by the Office on those claims. The final decision of the Patent Trial and Appeal Board, if adverse to claims in a patent, shall, if no appeal or other review of the decision has been or can be taken or had, constitute cancellation of those claims, and notice of such cancellation shall be endorsed on copies of the patent distributed after such cancellation.*

*35 U.S. Code § 291. Derived patents*

*(a) In General.—*

*The owner of a patent may have relief by civil action against the owner of another patent that claims the same invention and has an earlier effective filing date, if the invention claimed in such other patent was derived from the inventor of the invention claimed in the patent owned by the person seeking relief under this section."*

[This is followed by a German translation]

254     Hence, requirement for such a derivation claim is first that the person asserting the claim holds an own patent regarding the same invention.

255     Second, the respondent must hold a (pending) patent with an earlier effective filing date.



256     Third, the claimant must prove that he or his predecessor in title has made the significantly similar invention and communicated it. What is required is "conception" (Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227–1228 (Fed. Cir. 1994)):

> *"Thus, the test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure. An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue. The conception analysis necessarily turns on the inventor's ability to describe his invention with particularity. Until he can do so, he cannot prove possession of the complete mental picture of the invention. These rules ensure that patent rights attach only when an idea is so far developed that the inventor can point to a definite, particular invention."*

[This is followed by a German translation]

257     Besides that – as has been explained above – Plaintiff has not communicated to Defendant the inventions disclosed in the Applications in Suit, under U.S. law Plaintiff has no derivation claim for several legal reasons: Defendant is not the present holder of the Applications in Suit as those have never become pending as European applications and even the legal fiction of an application ceased to exist in the meantime. Plaintiff does not hold own applications for substantially similar inventions as the subject matter of WO'049 and WO'919 (regarding WO'919 Plaintiff even failed to provide sufficient *prima facie* evidence in the proceedings before PTAB to achieve the institution of derivation proceedings, above margin no. 226). In particular regarding WO'049 also "conception" is lacking. According to the email by Mr. Sankar he had merely a development plan and goals but not a definitive and permanent solution (margin no. 123 *et seq.*). Plaintiff has not been able to submitted corroborating evidence regarding "conception", preferably contemporaneous disclosure.

258     Moreover, under 35 U.S.C. 102(a), a person has no claim anymore to a patent once an invention has been made available to the public:

> *"A person shall be entitled to a patent unless—*
>
> *(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention"*

[This is followed by a German translation]



259    Accordingly, Plaintiff is not entitled to be granted the right to the grant of the Applications in Suit under U.S. law.

### 3.5.3    *As an Auxiliary Line of Argument:* No Claims under German Law

260    Should the Court apply German law, the requests are to be dismissed at least as unfounded for the following reasons.

#### 3.5.3.1    *No Violation of Plaintiff's Inventor's Rights*

261    Defendant has not infringed Plaintiff's inventor rights, and therefore the requests are unfounded pursuant to German law for this reason alone.

262    The asserted claims would require that Plaintiff had been in possession of finished inventions before the priority date, which anticipate the subject matter of the Applications in Suit, and communicated these to Defendant, without Defendant having developed these inventions itself independently of the communication. None of these prerequisites is met here.

263    The preliminary thoughts expressed by Shyam Sankar in the email of 9 June 2014 about cyber insurance were not yet a finished invention. Nor did they go beyond that which was already so well-known at the time that it was already reflected in government programs.

264    Plaintiff was at most in possession of its CyberMesh application which, however, had already been extensively published by Plaintiff (**section 2.3**).

265    Conveying mere common general knowledge does not constitute a creative contribution (Regional Court Munich I judgment of 22 February 2018, court docket: 7 O 4209/17).

266    As already shown (**sections 2.2.4.1** and **2.2.4.2**) CyberMesh and the thoughts on cyber insurance do not anticipate the subject matters of the Applications in Suit, be it the features of the independent claims or the further features from the description, which Plaintiff emphasized as technical teaching.

267    As the Communications of the EPO Examining Divisions regarding Plaintiff's own applications on CyberMesh prove (**margin no. 115 *et seqq.*** above), CyberMesh is also not an "invention", at least not one to which Plaintiff would have any rights. It is merely a business concept implemented by means of generic and well-known data processing concepts and components. The same applies to cyber insurance. Plaintiff cannot claim to have invented these well-known data processing concepts and components, and it is also not the "inventor" of the business concepts, for the reason alone that such business concepts are generally not considered an invention (Art. 52 (2) (c) EPC, Section 1 (3) German Patent Act).



268    Moreover, when communicating the "invention" to Defendant who was not subject to a confidentiality obligation (section **2.4.2**), any rights of Plaintiff to it and thus to a patent would in any case have lapsed (Benkard/Melullis *"PatG"*, 11th edition 2015, Sec. 6 German Patent Act, margin no. 28):

> *"The right to an invention lapses when the invention is disclosed to the public, i.e. published, in writing or by oral description or by use or in any other form."*

269    The FCJ confirms this in the judgment *Steuervorrichtung* according to which the right to an invention is only protected for as long as the invention is only communicated "maintaining confidentiality which excludes the public"; the right to a patent in turn presupposes the right to an invention (FCJ, *loc. cit.*, margin no. 28).

270    Regarding Plaintiff's alleged communication to Defendant, the submissions lack sufficient substantiation to be commented on. Defendant **denies** that the teachings of the Applications in Suit were communicated to him by Mr. Sankar.

271    As shown in sections **2.2.3** and **2.5**, the subject matter of the Applications in Suit is based on Defendant's own idea, which in one embodiment was already made the subject matter of a patent application filed at the beginning of March 2014. A possible later communication by Plaintiff thus cannot have been causal for Defendant's considerations.

### 3.5.3.2    No Legal Basis for Conferring a Right to the Grant

272    Request 1) remains unfounded since German patent law – contrary to English patent law – does not provide a legal basis, according to which Plaintiff could still be granted the rights to the grant of the European Applications in Suit after they have lapsed.

273    The right arising from Sec. 7 (2) German Patent Act, i.e. to file a separate application for the invention within one month if a patent is revoked or let lapse on the grounds of an opposition based on unlawful usurpation and to claim the priority of the earlier patent, is not applicable in the present case for several reasons. It applies only to German patents, and it requires an opposition based on unlawful usurpation and grants only the opponent the right to file a new application, and this only within a time limit of one month.

274    Art. II, Sec. 5, sentence 1, Act on International Patent Conventions requires first of all that a European patent application has become pending (as is not the case here, **section 3.2.1** above) and is still a pending application at the time of the oral proceedings ("[…] whose invention <u>has been</u> applied for, can request <u>the applicant</u> to assign to him the right to the grant of the European patent"). By requesting a stay of the grant proceedings pursuant to Rule 14 EPC, a plaintiff can



prevent the applicant from letting the application is suit lapse before he could file his own application according to Art. 61 (1) (b) EPC. For this purpose, Rule 14 (2) EPC grants him a time limit of three months after the decision has become final and binding, during which the applicant cannot take any further action in the grant proceedings:

> *"(2) Where evidence is provided that a final decision within the meaning of Article 61, paragraph 1, has been taken, the European Patent Office shall inform the applicant and any other party that the proceedings for grant shall be resumed as from the date stated in the communication, unless a new European patent application under Article 61, paragraph 1(b), has been filed for all the designated Contracting States. If the decision is in favour of the third party, the proceedings may not be resumed earlier than three months after the decision has become final, unless the third party requests the resumption."*

275　A claim to assign after letting the application lapse would also be dogmatically unjustifiable, in particular if one classifies – in line with Krasser (*"Vindikation im Patentrecht und rei vindication"*, Commemorative Publication of Gamm, 1990, page 405 *et seqq.*) and probably also the Panel – the *right to the grant of the patent* as a public-law claim, which originates from the application, and thus characterizes the assignment claim under Art. II, Sec. 5, sentence 1 of the Act on International Patent Conventions as an unjustified enrichment claim. The reason for this is that Defendant's public-law claims to be granted a patent, if they have arisen at all, have in any case lapsed with the non-initiation of the regional phase; an assignment of these claims to Plaintiff is thus objectively impossible.

276　An analogous application of the aforementioned provisions is out of consideration as well. There is already no unintended gap in the legal provisions as would be necessary for such an analogy, but in any case no comparable constellation of interests.

277　With Art. II, Sec. 5, sentence 1 of the Act on International Patent Conventions, the German legislator created a specific provision supplementing Section 8 German Patent Act to provide an entitlement claim also for European patents under certain conditions (Bundestag document 7/3712, top of page 19, margin no. 188). As Section 7 (2) German Patent Act shows, the German legislator was well aware of the fact that a non-entitled person can let a patent application lapse and thus deprive the entitled person of his right under Section 8 German Patent Act, and this long before the EPC or G 3/92 (cf. Grounds regarding Sec. 4 (3), sentence 2 , German Patent Act 1936, as published in BIPMZ 1936, at 104). An unintended gap in the legal provisions is therefore not given.

278　The strict requirements of Section 7 (2) German Patent Act, such as the require-ment to file the subsequent application <u>within one month after withdrawal</u> of the



corresponding patent application, take into account the interests of the general public in legal certainty. As already set forth in detail (RtC, margin no. 94 *et seq.*), the Federal Court of Justice thus held in its *"Drahtbiegemaschine"* decision that the grounds stated in G 3/92 <u>cannot</u> justify an <u>analogous application</u> of this provision in situations where the application was already relinquished before the opposition was filed.

279     The same third-party interests also exclude an analogous application of Art. II, Sec. 5, sentence 1 of the Act on International Patent Conventions – in particular long after expiry of the strict time limit of one month pursuant to Sec. 7 (2) German Patent Act – in situations where the patent application has already lapsed before the entitlement action is brought. This must apply all the more if the corresponding patent applications have never come into existence.

280     Even if it were possible to base request 1) solely on Art. 60 (1), sentence 1 EPC and/or a violation of Plaintiff's inventor rights, which is not the case, the request would be unfounded since the Applications in Suit have never become pending as European patent applications (**section 3.2.1** above). Pursuant to Art. 60 (2) EPC, only the applicant of a European patent application is entitled to the right to the grant of the European patent and thus a privileged position which could be considered as the basis for a possible infringement (cf. Federal Court of Justice judgment *"Steuervorrichtung", loc. cit.*, margin no. 28). Even such a privileged position would cease to exist in any case when the fiction of an application ceased due to the non-initiation of the regional phase, and restitution of this position is excluded pursuant to Section 818 (2) and (3) German Civil Code.

### 3.5.3.3     No Right to Declaration of an Obligation to Compensate Damages

281     A claim pursuant to Sections 823 (1) and 249 German Civil Code also fails for the reason alone that German patent applications have never been effectively requested (request 3)) and European patent applications have not become pending (request 2)).

282     Moreover, the Federal Court of Justice confirms in its *"Steuervorrichtung"* decision "that the right to the IP right as an intangible property right pursuant to Section 823 (1) German Civil Code is <u>only protected</u> against violations by third parties <u>if the invention is patentable</u>" (Federal Court of Justice, *loc. cit.*, margin no. 28). It is therefore incorrect that the patent would constitute "a protected legal position and another right within the terms of Section 823 (1) even before the filing as an invention", as is Plaintiff's opinion (Counterstatement, page 36).

283     Moreover, Plaintiff still fails to make even the possibility of a damage being incurred in any way plausible. Plaintiff's brief remarks on this essential require-ment for the claims to compensation of damages asserted by Plaintiff fall far



short of what is required for a substantiated submission of facts and are also highly contradictory.

284    For example, Plaintiff asserts in the Complaint that it *will* incur damage due to Defendant's applications, which however could not be quantified at that time. According to Plaintiff, the alleged damage is supposed to consist in the litigation costs and the delay of the patent application and grant of the patent (cf. Complaint, page 24).

285    Now, Plaintiff is asserting that it *has already* suffered damages since it could not use the Applications in Suit between October 2015 and the "second" filing date (cf. Counterstatement, page 39). This is beside the point in various ways.

286    First of all, requests for declaratory relief are unallowable as far as they relate to damages which Plaintiff has already incurred. Plaintiff would have to quantify said damages. However, even an action for specific performance regarding the compensation of damages would have to be dismissed since Plaintiff has not set forth, let alone proven, any damage which it has allegedly already suffered.

287    Secondly, the fact that Plaintiff fails to set forth the damage allegedly already suffered since October 2015 even rudimentarily clearly speaks against the fact that such an alleged damage will still occur in the future.

288    Thirdly, it is unclear why Plaintiff was allegedly unable to use the technology disclosed in the Applications in Suit. Neither the international filing nor the fact that no European phase was initiated has ever prevented Plaintiff from using the technology. The reference to possible exclusive rights is also beside the point for the reason alone that the Applications in Suit are obviously not patentable.

289    Moreover, Plaintiff fails to set forth any damage on the grounds of "delayed use". However, even if one were to assume that such a claim existed, Plaintiff's considerable delay in enforcing its alleged inventor rights would have to be considered as contributory fault pursuant to Section 252 German Civil Code.

### 3.5.3.4    No Right to Declaration of Restitution Claim

290    With requests 2) and 3), Plaintiff requests the determination that Defendant is allegedly obliged to compensate Plaintiff for damages.

291    As far as the statements in the Counterstatement regarding an alleged restitution right are to be interpreted as an extension of the legal action, such action is to be dismissed with costs. An extension of the legal action would not be expedient.

292    However, a claim arising from *negotiorum gestio* or unjustified enrichment also has not been substantiated in the present case since Defendant has undisputedly not obtained anything by its international patent applications. An asset protected pursuant to Section 812 (1), sentence 1, alternative 2 German Civil Code requires



an "invention", i.e. the solution to a specific technical problem by technical means (cf. Federal Court of Justice judgment *"Steuervorrichtung"*, *loc. cit.*, margin no. 28).

293    Defendant itself did not use the subject matter of the Applications in Suit, which would also be necessary for an enrichment claim (cf. Federal Court of Justice judgment *"Steuervorrichtung"*, *loc. cit.*, margin no. 29 *et seq.*).

294    Furthermore, owing to a lack of patentability, the Applications in Suit do not have a replacement value pursuant to Section 818 (2) German Civil Code. Plaintiff has not submitted anything with regard to the value of the allegedly protectable Applications in Suit. Plaintiff does not state either that Plaintiff itself utilized the subject matter of the applications at any time or that there are specific plans to do so in the foreseeable future, or that anyone else commercially used, uses or will use this subject matter.

### 3.5.3.5    Lack of Protectability Represents a Bar to the Requests

295    The lack of patentability of the Applications in Suit is also to be taken into account with regard to the requests in the present special situation. This was explicitly decided by the Federal Court of Justice in the case of a legal action for compensation of damages on the grounds of the filing of an unauthorized patent application which later lapsed (Federal Court of Justice judgment *"Gummielastische Masse"*, as published in NJW 1995, at 696, see already RtC, margin no. 125 *et seqq.*).

296    Instead of dealing with the reasons behind this, Plaintiff generally points out that the Applications in Suit "are to be filed again with the EPO by Plaintiff and are thus to be examined in the regular grant proceedings as well". According to Plaintiff, it is also "not yet foreseeable" how Plaintiff will adapt the Applications in Suit newly taken up in the further grant proceedings (Counterstatement, page 6). However, it is equally impossible to foresee whether Plaintiff, in view of the non-existing patentability of the Applications in Suit, will go through with the filing of new patent applications, claiming priority from the Applications in Suit.

297    In particular since there is no instance which will decide with certainty on the patentability of the Applications in Suit, it is imperative to consider whether the object of the request is patentable to protect Defendant against arbitrary legal actions. Defendant overlooks the fact that the foregoing position on the assessment of patentability is also founded in the behavior of the applicant who retains the patent application (cf. Federal Court of Justice, as published in GRUR 2001, at 823 [825] - *Schleppfahrzeug*; emphasis added):

> *"What is decisive in this regard is the concept that the assessment of patentability is incumbent upon the patent offices and patent courts and*



*that the general courts should not anticipate the result of <u>pending
examination proceedings</u>. Moreover, it would also seem to be
inconsistent and to contravene trust if the sued applicant asserts on the
one hand that the teaching in dispute is not patentable <u>while said
applicant prosecutes it as its own patent application.</u>"*

298    However, the background of the present dispute is that Defendant itself did not
assume that the Applications in Suit were patentable according to the strict
European standards. It is precisely for this reason that Defendant refrained from
initiating the European phase with regard to the Applications in Suit.

### 3.6        No Jurisdiction

299    As already set-forth in the Response to the Complaint, the Regional Court does
not have jurisdiction. Jurisdiction for all requests included in the Complaint could
only be based on Section 32 German Code of Civil Procedure (see **section 3.6.2**).
The Protocol on Recognition does not apply to the present case (see
**section 3.6.1**).

### 3.6.1        *The Protocol on Recognition Requires That Application Is Pending*

300    The Protocol on Recognition is completely irrelevant for requests 2) and 3) and
the Protocol on Recognition does not provide the seized court with jurisdiction
regarding request 1) either since the Protocol on Recognition cannot establish
jurisdiction outside of its scope of application (RtC, margin no. 147).

301    Already according to the wording of Art. 1 (1) the Protocol on Recognition clearly
applies only to claims against a (current) applicant "to the right to the grant of a
European patent in respect of one or more of the Contracting States designated
in the <u>European patent application".</u> Before initiation of the European phase,
there is not even a European patent application to which the Protocol on
Recognition could apply (**margin no. 3.2.1** above). The right to the grant of a
European patent has thus never existed, and even if it had, it would at least have
lapsed since the regional phase was not initiated.

302    The Protocol on Recognition is supposed to relieve the European Patent Office
from questions of entitlement during pending proceedings, and not, as Plaintiff
believes, to create a general provision for all situations "which require a decision
on the substantive entitlement in preparation for or in connection with European
patents or patent applications" (Counterstatement, page 35). This becomes clear
from the objective of the Protocol on Recognition, as apparent from **Exhibit HE 2**,
margin no. 13 *et seq.* (emphasis added):

*"13. [...] It is completely functional to the specific needs of the EPO under
the Convention, i.e. the Contracting States are required to mutually
recognise decisions on entitlement to the European patent application,*



*only to the extent necessary for the EPO to be able to deal with one and the same party. […]*

*14. Article 1 of the Protocol, disposing of the Protocol's field of application, states in paragraph 1 that 'the courts of the Contracting States shall … have jurisdiction to decide claims, <u>against the applicant</u>, to the right to the grant of a European patent …' (emphasis added). [sic!]*

*The defendant is, therefore, clearly the applicant. The status of applicant, however, is obtained with the filing of an application and ceases to exist once the application has been disposed of either through withdrawal or through refusal or through grant of a patent. If there is no longer an applicant for whichever of the aforementioned reasons, then there is also no defendant for the entitlement claim. Also, the right to the grant of a European patent comes into existence with the application. If the application is disposed of, in whichever way, there is nothing to claim anymore, no object to the entitlement claim. It follows that the provisions of Article 1(1) of the Protocol cannot apply anymore."*

[This is followed by a German translation.]

303     Plaintiff's systematic argument, i.e. that Art. 61 EPC expresses a general allocation of competences that in turn is determined centrally in the Protocol on Recognition "as an integral part of the EPC" (Counterstatement, page 35), is beside the point as well: The risk of conflicting decisions and an associated interest in a uniform provision regarding entitlement to a European patent application exists only as far as said application is pending. Therefore, the Protocol on Recognition is not even applicable to questions of proprietorship of granted European patents, for example (cf. European Court of Justice, as published in GRUR Int. 1984, at 693 [695] – *Duijnstee vs. Goderbauer*; Regional Court Munich judgment of 21 November 2018, court docket: 21 O 11279/17). Plaintiff's conclusion that the Protocol on Recognition is supposed to comprehensive regulate jurisdiction is thus incorrect.

304     The majority opinion of the Enlarged Board of Appeal in G 3/92 cannot be used by Plaintiff as support for its position either. The general statements regarding the allocation of competences in section 3 *et seqq.*, to which Plaintiff refers (cf. Counterstatement, page 34) do not provide guidance on the question of jurisdiction for legal actions against a former applicant of a lapsed PCT application. The Enlarged Board of Appeal did not decide on the interpretation of the Protocol on Recognition, as apparent from the findings of the minority opinion in G 3/92 (emphasis added):



*"8.8 Moreover, it cannot be inferred from the Protocol on Jurisdiction and the Recognition of Decisions in respect of the Right to the grant of a European Patent that it is possible to file a new application under Article 61(1)(b) EPC if the earlier application is no longer pending at the time of filing the new application. The Protocol merely regulates the jurisdiction of the courts for legal proceedings against applicants to determine the right to the grant of a European patent, and the recognition of a final decision issued in one Contracting State in the other Contracting States. The question referred to the Enlarged Board of Appeal is not concerned with these matters. The Board which referred the question had already decided that the Comptroller had jurisdiction to issue a decision concerning the right to the grant of a European patent, and there is no doubt that this decision will be recognised in the other designated Contracting States, which is why these questions were not referred to the Enlarged Board for decision. The Protocol permits no conclusions to be drawn with respect to the question referred to the Enlarged Board of Appeal as the Protocol contains no provisions regulating this."*

305    Thus, the interpretation of the Protocol on Recognition is not beyond doubt at all, in contrast to Plaintiff's self-serving opinion (Counterstatement, page 35). It is to be determined by the Panel.

306    Nothing else applies to the alleged "general jurisdiction" pursuant to Art. II, Sec. 10 (1), second sentence, Act on International Patent Conventions, to which Plaintiff refers (cf. Counterstatement, page 36, section 1.bb)). This provision presupposes that international jurisdiction has been established pursuant to the Protocol on Recognition.

### 3.6.2    No Jurisdiction Under the General Rules

307    For the reasons already set forth in the Response to the Complaint (RtC, section 6.2), the Regional Court does not have jurisdiction for the asserted requests under the general jurisdiction regime of the German Code of Civil Procedure either.

308    At most the place where the harm is incurred in the context of the jurisdiction for unlawful acts pursuant to Section 32 German Code of Civil Procedure could be considered. According to Plaintiff's arguments, since the EPO made register entries and issued communications such harm already was incurred due to the filing of the international patent applications WO'919 and WO'049 at the U.S. Patent Office (Counterstatement, top of page 36).

309    However, also the jurisdiction for unlawful acts requires at least the possibility of an accomplished infringement (cf. Federal Court of Justice, as published in NJW 2005, at 1435). According to Plaintiff's submission, the legally protected right



at issue here is Plaintiff's alleged right to the European patent and the associated entitlement to file patent applications (cf. Counterstatement, page 46 *et seq.*).

310     However, the Applications in Suit have never become effective as European patent applications (see **section 3.2.1** above), but were deemed to be withdrawn already before the European phase was initiated. The designation of EP in the international phase excluded that German patent applications could ever have come into existence (see **section 3.2.2** above). A place where harm was incurred within the terms of Sec. 32 German Code of Civil Procedure therefore does not exist.

311     The decision cited by Plaintiff (Regional Court Munich I judgment of 21 November 2018, as published in BeckRS 2018, at 29526, court docket: 21 O 11279/19, cf. Counterstatement, page 36) is silent on the jurisdiction of the Regional Court in a situation as the present. The reason for this is that this decision was based on a legal action regarding entitlement to patent rights which originated from a European patent application, i.e. a case of Art. II, Sec. 5 (1), sentence 2 of the Act on International Patent Conventions. However, such is not the present case for the reason alone that the Applications in Suit have never reached a corresponding stage.

312     In the *"Steuervorrichtung"* decision also cited (*loc. cit.*), the Federal Court of Justice did not have to decide on questions of international jurisdiction. There the Federal Court of Justice awarded an (German) employee a right to restitution of proceeds, in particular license revenues, which the (German) employer had generated based on an application on a service invention which it had not effectively claimed. Thereby, the Federal Court of Justice considered also foreign applications with regard to infringement and enrichment "since the right to the invention also includes the filing thereof abroad" (Federal Court of Justice, *loc. cit.*, margin no. 33), i.e. it considered the act of infringement of the right to the patent to be already completed in Germany. When applied to the case at issue here, namely the filing of an application with the U.S. Patent Office regarding an (alleged) invention made in the U.S., this excludes that Germany was a place where harm was incurred.

### 4.     Request for Confidential Handling / Exclusion of the Public

313     The request to exclude the statements and annexes identified as confidential in the Counterstatement from file inspections and from the judgment and to exclude the public at the hearing is unfounded.

314     It is a mystery how the plaintiff wants to substantiate that the events and scattered information about a product which, as far as can be seen, was never successfully marketed and has been discontinued for a long time are still



supposed to be confidential today. This is especially true in the fast-moving IT industry, where information is outdated after weeks and months, let alone years.

315    We regard this as a mere show to simulate substance where there is obviously none, just like the absurdly exaggerated value in dispute.

* * *

316    Thus, the fact remains that the legal action is inadmissible, but in any case unfounded.

Dr. Clemens Tobias Steins
Attorney at Law



# List of Exhibits

| | |
|---|---|
| **HE 6** | Report of the U.S. Treasury and press release |
| **HE 7** | US 2015/0254766, "Generating a Dynamic Credit Risk Rating for a Debt Security" |
| **HE 8** | WO'919 with supplements highlighted in yellow as compared to US 62/066,716 |
| **HE 9** | WO'049 with supplements highlighted in yellow as compared to US 62/066,716 |
| **HE 10** | Palantir Cyber – An End-to-End Cyber Intelligence Platform |
| **HE 11** | Communications regarding EP'079 (15 156 004) and EP'078 (15 155 845) |
| **HE 12** | IPO, "A Global Perspective on Patent Subject Matter Eligibility and Software-Related Inventions", 2019, ipo.org/wp-content/uploads/2019/12/IPO_elegibility_whitepaper11-20-19.pdf |
| **HE 13** | Excerpt from PCT Applicant's Guide, wipo.int/export/sites/www/pct/guide/en/gdvol1/annexes/annexd/ax_d_kr.pdf |
| **HE 14** | Decision of the Comptroller in the matter of Latchways Ltd. |
| **HE 15** | EPO, Legal Board of Appeal, decision J 18/09 of 1 September 2010 |



**HOFFMANN EITLE**
Patent- und Rechtsanwälte
Partnerschaftsgesellschaft mbB

Arabellastraße 30
81925 München
Deutschland | Germany

T +49. (0)89. 92 409. 0
F +49. (0)89. 91 83 56

pm@hoffmanneitle.com
www.hoffmanneitle.com

HOFFMANN EITLE | Postfach 81 04 20 | 81904 München

**Per beA und Bote | Zustellung von Anwalt zu Anwalt!**

Landgericht München I
- 21. Zivilkammer -
Lenbachplatz 7

**80316 München**

Dr. Clemens Tobias Steins, LL.M.
CSteins@hoffmanneitle.com

Mike Gruber, LL.M. IP (GWU)
MGruber@hoffmanneitle.com

Michael Pfeifer
mpfeifer@hoffmanneitle.com

München, den 7. August 2020

**Aktenzeichen:**    21 O 11054/18
**Unser Zeichen:**    208 748 z5/z10/z14/dei

# Duplik

I n   d e r   S a c h e

**Palantir Technologies, Inc.**

(Freshfields Bruckhaus Deringer)

- Klägerin -

g e g e n

**Marc L. Abramowitz**

(Hoffmann Eitle)

- Beklagter -

MÜNCHEN
LONDON
DÜSSELDORF
HAMBURG
MILANO*
MADRID*
AMSTERDAM*

HOFFMANN EITLE's professionals include:
European Patent Attorneys
Patentanwälte | German Patent Attorneys
Rechtsanwälte | German Attorneys at Law
British Patent Attorneys (regulated by IPReg)
Italian Patent Attorneys
Spanish Patent Attorneys
Dutch Patent Attorneys
Belgian Patent Attorneys
European Trademark Attorneys
European Design Attorneys

nehmen wir ergänzend zu unserer Klageerwiderung („**KE**") zum Schriftsatz der Klägerin vom 21. Februar 2020 („**Replik**") wie folgt Stellung:

Partnerschaftsregister Amtsgericht München | PR 1372
Eine Liste der Partner i.S.d. PartGG ist in unseren Büros und unter www.hoffmanneitle.com/partner einsehbar.
A list of members of the partnership is open to inspection at our offices and at www.hoffmanneitle.com/partner.
* Die Büros in Mailand, Madrid und Amsterdam sind unabhängige Unternehmen und handeln in Kooperation mit HOFFMANN EITLE PartmbB.
  The Milan, Madrid and Amsterdam offices are independent legal entities which act in cooperation with HOFFMANN EITLE PartmbB.



| | | |
|---|---|---|
| **1.** | **Zusammenfassung** ............................................................................................................ **4** |
| **2.** | **Zum Sachverhalt** ............................................................................................................... **6** |
| 2.1 | Vorbemerkungen.................................................................................................................. 6 |
| 2.2 | Unrichtige Darstellung der Lehren der Streitpatentanmeldungen .................................... 10 |
| | 2.2.1 | Cyber-Versicherungen und Rolle im Informationsaustausch bekannt ................. 12 |
| | 2.2.2 | Die Lehre der Prioritätsanmeldung ..................................................................... 15 |
| | 2.2.3 | Ableitung von früherer Anmeldung des Beklagten .............................................. 22 |
| | 2.2.4 | Weiterer Offenbarungsgehalt und Ansprüche der Streitpatentanmeldungen ..................... 25 |
| | | 2.2.4.1 | Patentanmeldung WO'919 ................................................................... 25 |
| | | 2.2.4.2 | Patentanmeldung WO'049 ................................................................... 28 |
| 2.3 | Vortrag der Klägerin zum vermeintlichen Erfindungsbesitz ............................................... 35 |
| | 2.3.1 | Die angebliche CyberMesh-„Erfindung" der Klägerin........................................... 35 |
| | 2.3.2 | Die provisorische US-Anmeldung US 61/942,480 ................................................. 39 |
| | 2.3.3 | Die angebliche Cyber-Versicherungs-„Erfindung" der Klägerin............................ 40 |
| 2.4 | Zur vermeintlichen Mitteilung des angeblichen Erfindungsbesitzes.................................. 42 |
| | 2.4.1 | Vortrag nicht substantiiert und auch unrichtig ................................................... 42 |
| | 2.4.2 | Keine vertrauliche Mitteilung ............................................................................... 43 |
| | | 2.4.2.1 | Keine vertragliche Pflicht zur Vertraulichkeit....................................... 44 |
| | | 2.4.2.2 | Keine Vertraulichkeitspflicht nach kalifornischem Recht ....................... 46 |
| 2.5 | Eigene Entwicklung des Beklagten ..................................................................................... 47 |
| 2.6 | Mangelnde Patentfähigkeit der Streitpatentanmeldungen ............................................... 49 |
| | 2.6.1 | Parallelverfahren nicht indikativ für Patentfähigkeit eines EP/DE ...................... 49 |
| | 2.6.2 | Fehlende Schutzfähigkeit...................................................................................... 50 |
| 2.7 | Das Verhältnis der Parteien bei Entwicklung des Cyber-Versicherungsgeschäfts.............. 51 |
| **3.** | **Rechtliche Würdigung** ..................................................................................................... **53** |
| 3.1 | Klägerin verkennt Regelungsgegenstand des EPÜ .............................................................. 54 |
| 3.2 | Patentanmeldungen waren weder beim EPA noch DPMA anhängig .................................. 59 |
| | 3.2.1 | EP Anmeldungen wurden nie anhängig – Klageanträge 1) und 2) ....................... 59 |
| | 3.2.2 | Deutsche Anmeldungen nie wirksam beantragt – Klageantrag 3) ....................... 62 |
| 3.3 | Kein Feststellungsinteresse ................................................................................................ 63 |
| | 3.3.1 | Klageantrag 1)...................................................................................................... 63 |
| | | 3.3.1.1 | Kein Feststellungsinteresse hinsichtlich derzeitiger Antragsfassung ...................... 63 |
| | | 3.3.1.2 | Kein Feststellungsinteresse aus Art. 60 Abs. 1 EPÜ............................... 64 |
| | | 3.3.1.3 | Kein Feststellungsinteresse aus Art. 61 Abs. 1 EPÜ............................... 64 |
| | | 3.3.1.4 | Kein Feststellungsinteresse bei bloßer Mitinhaberschaft....................... 66 |
| | 3.3.2 | Klageanträge 2) und 3) ........................................................................................ 68 |
| 3.4 | Kein Rechtsschutzbedürfnis aufgrund zögerlichen Verhaltens .......................................... 68 |
| 3.5 | Feststellungsanträge sind unbegründet ............................................................................. 71 |
| | 3.5.1 | Kollisionsrecht führt zur Anwendung von US-Recht............................................. 71 |
| | 3.5.2 | Nach US Recht bestehen geltend gemachte Ansprüche nicht .............................. 73 |
| | 3.5.3 | Hilfsweise: Auch nach deutschem Recht bestehen Ansprüche nicht..................... 77 |
| | | 3.5.3.1 | Kein Eingriff in Erfinderrechte der Klägerin .......................................... 77 |
| | | 3.5.3.2 | Keine Rechtsgrundlage für Zuerkennen eines Rechts auf Erteilung ..................... 79 |
| | | 3.5.3.3 | Kein Anspruch auf Feststellung einer Schadensersatzpflicht ................. 81 |
| | | 3.5.3.4 | Kein Anspruch auf Feststellung eines Herausgabeanspruchs ................. 82 |
| | | 3.5.3.5 | Mangelnde Schutzfähigkeit steht Klageanträgen entgegen................... 83 |



3.6   Fehlende Zuständigkeit ................................................................................................................. 84

    3.6.1    Anerkennungsprotokoll setzt Anhängigkeit der Anmeldung voraus ...................................... 84

    3.6.2    Keine Zuständigkeit nach den allgemeinen Regeln ............................................................. 87

**4.    Antrag auf vertrauliche Behandlung / Ausschluss der Öffentlichkeit ................................................. 88**



### 1.     Zusammenfassung

1     Die Klägerin kann auch mit der Replik nicht ausräumen, dass die Klage unzulässig und unbegründet ist.

2     Die Klägerin hat weiterhin nicht substantiiert dargetan, geschweige denn Beweise vorgelegt, dass sie (1) die in den Streitpatentanmeldungen offenbarten Erfindungen in Händen hielt und diese (2) dem Beklagten jemals mitgeteilt hat. Der Grund für diese eklatanten Lücken im Vortrag der Klägerin ist schlicht, dass die Vorwürfe ein Fantasiekonstrukt sind, um den Beklagten mit einem weiteren Verfahren zusätzlich zu den in Kalifornien und Delaware anhängigen zu überziehen, und ihn so von der fortgesetzten Geltendmachung seiner Rechte gegenüber der Klägerin abzubringen. Es bestand zum Zeitpunkt der angeblichen Mitteilung (3) auch keine Vertraulichkeitsverpflichtung des Beklagten. Daher hätte die Klägerin mit einer Mitteilung an den Beklagten ihre vermeintliche Erfindung auch der Öffentlichkeit zugänglich gemacht und sich dadurch sämtlicher Rechte auf ein Patent begeben.

3     Der Beklagte, ein Investor mit *Juris Doctorate* Abschluss der Harvard Law School und Masterabschluss in Betriebswirtschaftslehre von der Stanford Universität, hat die in den Streitpatentanmeldungen offenbarten, computerimplementierten Geschäftsverfahren selbst entwickelt, insbesondere Echtzeitinformationen zu nutzen, um verschiedenen Vermögenspositionen dynamisch Werte zuzuordnen. Im März 2014, also bevor ihm die Klägerin vermeintlich etwas mitgeteilt hat, reichte der Beklagte eine Patentanmeldung zu seiner Erfindung ein, Echtzeitinformationen zu nutzen, um Anleihen dynamisch zu bewerten. Dieses Konzept hat er in weiteren Patentanmeldungen auch auf Cyberversicherung, Cybersicherheit, Arzneimittelforschung und andere Geschäftsfelder angewandt, in denen die Analyse von Echtzeitinformationen Bedeutung haben kann. Dies ist ein Vorgehen, das der Patentanwalt des Beklagten – John Squires (auf den wir unten noch eingehen) – zuvor bereits mit anderen Erfindern mit eher wirtschaftlichem als technischem Berufshintergrund praktiziert hat.

4     Die Behauptung der Klägerin, dass ihr statt dem Beklagten hinsichtlich der Streitpatentanmeldungen das Rechte auf ein Patent zustehe, da ihre Mitarbeiter deren Gegenstände erfunden hätten, entbehrt daher bereits jeder tatsächlichen Grundlage.

5     Des Weiteren ergibt sich auch eine Zuständigkeit des Landgerichts weder aus dem *Protokoll über die gerichtliche Zuständigkeit und die Anerkennung von Entscheidungen über den Anspruch auf Erteilung eines europäischen Patents* („**Anerkennungsprotokoll**") noch aus den allgemeinen Regeln (**Ziffer 3.6**).



6       Es besteht auch kein Feststellungsinteresse, weder hinsichtlich des derzeitigen
        Klageantrags 1), insbesondere nicht aufgrund des von der Klägerin herangezoge-
        nen Art. 60 Abs. 1 EPÜ (**Ziffer 3.3.1**), noch hinsichtlich der Klageanträge 2) und 3)
        (**Ziffer 3.3.2**). Die Klägerin verkennt inbesondere, dass Art. 60 Abs. 1 EPÜ nur
        regelt, wem das *Recht auf ein Patent* zusteht, während eine neue Anmeldung
        nach Art. 61 Abs. 1 lit b) EPÜ verlangt, dass dem Anmelder das *Recht auf Erteilung*
        *des Patents* zuerkannt wurde und dass die Voraussetzungen für eine solche
        Zuerkennung aus dem EPÜ bewusst ausgeklammert wurden, zugunsten des
        nationalen Zivilrechts (**Ziffer 3.1**). Auch die Wahrscheinlichkeit eines Schadensein-
        tritts ist weder dargetan, noch plausibel.

7       Art. 61 Abs. 1 lit b) EPÜ ist ferner schon deshalb nicht einschlägig und die G 3/92
        nicht informativ, da die für die Klageanträge 1) und 2) relevanten europäischen
        Streitpatentanmeldungen nie anhängig geworden sind; bis zur Einleitung der
        europäischen Phase, die hier nie eingeleitet wurde, sind allein die Vorschriften
        des PCT anwendbar (**Ziffer 3.2.1**). Die für den Klageantrag 3) angeführten
        deutschen Patentanmeldungen sind nach den Regeln des PCT nicht einmal wirk-
        sam beantragt worden (**Ziffer 3.2.2**).

8       Aufgrund ihres zögerlichen Handelns hat die Klägerin auch zumindest ihr Rechts-
        schutzbedürfnis verloren (**Ziffer 3.4**).

9       Jedenfalls ist die Klage unbegründet:

10      Für die Zuerkennung des *Rechts auf Erteilung eines Patents* ist nach dem anwend-
        baren deutschen Kollisionsrecht zunächst das anwendbare materielle Recht zu
        bestimmten, was hier zu US Recht als dem Recht des gewöhnlichen Aufenthalts
        der Parteien führt. Die Argumente der Klägerin hiergegen überzeugen nicht und
        sie stehen im Widerspruch zur höchstrichterlichen Rechtsprechung (**Ziffer 3.5.1**).
        Nach US Recht stehen der Klägerin die geltend gemachten Ansprüche nicht zu
        (**Ziffer 3.5.2**).

11      Aber auch nach dem hier hilfsweise diskutierten deutschen Recht hat die Klägerin
        kein Anspruch auf Zuerkennen des Rechts auf Erteilung der Streitpatentan-
        meldungen. Der Beklagte hat, wie bereits eingangs betont, nicht in Erfinderrechte
        der Klägerin eingegriffen (**Ziffer 3.5.3.1**) und es besteht darüber hinaus keine
        Rechtsgrundlage nach der der Klägerin die *Rechte auf Erteilung eines Patents*
        hinsichtlich der nie beim EPA anhängig gewordenen, jedenfalls aber zwischen-
        zeitlich weggefallenen EP-Streitpatentanmeldungen zuerkannt werden könnten
        (**Ziffer 3.5.3.2**).

12      Ebenso wenig besteht ein Anspruch auf Feststellung eines Schadensersatz-
        (**Ziffer 3.5.3.3**) oder Herausgabeanspruchs (**Ziffer 3.5.3.4**).



## 2.    Zum Sachverhalt

### 2.1    Vorbemerkungen

13    Die Klägerin erkennt wohl selbst, dass es ihrer Klage hinsichtlich Erfindungsbesitz und Mitteilung desselben erheblich an Substanz mangelt. Sie versucht dies auf zweierlei Weise zu verschleiern. Zum einen stellt sie die tatsächlichen Gegenstände der Streitpatentanmeldungen unrichtig dar, was schon daraus deutlich wird, dass die Klägerin einen Vergleich auch nur mit den selbständigen Ansprüchen scheut und sich stattdessen mit vermeintlichen „Kernaspekten" behilft. Zum anderen sind die Behauptungen der Klägerin über das, was sie vermeintlich erfunden und mitgeteilt haben will, so allgemein gehalten, dass unklar bleibt, was sie tatsächlich behauptet.

14    Die Absicht der Klägerin ist klar – sie versucht vorzutäuschen, dass die mit den Streitpatentanmeldungen beanspruchten Erfindungen von der Klägerin stammen, indem sie die Gegenstände der Streitpatentanmeldungen auf aus dem Zusammenhang gerissene Details reduziert und ihre vermeintlichen Beiträge demgegenüber so generalisiert, dass sie sich vermeintlich auf diese Details lesen lassen. Bei jedem Patentrechtler gehen die Alarmglocken an, wenn eine Partei durchgehend auf vermeintliche „Kernaspekte" abstellt, denn dies ist ein Euphemismus für „zusammenhanglose Einzelheiten". Verweise der Klägerin auf Kernaspekte finden sich beispielsweise an den folgenden Stellen:

- „Kernaspekten der Klagepatentanmeldungen" (Replik, Seite 4)
- „Kernoffenbarung der beiden Klagepatentanmeldungen" (Replik, Seite 6)
- „Kernoffenbarungen sind unbestritten" (Replik, Seite 6)
- „Kern der Cyber-Konsortium-Anmeldung" (Replik, Seite 6)
- „Kernaspekte dieser Erfindungen" (Replik, Seite 8)
- „Kernaspekte der klagepatentgemäßen Erfindungen" (Replik, Seite 9)
- „Kern sowohl der ‚Cyber Mesh'- als auch der Cyber-Versicherungs-Erfindungen" (Replik, Seite 9)
- „Kernaspekte der Erfindungen" (Replik, Seite 25)
- „Kernaspekte der beiden Klagepatentanmeldungen" (Replik, Seiten 31 und 40)
- „Kernaspekte der klagepatentgemäßen Erfindungen" (Replik, Seite 33)
- „Kernaspekte der Cyber-Konsortium-Anmeldung" (Replik, Seite 40)
- „Kernaspekte der Cyber-Versicherungs-Anmeldung" (Replik, Seite 42)

15    Hinsichtlich ihres vermeintlichen Erfindungsbesitzes ist die Klägerin nur in einer Hinsicht konkret und vermag Dokumente vorzulegen, nämlich hinsichtlich der

HOFFMANN EITLE

nach ihrer Aussage im Oktober 2013 in Händen gehaltenen CyberMesh-Anwen-
dung (Replik, Seite 16). Zur vermeintlich zeitgleich entwickelten Cyber-Versiche-
rungs-Anwendung ist der Vortrag wolkig. Es wird kein einziges Dokument aus der
Entwicklungszeit vorgelegt. Die Klägerin bezieht sich ausschließlich auf die Email
von Shyam Sankar vom 9. Juni 2014, die aber nicht die in den Streitpatentanmel-
dungen offenbarten Erfindungen mitteilt. Sie belegt im Gegenteil, dass Herr
Sankar ein dreiviertel Jahr nach dem vermeintlichen Entwicklungsbeginn, nur
Allgemeinbekanntes zu den mit Cyber-Versicherungen verfolgten Vorteilen
wiedergeben kann, dass keine Entwicklung stattgefunden hat und dass er zu
diesem Zeitpunkt keine fertige Erfindung, insbesondere nicht die der Streitpatent-
anmeldungen in Händen hielt.

16        Es wird nicht in Abrede gestellt, dass die Klägerin an Technologien zu Cyber-An-
griffen gearbeitet und auch an einer CyberMesh genannten Technologie. Im
Gegenteil, in der Klageerwiderung wurde bereits aufgezeigt, dass die Klägerin
diese Anwendung noch vor Ende des Jahres 2013 öffentlich beworben hat (KE,
Rz. 117, **Anlage HE 4**). Dies ist in der Replik unwidersprochen geblieben. Die
§ 1782-Discovery hat ebenfalls gezeigt, dass die Klägerin verschiedene Werbe-
prospekte zu CyberMesh an potentielle Kunden geschickt hat, was die allgemeine
Veröffentlichung ihrer CyberMesh-Technologie weit vor der angeblichen Mittei-
lung an den Beklagten ebenfalls bestätigt. Damit hat die Klägerin sich selbst der
Chance begeben, CyberMesh zum Patent anzumelden. CyberMesh war jedenfalls
zum Zeitpunkt des Gesprächs zwischen Herrn Sankar und dem Beklagten am 10.
Juni 2014, in dem die Klägerin über diese Entwicklung berichtet haben will, was
der Beklagte **bestreitet,** keinesfalls mehr als vertrauliche Information anzusehen.

17        Gemäß den von der Klägerin überreichten oder im Verlauf dieses Verfahrens aus
öffentlichen Quellen erhaltenen Dokumenten diente CyberMesh dem Informa-
tionsaustausch über Erkennungsmerkmale eines Cyber-Angriffs. Es ist darauf
ausgerichtet, Informationen von Dritten und von Teilnehmern des CyberMesh
über eine zentrale Instanz automatisiert zusammenzuführen, um die Teilnehmer
vor Risiken eines Cyber-Angriffs zu warnen, und ihnen damit eine bessere
Verteidigung gegen solche Cyber-Angriffe zu ermöglichen. CyberMesh-Teilnehmer
können zum selben Zweck Informationen auch direkt automatisiert austauschen.
Dies ermöglicht Synergien, denn wenn Teilnehmer A angegriffen wird und Infor-
mationen über diesen Angriff, beispielsweise die IP-Adresse von der dieser Angriff
ausging, direkt oder indirekt mit den Teilnehmern B bis Z teilt, können sich diese
besser gegen den Angriff zur Wehr setzen.

HOFFMANN EITLE

18        In seiner Email vom 9. Juni 2014 erwähnt Herr Sankar zum Thema Cyber-Versiche-
          rung, man würde:

          • Sonden und Sensoren in die Netzwerke der Versicherungskunden einführen
            und aktiv in Echtzeit nicht nur auf Anzeichen von Angriffen, sondern auch
            auf Anzeichen von Schwächen achten; und

          • Mindestanforderungen für den Schutz gegen Cyber-Angriffe aufstellen bei
            deren Nichterfüllung der Versicherungsschutz verfalle.

19        Als Vorteil gibt er die in Rz. 17 bereits erwähnten, mit CyberMesh erzielten
          Synergieeffekte an.

20        Demgegenüber ist die Streitpatentanmeldung WO'919 des Beklagten darauf
          gerichtet, dynamisch und automatisiert passende Versicherungsprodukte und
          angemessene Versicherungssummen für die IT-Infrastruktur-Anlagen der Versi-
          cherungsnehmer zu ermitteln und ihnen auf elektronischem Weg anzubieten. Es
          sollen Indikatoren wie die Risikogeneigtheit des Kunden, die Sensitivität der
          gespeicherter Daten und der ggf. entstehende Schaden bestimmt werden, die
          Profiltypen oder einem Produkt oder einer Dienstleistung zugeordnet sind, und
          die mit Gewichtungen versehen werden können, um durch ein Mapping das
          passende Versicherungsprodukt oder die angemessene Versicherungssummen zu
          bestimmen.

21        WO'049, die weitere Streitpatentanmeldung des Beklagten, ist gerichtet auf die
          Zusammenarbeit zwischen Unternehmen, die ihren Kunden bei Cyber-Angriffen
          auf deren Computer-Systeme beistehen, wie externe IT-Dienstleister, sei es durch
          Remote-Access oder vor Ort. Als Mitglieder eines Konsortiums unterstützen sich
          die Unternehmen dabei gegenseitig mit technischen und personellen Ressourcen
          und koordinieren sich bei ihrer Arbeit auch über ein zentrales Konsortiumssystem.

22        Es bestehen somit ganz erhebliche Unterschiede zwischen dem was die Klägerin
          als vermeintliche „Kernaspekte" darstellt und dem was die Streitpatentanmel-
          dungen tatsächlich beanspruchen und offenbaren. Und es passt ins Bild des spär-
          lichen Sachvortrags und der auffallend generalisierenden Pauschalbehauptungen
          der Klägerin, dass sie auch im von ihr selbst angestrengten § 1782-Discovery-Ver-
          fahren alles tut, um nicht offenlegen zu müssen, was sie tatsächlich „erfunden"
          hat.

23        Die Klägerin meint, dass sie der Discovery in den USA nicht nachkommen müssen,
          und behauptet hierzu in US-Discovery-Verfahren, dass der Beklagte im hiesigen
          Verfahren „nicht behaupte und nie behauptet habe, dass Palantir die Technologie
          nicht entwickelt habe, die den [Streitpatentanmeldungen] unterliegt" (Auszug aus

HOFFMANN EITLE

Email von David Livshiz, Freshfields, vom 15. Juli 2020 an die US Vertreter des
Beklagten; Hervorhebung hinzugefügt):

> had a cyber business that is unrelated to the specific technology underlying the Cyber Patents. Just as
> importantly, while Palantir has accused Abramowitz of misappropriating Palantir's technology,
> Abramowitz does not, and has never claimed, that Palantir did not develop the technology underlying
> the German Patents. *See* Response to Complaint (ENG), ¶¶40-154. There is thus no reason—other than
> to impose burden on Palantir—for Abramowitz to demand that Palantir apply search terms seeking
> evidence that it created/invented this technology.

Wie dem Gericht bekannt ist, stellt dies eine klare Irreführung dar. Es war und ist
keineswegs unstreitig, dass die Mitarbeiter der Klägerin die Lehren der Streit-
patentanmeldungen erfunden haben (siehe Ziffer 5.3 der Klageerwiderung). Die
Klägerin setzt sich damit über die Anweisung des US-Gerichts hinweg, alle rele-
vanten Dokumente vorzulegen.

24      Weder die Streitpatentanmeldungen noch die von der Klägerin beschriebenen
vermeintlichen Erfindungen sind nach den vom EPA und BGH aufgestellten Anfor-
derungen patentfähig.[1] Es sind computerimplementierte Verfahren für geschäft-
liche Tätigkeiten, die offensichtlich ohne jeglichen technischen Überschuss sind,
da sie nur vollkommen generische Datenverarbeitungskonzepte unter Verwen-
dung notorisch bekannter Bauteile nutzen, z.B. Prozessoren oder Computernetz-
werke.

25      Die Replik zeigt nichts anderes auf. Die Klägerin versucht abzulenken, indem sie
allein auf die Technizität abstellt. Die Voraussetzung „Technizität" ist aber nicht
der Filter, an dem computerimplementierte Verfahren für geschäftliche Tätig-
keiten zum Scheitern verurteilt sind. Dies erfolgt erst – wie hier zweifellos – auf
Ebene der Patentfähigkeit.

26      Nach dem Prüfungsschema des EPA und BGH ist Techniziät schon gegeben, wenn
die beanspruchte Lehre auch nur *ein* technisches Merkmal aufweist. Die Nennung
beispielsweise des Begriffs „Computernetzwerk" reicht aus. Nichttechnische
Merkmale zählen dennoch nicht zur Erfindung. Sie werden nach dem vorgenann-
ten Prüfungsschema auf der Stufe der Patentfähigkeit ausgeblendet. Verbleibt als
Gegenstand nur ein generisches Computernetzwerk, wie hier, dann liegt fraglos
keine patentfähige Erfindung vor.

27      Die Klägerin kann nicht geltend machen, dass ihre Mitarbeiter „Erfinder" dieser
generischen und notorisch bekannten Datenverarbeitungskonzepte und Bauteile
gewesen sind; ebenso wenig wie sie „Erfinder" der Geschäftskonzepte gewesen

---

[1] Soweit wir hier und im Folgenden zur Patentfähigkeit der Streitpatentanmeldungen Stellung beziehen, so
bezieht sich dies ausschließlich auf die Patentfähigkeit nach EPÜ und Patentgesetz.

HOFFMANN EITLE

sein können, denn Geschäftskonzepte sind grundsätzlich nicht als Erfindung anzusehen (§ 1 Abs. 3 PatG).

28     Dass die vermeintliche CyberMesh-„Erfindung" der Klägerin aus genau diesen Gründen nicht patentfähig ist, hat auch schon das EPA bestätigt, wie unter Rz. 114 ff. ausgeführt wird. Das EPA hat zu den EP Anmeldungen der Klägerin, die aus der vermeintlich den Erfindungsbesitz dokumentierenden US-Anmeldung US 61/942,480 (**FBD 13**) hervorgegangen sind, festgestellt, dass diese keine über generische Konzepte und Elemente hinausgehende technische Lehre offenbaren.

## 2.2     Unrichtige Darstellung der Lehren der Streitpatentanmeldungen

29     Durch das Abstellen auf vermeintliche „Kernaspekte" vermeidet die Klägerin eine Gegenüberstellung der Gegenstände der Streitpatentanmeldungen mit ihrer angeblichen „Erfindung". Dies genügt nicht den Anforderungen an einen substantiierten und einlassungsfähigen Sachvortrag. Die Darstellung der Lehre der Streitpatentanmeldungen ist aber auch schlicht unrichtig, wie man beim Lesen der Streitpatentanmeldungen feststellt und im Folgenden zusammengefasst ist.

30     Cyber-Versicherungen waren 2013 längst am Markt verfügbar, und ihre Rolle beim Informationsaustausch zur Abwehr von Cyber-Angriffen nicht nur in Fach-kreisen, sondern weit darüber hinaus bekannt (**Ziffer 2.2.1**).

31     Der Gegenstand der Cyber-Versicherungs-Anmeldung (WO'919; **FBD 1**) ist gerich-tet auf eine dynamische und automatisierte Neubewertung von Schadensrisiken, um ein Versicherbarkeits-Rating oder ein Versicherungsprodukt des Versiche-rungsnehmers kontinuierlich anpassen zu können (im Detail **Ziffer 2.2.4.1**). Es ist dieser Gegenstand, der zeitlich und inhaltlich das Fundament der Erfindungen des Beklagten bildet, denn die Prioritätsanmeldung der Streitpatentanmeldungen war allein auf diesen Gegenstand gerichtet (**Ziffer 2.2.2**).

32     Nach der Lehre dieser WO'919 bestimmt der Versicherer Indikatoren, die über Profile einem Unternehmen oder einem bestimmten zu versichernden Produkt oder Dienstleistung zugeordnet sind. Diese Indikatoren sollen beispielsweise Aspekte wie die Risikosensitivität des Unternehmens, die Anzahl und Art der von diesem Unternehmen betriebenen IT-Anlagen, die auf den jeweiligen IT-Anlagen gespeicherten Daten (beispielsweise Patientendaten versus öffentliche Website), die Risikoanfälligkeit der IT-Anlagen und die Schadenshöhe bei einem erfolg-reichen Cyber-Angriff abbilden, für das versicherte Unternehmen, das versicherte Produkt oder die versicherte Dienstleistung. Da jeder dieser Indikatoren Auswir-kungen auf die Schadenshöhe oder die Eintrittswahrscheinlichkeit eines Schadens haben kann und sie sich ständig ändern, soll eine kontinuierliche, dynamische Neubewertung erfolgen.



33      Eine dynamische und automatisierte Neubewertung von Einflussfaktoren, wie sie in der Prioritätsanmeldung und der WO'919 des Beklagten auf Cyber-Versicherungsrisiken angewandt wird, war auch bereits das Konzept der früheren Anmeldung des Beklagten aus dem März 2014. Dies zeigt, dass es sich um eine eigene Entwicklung des Beklagten handelt (**Ziffer 2.2.3**). Die Klägerin hat nicht vorgetragen, irgendeinen Beitrag zu der März-2014-Anmeldung des Beklagten geleistet oder dem Beklagten vor Juni 2014 irgendwelche Information hinsichtlich ihrer angeblichen Erfindungen mitgeteilt zu haben, weshalb unstreitig ist, dass diese frühere Anmeldung keinen Beitrag von Mitarbeitern der Klägerin umfasst.

34      Der vermeintliche „Kernaspekt" der Erfindung der WO'919, den Versicherungsnehmer schnell auf drohende Angriffe hinweisen zu können, ist buchstäblich nur ein nebensächlicher Gedanke, ein einziger Halbsatz in 21 Seiten Beschreibung der Prioritätsanmeldung. Entgegen dem Vortrag der Klägerin kommt in der WO'919 auch kein „Konsortium" vor.

35      Die Klägerin hat nicht hinreichend substantiiert vorgetragen und auch keine Belege dafür vorgelegt, dass ihre Mitarbeiter die in WO'919 offenbarten Erfindungen, insbesondere hinsichtlich der dynamischen und automatischen Quantifizierung von Risiken, gemacht und dem Beklagten mitgeteilt hätten.

36      Aspekte eines Konsortiums wurden erst und ausschließlich in die weitere Nachanmeldung aufgenommen, die die Klägerin als Cyber-Konsortiums-Anmeldung bezeichnet (WO'049; **FBD 3**). Auch den Gegenstand dieser Anmeldung missinterpretiert die Klägerin, sowohl hinsichtlich der grundsätzlichen Struktur des Konsortiums als auch hinsichtlich dessen Funktion (im Detail **Ziffer 2.2.4.2**).

37      Das Konsortium besteht aus unabhängigen Unternehmen, die jeweils eine Binnenstruktur aus zentralen Überwachungsstellen und lokalen Handhabungsstellen aufweisen. Jedes dieser Konsortiumsmitglieder hat eigene Kunden, die das Konsortiumsmitglied wie ein externer IT-Dienstleister bei Cyber-Angriffen auf die Kunden-Computersysteme unterstützt. Dabei helfen sich die Konsortiumsmitglieder gegenseitig, beispielsweise indem sie Cyber-Angriffe gegen den Kunden eines anderen Konsortiumsmitglieds abwehren, entweder durch Personal vor Ort beim Kunden-Computersystem oder durch Fernwartung. Das Konsortiumssystem unterstützt die Konsortiumsmitglieder bei der Koordination ihrer gegenseitigen Unterstützungsmaßnahmen, unter anderem durch die Kommunikation von Anfragen und Berichten, Informationen über technische und personelle Ressourcen der Mitglieder und durch Bereitstellung eines Datenrepositoriums, das allen Konsortiumsmitgliedern offensteht.

        Im Einzelnen:

HÖFFMANN EITLE

### 2.2.1    Cyber-Versicherungen und Rolle im Informationsaustausch bekannt

38    Die Idee einer Cyber-Versicherung war zum Prioritätstag bereits mehr als eine Dekade alt, und solche Versicherungen auch bereits lange kommerziell verfügbar. Dieser vermeintliche „Kern" der angeblichen Erfindung der Klägerin (vgl. Replik, Seite 18) stammt also nicht von ihr und die Rechte an dieser Idee können nicht von ihren Mitarbeitern auf sie übergegangen sein.

39    Durch Cyber-Versicherungen den Informationsaustausch zwischen Unternehmen zu deren besserem Schutz zu fördern, war im Jahr 2013 sogar bereits Teil eines Regierungsprogramms für systemrelevante Infrastrukturunternehmen. Wir überreichen hierzu den öffentlichen Bericht des U.S. Finanzministerium an den Präsidenten, zusammen mit einer Pressemitteilung des Weißen Hauses vom 6. August 2013, die auf diesen Bericht verlinkt, als

**Anlage HE 6**.

40    Insbesondere die beiden in der Email von Herrn Sankar angesprochenen Aspekte (oben **Rz. 18**) einer Cyber-Versicherung, (i) durch Überwachung der Systeme der Versicherungskunden in Echtzeit Anzeichen von Angriffen und von Schwächen in den Systemen zu erkennen (siehe unten **Rz. 41** und **43**) und (ii) Mindestanforderungen für den Schutz gegen Cyber-Angriffe aufzustellen bei deren Nichterfüllung der Versicherungsschutz verfällt (siehe unten **Rz. 41)**, waren bereits dermaßen notorisch, dass sie es bis in dieses Regierungspapier gebracht haben.

41    Unter Ziffer 7 „*Cyber Insurance*" heißt es unter anderem (Seite 23 f.; Hervorhebungen hinzugefügt):

> „*The growth of the private cyber insurance market could lead to a <u>better understanding of cyber threat patterns and improved information sharing</u> between the government and insured firms. Because insurers need credible data to appropriately underwrite and price policies, insurance creates incentives for <u>standardized data collection and reporting.</u>*"

und:

> „*[...] insurers can help establish <u>minimum cybersecurity standards, monitor market threats, and play an important compliance role.</u>*"

Auf Deutsch:

> „*Das Wachstum des privaten Cyber-Versicherungsmarktes könnte zu einem <u>besseren Verständnis von Cyber-Bedrohungsmustern und einem verbesserten Informationsaustausch zwischen der Regierung und den</u>*



HÖFFMANN EITLE

*versicherten Unternehmen führen. Da Versicherer glaubwürdige Daten benötigen, um eine angemessene Zeichnungs- und Preispolitik betreiben zu können, schafft die Versicherung Anreize für eine standardisierte Datenerfassung und Berichterstattung."*

*„Versicherer können dabei helfen, Mindestanforderungen für Cyber-Sicherheitsstandards zu entwickeln, Marktbedrohungen zu überwachen, und eine wichtige Rolle bei der Compliance spielen."*

42    Cyber-Versicherungen werden in diesem Bericht als ein potentielles Instrument beschrieben, den Informationsaustausch zwischen den versicherten Unternehmen zu verbessern, denn, wie der Bericht im Einführungsteil ausführt (Seite 5):

*„Private firms that are preparing to defend against an impending cyber threat, or recently experienced a cyber incident, might also have specific information that could help identify potential vulnerabilities, induce other firms to make new investments in security technologies, or aid them in taking additional steps to reduce the risk of cyber events."*

Auf Deutsch:

*„Privatunternehmen, die sich auf die Abwehr einer drohenden Cyber-Bedrohung vorbereiten oder vor kurzem einen Cyber-Zwischenfall erlebt haben, könnten ebenfalls über spezifische Informationen verfügen, die dazu beitragen könnten, potenzielle Schwachstellen zu identifizieren, andere Unternehmen zu neuen Investitionen in Sicherheitstechnologien zu bewegen oder sie dabei zu unterstützen, zusätzliche Schritte zur Verringerung des Risikos von Cyber-Ereignissen zu unternehmen."*

43    Der Bericht folgert unter Ziffer 1, „Enhancing Information Usage Capabilities to Support Information Sharing" (Seite 8):

*„Critical infrastructure stakeholders suggested that real-time informa-tion sharing would significantly improve cybersecurity by providing firms with quicker access to knowledge they need to pro-actively bolster their defenses. This means improving and increasing the flow of information among critical infrastructure organizations about security threats ob-served by the organizations themselves, and the government's dissemi-nation of such information to the private sector for preventive purposes."*

Auf Deutsch:

*„Akteure im Bereich systemkritischer Infrastrukturen regten an, dass ein Informationsaustausch in Echtzeit die Cybersicherheit erheblich verbes-*



*sern würde, indem er Unternehmen einen schnelleren Zugang zu Wissen
verschafft, das sie zur proaktiven Stärkung ihrer Verteidigung benötigen.
Dies bedeutet, dass der Informationsfluss zwischen den systemkritischen
Infrastruktur-Organisationen selbst, über durch sie beobachtete Sicher-
heitsbedrohungen, verbessert und verstärkt wird und dass die Regierung
solche Informationen zu Präventivzwecken an den privaten Sektor
weitergibt."*

44      Allerdings bestanden auch Bedenken, in zu großem Umfang oder zwischen be-
        stimmten Unternehmen Informationen auszutauschen (Seite 8):

> *„Although private firms recognize the value of receiving such
> information, they indicate that they may be hesitant to contribute to an
> information sharing program, principally out of liability concerns.  For
> example, firms are apprehensive that their information, if confidential
> and not subject to any duty of disclosure, could become a matter of
> public knowledge and adversely impact their reputation, financial
> position, or result in litigation over the appropriateness of their public
> disclosures. [...] Stakeholders also expressed concern that information
> shared in good faith could, if disclosed to competitor firms, give those
> competitors an advantage."*

Auf Deutsch:

> *„Obwohl private Firmen erkennen, wie wertvoll der Erhalt solcher
> Informationen wäre, geben sie an, der Teilnahme an einem Informa-
> tionsaustauschprogramm – hauptsächlich aufgrund von Haftungsfragen
> – zögerlich gegenüberzustehen. Firmen befürchten etwa, dass ggf.
> vertrauliche und keiner Auskunftspflicht unterliegende Informationen der
> Öffentlichkeit zugänglich werden könnten, was ihren Ruf und ihre
> finanzielle Position schädigen oder sogar Rechtsstreitigkeiten über die
> Rechtmäßigkeit der Veröffentlichung nach sich ziehen könnte. [...] Die
> Beteiligten zeigten sich außerdem besorgt, dass nach Treu und Glauben
> geteilte Informationen, sofern sie Wettbewerbern preisgegeben werden,
> jenen zum Vorteil gereichen könnten."*

45      Eine Möglichkeit, diesen Bedenken zu begegnen, sieht der Bericht darin, Informa-
        tionen nur freiwillig, aber automatisiert und unmittelbar zu teilen, sowie zu
        beschränken, welche Information geteilt wird und mit wem (Seite 9 f.):

> *„To allay the foregoing concerns, information sharing can be highly
> targeted to deliver actionable information only to those with a need to
> receive and in a form that is anonymized.  [...]*



*However, the Executive Order specifically calls for the establishment of a voluntary information sharing program for critical infrastructure organizations.*

*In order to fully participate in this program, critical infrastructure organizations must have the capability to send, receive, and act upon information about cyber threats and vulnerabilities. Adoption of the Framework could lead to the creation of more standardized information-sharing practices and policies, which would help these firms and others that adopt its measures to better utilize threat information for the timely and effective mitigation of cyberthreats within their environments."*

Auf Deutsch:

*„Um die vorstehenden Bedenken auszuräumen, kann der Informationsaustausch höchst zielgerichtet erfolgen, sodass nur jene Kenntnis verwertbarer Informationen erlangen, die sie auch tatsächlich benötigen, und zwar in anonymisierter Form. […]*

*Die Schaffung eines freiwilligen Informationsaustauschprogramms für systemkritische Infrastruktur-Organisationen wird jedoch in der Executive Order explizit verlangt.*

*Zur vollumfänglichen Teilnahme an diesem Programm müssen systemkritische Infrastruktur-Organisationen in der Lage sein, Informationen über Cyber-Bedrohungen und -Schwachstellen zu übermitteln, zu empfangen und darauf zu reagieren.*

*Die Annahme der Rahmenbedingungen könnte zur Schaffung standardisierterer Informationsaustauschpraktiken und -richtlinien beitragen, was diesen Firmen und anderen, die jene Maßnahmen umsetzen, ermöglicht, Informationen über Bedrohungen besser für die zeitnahe und wirksame Eindämmung von Cyber-Bedrohungen in ihrem Umfeld zu nutzen."*

46    Die vermeintliche Erfindung der Klägerin war somit zum Prioritätstag nicht nur in Fachkreisen allgemein bekannt. Sie war bereits so notorisch, dass sie selbst in der allgemeinen politischen Diskussion bereits angekommen war.

### 2.2.2    Die Lehre der Prioritätsanmeldung

47    Unabhängig vom Vorstehenden ist der Vortrag der Klägerin zum vermeintlichen „Kern" der Streitpatentanmeldungen unzutreffend. Da beide Streitpatentanmeldungen auf dieselbe Prioritätsanmeldung zurückgehen und deren Offenbarungs-



gehalt umfassen, gebietet es schon die effiziente Darstellung, mit den aus diesem gemeinsamen Stamm hervorgegangenen Gemeinsamkeiten zu beginnen, um dann die in den Nachanmeldungen hinzugefügten Aspekte zu erläutern. Zugleich verdeutlicht dies, was erst im Oktober 2015 – also in keinerlei zeitlichem Zusammenhang zu der vermeintlichen Mitteilung und auch nach Veröffentlichung der Cyber-Versicherungs-„Gedanken" der Klägerin – in die Streitpatentanmeldungen aufgenommen wurde.

48    Die Klägerin hat die Prioritätsanmeldung der Streitpatentanmeldungen, die provisorische Anmeldung US 62/066,716 bereits als *FBD-V 22* gekennzeichnet vorgelegt. Warum diese Anmeldung vertraulich sein soll bleibt das Geheimnis der Klägerin. Sie ist im US Patentregister frei zugänglich.

49    Die Prioritätsanmeldung des Beklagten (*FBD-V 22*), die den Titel trägt „*Dynamic Security Rating for Cyber Insurance Products*" („*Dynamisches Sicherheits-Rating für Cyber-Versicherungsprodukte*"), offenbart Mechanismen zur dynamischen und automatisierten Einschätzung der Versicherbarkeit von Cyber-Risiken hinsichtlich IT-Infrastruktur-Anlagen (*computing assets*) eines Unternehmens mit einem bestimmten Risikoprofil, bzw. hinsichtlich bestimmter Produkte oder Dienstleistungen. Aufgrund der Bestimmung kann eine jeweils ausreichende Versicherungssumme und ein passendes Versicherungsprodukt auf elektronischem Weg ermittelt und angeboten werden (vgl. insbesondere Abschnitte [0028] und [0038]).

50    Um passende Versicherungsprodukte auszuwählen, ermittelt die Technologie der Streitpatentanmeldungen numerische Werte für drei Typen von Profilen:

- das Cyber-Risikoprofil einer IT-Anlage – „*asset risk profile*" (Abb. 3A);
- das Schadensprofil einer IT-Anlage – „*asset damage profile*" (Abb. 3B); und
- das Risikoprofil des Unternehmens dem diese eine oder mehreren Anlagen der IT-Infrastruktur zugeordnet sind – „*company risk profile*" (Abb. 3C).

51    Hierzu legt der Nutzer sogenannte Indikatoren („*indicators*") fest, die den Wert des jeweiligen Profils beeinflussen. Dies ist beispielsweise in Abschnitt [0028] wie folgt zusammengefasst:

> „[…] *based on one or more indicators of the asset risk profile, asset damage profile, and/or company risk profile, the technology determines one or more cyber insurance policies and/or products* […]"

Auf Deutsch:

> „[…] *Auf Grundlage eines oder mehrerer Indikatoren für das Cyber-Risikoprofil einer IT-Anlage, das Schadensprofil einer IT-Anlage und/oder*



> das Risikoprofil des Unternehmens ermittelt die Technologie eine oder
> mehrere Cyber-Versicherungspolicen und/oder -produkte [...]"

52    Beispiele für die Indikatoren sind in Abschnitt [0026] (aber auch in den Ab-
schnitten [0027] und [0034] bis [0037]) beschrieben:

> „[0026] [...] For example and as further described below, the technology
> can determine that an asset (e.g., a server) has a risk assessment of 8
> out of 10 (i.e., 0.8) based on various indicators in that asset's profile,
> such as being a public server (i.e., a first indicator) operating using an
> older operating system and/or other software products (i.e., a second
> indicator) that has known vulnerabilities (i.e., a third indicator). That
> asset (e.g., the server described above) is also, in one or more
> embodiments, associated with a damage assessment, which is a
> measure of a company's estimated loss of capital and/or intangible
> losses (e.g., loss due to an adverse effect to company reputation) if the
> asset were compromised by a cyber-attack. Similar to the determination
> of the risk assessment, a damage assessment for the server mentioned
> above could be, for example, 3 out of 10 (i.e., 0.3) because the server
> stores lower valued webpages and, if compromised, would not
> negatively affect the company's reputation. [...]"

Auf Deutsch:

> „[0026] [...] Zum Beispiel kann die Technologie, wie unten näher
> beschrieben, ermitteln, dass eine IT-Anlage (z.B. ein Server) aufgrund
> verschiedener Indikatoren im Risikoprofil dieser IT-Anlage – z.B. ob es ein
> öffentlicher Server ist (d.h. ein erster Indikator), der mit einem älteren
> Betriebssystem und/oder anderen Softwareprodukten (d.h. ein zweiter
> Indikator) betrieben wird, der bekannte Schwachstellen hat (d.h. ein
> dritter Indikator) – eine Risikobewertung von 8 von 10 (d.h. 0,8) aufweist.
> Diese IT-Anlage (z.B. der oben beschriebene Server) ist in einer oder
> mehreren Ausführungsformen auch mit einer Schadensbewertung
> verknüpft, die das Ausmaß des geschätzten Kapitalverlustes der Firma
> und/oder immaterieller Verluste (z.B. Verluste durch Rufschädigung der
> Firma) im Falle eines Cyberangriffs auf die Anlage bemisst. Ähnlich wie
> bei der Bestimmung der Risikobewertung könnte eine Schadensbewer-
> tung für den oben genannten Server beispielsweise 3 von 10 (d.h. 0,3)
> ergeben, weil der Server weniger wertvolle Webseiten speichert, weshalb
> der Ruf der Firma bei einem Angriff keinen Schaden nehmen würde. [...]"



53      Zusätzlich können die Indikatoren noch mit Gewichtungen versehen werden, wie
        in Abschnitt [0048] (aber auch Abschnitt [0050]) ausgeführt:

        „[0048] In one implementation, the real-time damage assessment is
        computed by an algorithm that uses a weighted average technique. This
        technique assigns a first weight to an indicator representative of a
        likelihood of the occurrence of the one or more cyber attacks, assigns a
        second weight to an indicator representative of a the likelihood of
        success of the one or more cyber attacks, and a third weight to an
        indicator representative of the measure of severity of damage to the
        product or service. The weights can be indicative of the importance of
        each of the associated indicators of likelihood and/or measure."

        Auf Deutsch:

        „[0048] In einer Ausführungsform wird die Echtzeit-Schadensbewertung
        mithilfe einer gewichteten Mittelwertmethode von einem Algorithmus
        berechnet. Mithilfe dieser Methode wird eine erste Gewichtung einem
        Indikator zugewiesen, der die Auftrittswahrscheinlichkeit von einem oder
        mehreren Cyberangriffen darstellt, eine zweite Gewichtung einem
        Indikator, der die Erfolgswahrscheinlichkeit von einem oder mehreren
        Cyberangriffen darstellt, sowie eine dritte Gewichtung einem Indikator,
        der das Ausmaß der Schadensschwere für das Produkt oder die
        Dienstleistung darstellt. Diese Gewichtungen können die Wichtigkeit des
        jeweiligen Indikators in Bezug auf Wahrscheinlichkeit und/oder Ausmaß
        widerspiegeln."

54      Es findet für jedes dieser Profile eine Auswertung (assessment) der Indikatoren
        statt, ggf. mit ihren jeweiligen Gewichtungen, womit ein Wert, das „assessment
        value", bestimmt wird. Wir verweisen erneut auf Abschnitt [0026]:

        „[0026] In various embodiments the technology determines asset risk
        assessments, asset damage assessments, and customer risk assess-
        ments. Assessments are snapshots of real-time asset and/or company
        behavior based on various indicators and expressed as simple values,
        such as a number, percentage, hash, etc. [...] Each asset, in one or more
        embodiments, is associated with one or more profiles or other data
        structures ("profiles") that are associated with indicators that define
        asset and/or company characteristics and are used by the technology as
        variables for calculating assessment value."



Auf Deutsch:

> „[0026] In verschiedenen Ausführungsformen bestimmt die Technologie
> die Risikobewertungen einer IT-Anlage, die Schadensbewertungen einer
> IT-Anlage sowie die Kundenrisikobewertungen. Diese Bewertungen sind
> Echtzeit-Momentaufnahmen der IT-Anlagen und/oder des Unterneh-
> mensverhaltens, die auf verschiedenen Indikatoren beruhen und als
> einfache Werte ausgedrückt werden, z.B. als Zahl, Prozentsatz, Streu-
> wert, usw. [...] In einer oder mehreren Ausführungsform(en) wird jede
> Anlage einem oder mehreren Profil(en) oder anderen Datenstrukturen
> ("Profilen") zugeordnet, die mit Indikatoren verknüpft sind, die die
> Eigenschaften der Anlage und/oder des Unternehmens definieren und
> von der Technologie als Variablen für die Berechnung des Bewertungs-
> werts herangezogen werden."

55      Durch ein Mapping wird diesen Auswertungen der Profile ein Versicherungs-
        produkt zugeordnet, beispielsweise durch eine „Recommendation Engine" gemäß
        Abb. 4 der Prioritätsanmeldung:



*FIG. 4*

HÖFFMANN EITLE

56        Wie im oben zitierten Abschnitt [0026] erläutert, bilden die Auswertungen den Echtzeit-Wert ab. Diese Werte sind nicht statisch, sondern werden dynamisch angepasst. Wir blenden zur Erläuterung Abb. 5 ein:



*FIG. 5*

57        Änderungen in einem Profil führen aufgrund des Verweises in Schritt 514 zu einer entsprechenden Überprüfung der Werte, die den betroffenen Profilen zugeordnet sind (Schritte 504-508). Der Algorithmus kann in Schritt 512 zu einer Anpassung des empfohlenen Versicherungsproduktes führen.

58        Dies ist in Abschnitt [0028] weiter erläutert:

> „[...] *In various embodiments, the technology continuously, or on a schedule, updates the profiles based on changes to the assets or company (e.g., a new asset is added or an asset is recommissioned, critical data is moved, new vulnerabilities are discovered, etc.). In response to the changes to one or more of the profiles, the technology dynamically and automatically determines a new policy tailored to the changed profiles. This feedback technique allows the company to efficiently and comprehensively understand, in real time, where it has vulnerabilities and how best to insure against losses.*"



Auf Deutsch:

> „[…] *In verschiedenen Ausführungsformen aktualisiert die Technologie kontinuierlich oder nach einem Zeitplan die Profile auf Grundlage von Änderungen in den Anlagen oder im Unternehmen (z.B. wenn eine neue Anlage hinzugefügt wird, oder wenn eine Anlage wieder in Betrieb genommen wird, wenn entscheidende Daten verschoben werden, oder wenn neue Vulnerabilitäten entdeckt werden). Als Reaktion auf die Änderungen an einem oder mehreren der Profile bestimmt die Technologie dynamisch und automatisch eine neue Police, die auf das geänderte Profil zugeschnitten ist. Diese Feedback-Technik ermöglicht es dem Unternehmen, in Echtzeit effizient und umfassend zu verstehen, wo es Schwachstellen hat und wie es sich am besten gegen Verluste versichern kann.*"

59      Die Abschnitte [0043] ff. und Abb. 7 beschreiben dann weiter die Herleitung eines Versicherbarkeits-Ratings für ein Produkt oder eine Dienstleistung aus den vorgenannten Indikatoren, basierend auch auf historischen Daten über den Schaden aus vorangegangenen Cyber-Angriffen und Echtzeit-Daten, die auf Cyber-Angriffe hindeuten, die den Wert des Produktes oder der Dienstleistung wahrscheinlich beeinträchtigen. Das Versicherbarkeits-Rating soll es ermöglichen, einen Versicherungsbetrag zu bestimmen, der hinreichend gegen das Risiko eines oder mehrerer Cyber-Angriffe absichert.

60      Zusammenfassend lehrt die Prioritätsanmeldung bereits, Indikatoren zu bestimmen, die Profiltypen oder einem Produkt oder einer Dienstleistung zugeordnet sind, und die mit Gewichtungen versehen werden können. Basierend auf diesen Indikatoren wird eine Auswertung vorgenommen, die einen Wert bestimmt, das „*assessment value*" oder Versicherbarkeits-Rating. Durch ein Mapping kann diesen Auswertungen ein angemessener Versicherungsbetrag oder ein Versicherungsprodukt zugeordnet, und dem Kunden angeboten werden, beispielsweise durch eine „*Recommendation Engine*" gemäß Abb. 4 der Prioritätsanmeldung. Die bestimmten Werte, und damit unter Umständen auch der Versicherungsbetrag oder das Versicherungsprodukt, werden bei Änderungen in den zugrundeliegenden Indikatoren dynamisch und automatisiert angepasst.

HÖFFMANN EITLE

### 2.2.3 Ableitung von früherer Anmeldung des Beklagten

61 Bevor wir auch die den Streitpatentanmeldungen bei der Nachanmeldung hinzu-
gefügten Lehren erläutern, gehen wir aufgrund der Sachnähe zunächst auf die
vom Beklagten bereits Anfang März 2014 eingereichte Patentanmeldung
US 14/198,015 (Publikationsnummer US 2015/0254766; „**US'766**") ein, die wir
überreichen als

**Anlage HE 7**.

62 Wie bereits in der Klageerwiderung angeführt und von der Klägerin unkommen-
tiert gelassen, hat die technische Lehre der Prioritätsanmeldung, die in beiden
Streitpatentanmeldungen umfasst ist, eindeutige konzeptionelle Parallelen zur
älteren US'766 des Beklagten. Dies bestätigt, dass der Beklagte die zugrunde-
liegende Idee der Streitpatentanmeldungen bereits vor der vermeintlichen
Mitteilung durch die Klägerin im Juni 2014 in Händen hielt. Der Beklagte hat den
Gegenstand der Prioritätsanmeldung aus dieser zugrunde liegenden Idee selbst
entwickelt.

63 Die Parallelen beginnen schon im Titel, denn die US'766 trägt den Titel „*System
and Method for Generating a Dynamic Credit Risk Rating for a Debt Security*", was
bereits aufzeigt, dass diese Anmeldung ebenso auf der prädikativen und
dynamischen Analyse von Risiken beruht, wie die Prioritätsanmeldung (Titel:
„*Dynamic Security Rating for Cyber Insurance Products*") und damit letztlich auch
wie die Streitpatentanmeldungen.



64      Die Parallelen werden weiter offensichtlich, wenn man die oben (Rz. 56) bereits
        gezeigte Abb. 5 der Prioritätsanmeldung (links) der Abb. 1 der US'766 (rechts)
        gegenübergestellt:



*FIG. 5*

65      Beide Ablaufdiagramme sehen eine dynamische Rückkopplung zwischen neuen
        Informationen (Abb. 5: Schritt 514; Abb. 1: Schritt 110) und deren Auswertung auf
        die jeweilige Zielgröße hin vor. Im Falle der Prioritätsanmeldung ist dies eine Neu-
        bewertung der Profile 504 bis 508, die wiederum in das angebotene Versiche-
        rungsprodukt eingehen (Schritt 512) und im Fall der US'766 eine Neubewertung
        der Attribute, die den Wert der Anleihe bzw. des ausgebenden Unternehmens
        oder der ausgebenden Kommune beeinflussen, was in die Auswertung („*score*")
        und damit in das Anleihen-Rating eingeht.

66      Die Lehre der US'766 ist in den im Folgenden zitierten Abschnitten der Beschrei-
        bung näher erläutert:

        „*[0006] [...] A system and method are provided that receive credit-
        worthiness, structured and unstructured debt security related data from
        disparate sources including but not limited to general economic data
        sources, government data sources, and proprietary data sources. Users
        can specify particular attributes of the received debt security related*



data and can specify weights for the attributes. An debt security credit rating algorithm computes a score for each debt security using the weighted attributes for the debt security and then determines a credit rating from the score. [...]

[0031] An embodiment can be understood with reference to FIG. 2, a flow diagram of receiving bond information. At step 102a, the algorithm receive cash flows, profitability, corporate structure, and other leadership and operational information about a company, when the bond is issued by the company. [...]

[0032] An embodiment can be understood with reference to FIG. 3, a flow diagram of determining or receiving weights for each bond attribute and determining values for each bond attribute. At step 104a, the algorithm determines or receives weights as input for each bond attribute, e.g. as described above. At step 104b, the algorithm determine values for each bond attribute, e.g. as described above. [...]

[0034] [...] The weighted attributes are used by the algorithm to generate a score and the score is used to determine a bond rating."

Auf Deutsch:

„[0006] [...] Vorgesehen sind ein System und ein Verfahren, die Daten zur Kreditwürdigkeit sowie zu strukturierten und unstrukturierten Schuldtiteln aus unterschiedlichen Quellen erhalten, u.a. allgemeine Wirtschaftsdaten, staatliche Daten sowie unternehmenseigene Daten. Die Nutzer können bestimmte Attribute für die erhaltenen Daten zu Schuldtiteln angeben und diesen Attributen Gewichtungen zuordnen. Ein Algorithmus zur Bonitätsbewertung von Schuldtiteln berechnet anhand der gewichteten Attribute für den Schuldtitel eine Punktzahl (Score) und nimmt dann auf Grundlage dieser Punktzahl eine Bonitätsbewertung vor. [...]

[0031] Eine Ausführungsform wird in Zusammenhang mit Fig. 2, einem Ablaufdiagramm zum Erhalt von Anleiheinformationen, erläutert. In Schritt 102a erhält der Algorithmus Informationen zu Cashflows, Rentabilität, Unternehmensstruktur sowie andere Führungs- und Betriebsinformationen zu einem Unternehmen, wenn die Anleihe von dem Unternehmen ausgegeben wird. [...]

[0032] Eine Ausführungsform wird in Zusammenhang mit Fig. 3 erklärt, einem Ablaufdiagramm zur Bestimmung oder zum Erhalt von Gewichtungen für jedes Anleihen-Attribut sowie zur Bestimmung von Werten für



*jedes Anleihen-Attribut. In Schritt 104a bestimmt oder erhält der Algo-*
*rithmus, wie z.B. oben beschrieben, Gewichtungen als Basis für jedes*
*Anleihen-Attribut. In Schritt 104b bestimmt der Algorithmus, wie z.B.*
*oben beschrieben, Werte für jedes Anleihen-Attribut. [...]*

*[0034] [...] Die gewichteten Attribute werden vom Algorithmus zur*
*Erzeugung eines Scores verwendet und der Score wird zur Bestimmung*
*eines Anleihen-Ratings benutzt."*

67      Die US'766 sieht somit ein System vor, in dem der Nutzer Attribute bestimmt, die
        den Wert einer Anleihe beeinflussen, und diesen Attributen Gewichtungen zuord-
        net. Die Werte der Attribute werden regelmäßig überprüft und mit den Gewich-
        tungen durch einen Algorithmus zu einer Auswertung (*score*) verarbeitet. Durch
        ein Mapping wird diesem Score ein Anleihen-Rating zugeordnet.

68      Entsprechendes lehrt, wie oben gezeigt, auch die Prioritätsanmeldung. Den
        Attributen der US'766 entsprechen in der Prioritätsanmeldung die vom Nutzer
        bestimmten Indikatoren, die den drei Profiltypen zugeordnet sind, und ebenfalls
        mit Gewichtungen versehen werden können. Für jedes dieser Profile wird eine
        Auswertung vorgenommen, die einen Wert bestimmt, das *„assessment value"*
        oder Versicherbarkeits-Rating. Diese entsprechen somit dem *„score"* der US'766.
        Durch ein Mapping wird diesen Auswertungen – statt wie in der US'766 ein
        Anleihen-Rating – in der Prioritätsanmeldung ein Versicherungsprodukt oder eine
        Versicherungssumme zugeordnet.

### 2.2.4 Weiterer Offenbarungsgehalt und Ansprüche der Streitpatent-
###       anmeldungen

### 2.2.4.1 Patentanmeldung WO'919

69      Die WO'919, die wie die Prioritätsanmeldung den Titel *„Dynamic Security Rating*
        *for Cyber Insurance Products"* („*Dynamisches Sicherheits-Rating für Cyber-Versi-*
        *cherungsprodukte*") trägt, fügt der Prioritätsanmeldung nur eine neue Zusammen-
        fassung und einige Ergänzungen in Details hinzu. Als Hilfestellung für die Kammer
        überreichen wir eine Version der WO'919, in der die in der Nachanmeldung
        hinzugekommenen Passagen der Beschreibung gelb hinterlegt sind, als

**Anlage HE 8**.



70      Die technische Lehre ist auch in den (vorläufigen) Ansprüchen der Streitpatent-
        anmeldung reflektiert. Der unabhängige Verfahrensanspruch 1 der WO'919 lässt
        sich wie folgt gliedern:

        [0]  A method for producing insurability ratings for a product or service, the
             method comprising:

        [1]  receiving, at a processor that is implemented at least in-part by electronic
             circuitry and coupled to a computer network, real-time data

             [1.1]  indicative of cyber attacks

             [1.2]  that are likely to diminish a value of the product or service

        [2]  using the processor to process the real-time data to compute a real-time
             damage assessment associated with losses to the product or service due
             to occurrence of one or more cyber attacks

             [2.1]  the damage assessment computed using at least a likelihood of the
                    occurrence of the one or more cyber attacks

             [2.2]  a likelihood of success of the one or more cyber attacks

             [2.3]  and a measure of severity of damage to the product of service as a
                    result of the occurrence of the one or more cyber attacks

        [3]  using the processor to determine an insurability rating for the product or
             service that is usable for determination of an amount of insurance that
             sufficiently insures against the occurrence of the one or more cyber
             attacks, wherein

             [3.1]  the insurability rating is determined at least in-part based on the
                    real-time damage assessment

             [3.2]  and is changeable in response to changes in the received real-time
                    data

71      Die Klägerin hat nicht gezeigt, dass sie eine Erfindung in Händen gehabt hätte, die
        all diese Merkmale vorwegnimmt, geschweige denn die in den abhängigen
        Ansprüchen und der Beschreibung offenbarten bevorzugten Ausführungsformen.
        Und, wie oben angesprochen, kommt die Klägerin auch der Verfügung des US-Ge-
        richts nicht nach, im § 1782-Discovery-Verfahren alle relevanten Dokumente zu
        ihrer angeblichen Erfindung vorzulegen. Dies macht es dem Beklagten unmöglich,
        abschließend zu beweisen (ohne Anerkennung der Beweislast), dass die Klägerin
        niemals eine solche Erfindung in Händen hatte.

HOFFMANN EITLE

72    Das von ihr angeführte CyberMesh nach **FBD 5**, **FBD-V 11** und **FBD-V 12**, wie auch
die als **FBD 13** vorgelegte, eigene Anmeldung der Klägerin sind auf den Informa-
tionsaustausch über Erkennungsmerkmale eines Cyber-Angriffs gerichtet, also
darauf, Informationen von Dritten und von Teilnehmern des CyberMesh zusam-
menzuführen, um Teilnehmer über die Charakteristika aktueller Cyber-Angriffe zu
informieren, und ihnen so eine bessere Verteidigung gegen Cyber-Angriffe zu
ermöglichen. Zusätzlich können die CyberMesh-Teilnehmer zum selben Zweck
auch Informationen direkt austauschen.

73    In dieselbe Richtung geht Herr Sankar in seiner E-Mail an den Beklagten (**FBD 6**),
denn auch er will durch das Sammeln von Informationen über Cyber-Angriffe auf
Versicherungsnehmer die Schwächen in deren IT-Systemen erkennen, Mindest-
standards setzen, bei deren Nichteinhaltung der Versicherungsschutz entfallen
soll, und die gewonnen Informationen auch den Versicherungsnehmern zu deren
besserer Verteidigung bereitstellen.

74    All dies offenbart nicht die Lehre des unabhängigen Anspruchs. Soweit die Kläge-
rin abstrakt behauptet, die Anwendung habe auch *„Parameter und Risikofaktoren
abrufen und bereitstellen* […] *können, die für eine Bewertung der Sicherheitsrisiken
und damit auch für die Versicherungspolice notwendig sind"* (Replik, C.I.2), so ist
dies unsubstantiiert und daher nicht einlassungsfähig. Es bleibt unklar, welche
Parameter und Risikofaktoren angeblich bereitgestellt werden und was „Bewer-
tung" in diesem Zusammenhang bedeuten soll. Vorsorglich <u>erklären wir uns aber
auch hierzu mit Nichtwissen,</u> dass es im Sinne der Streitpatentanmeldungen
gewesen ist.

75    Aus Sicht der Klägerin liegt eine technische Lehre, und damit ein Gegenstand der
grundsätzlich dem Patentschutz zugänglich sein kann, aber auch gerade in der
Beschreibung (Replik, Seite 53 f.). Dies ist zwar unrichtig (zur fehlenden Patent-
fähigkeit siehe **Ziffer 2.6.2**), aber insbesondere wenn dies der technische „Kern"
der WO'919 sein soll, müsste die Klägerin zumindest auch in dieser Hinsicht
Erfindungsbesitz und Mitteilung an den Beklagten darlegen.

76    Die Klägerin verweist zum einen auf die in den Abschnitten [0007], [0008] und
[0012] sowie in Anspruch 19 der WO'919 offenbarte Überwachung in Echtzeit.
Diese Echtzeitüberwachung muss sich nach den zitierten Offenbarungsstellen auf
Daten beziehen, die einem Produkt oder einer Dienstleistung zugeordnet sind,
und geeignet, eine Wertminderung hinsichtlich des Produktes oder der Dienstleis-
tung zu quantifizieren, also eine Echtzeit-Schadensbewertung vorzunehmen (*„real
time damage assessment associated with losses to the product or service due to
the occurrence of one or more cyber-attacks"*; vgl. Anspruch 19 und Abschnit-
te [0007] und [0012]). Echtzeit-Schadensbewertungen sollen zudem kontinuier-



lich, über einen definierten Zeitraum hinweg, berechnet werden, um statistische Auswertungen zu ermöglichen (vgl. Abschnitt [0008]).

77      Obwohl sie hierin die vermeintliche technische Lehre erkennen möchte, hat die Klägerin nicht dargetan, dass sie diese technische Lehre in Händen gehabt hätte und dem Beklagten mitgeteilt.

78      Zum anderen verweist die Klägerin auf das in Abschnitt [0034] offenbarte kontinuierliche Monitoring, wo es heißt:

> „The technology can continuously or semi-continuously monitor the company's network for any changes to assets and, if changes are detected that could affect the company's exposure to a cyber attack, information associated with the detected changes is fed back to aspects of the technology that are configured to determine new/modified cyber insurance policies/products."

Auf Deutsch:

> „Die Technologie kann das Unternehmensnetzwerk kontinuierlich oder halbkontinuierlich in Bezug auf Veränderungen in den IT-Anlagen überwachen. Sollten Veränderungen festgestellt werden, die das Unternehmen anfälliger für Cyberangriffe machen könnten, werden die mit den festgestellten Veränderungen zusammenhängenden Informationen an jene Technologiekomponenten zurückgemeldet, die zur Bestimmung neuer bzw. geänderter Cyber-Versicherungspolicen/-produkten konfiguriert sind."

79      Die Klägerin hat auch hierzu nicht dargetan, dass sie eine technische Lehre in Händen gehabt hätte, die ein solches kontinuierliches Monitoring der IT-Anlagen eines Versicherungsnehmers vornimmt, einschließlich ob eine neue IT-Anlage hinzugefügt wurde oder wieder in Betrieb genommen und ob kritische Daten auf eine andere IT-Anlage verlagert wurden (s. Abschnitt [0040]).

### 2.2.4.2      Patentanmeldung WO'049

80      Die Ergänzungen in der Patentanmeldung WO'049 mit dem Titel „Joined and Coordinated Detection, Handling, and Prevention of Cyberattacks" („Gemeinsame und koordinierte Erkennung, Handhabung [Bewältigung] und Prävention von Cyberattacken") sind umfangreicher. Wie in der WO'919 ist die Lehre des dynamischen Versicherbarkeits-Ratings für Cyber-Versicherungsprodukte um einige Details ergänzt. Darüber hinaus ist in der WO'049 – und nur in dieser, nicht in der WO'919 – das Konsortialsystem hinzugefügt worden (im Wesentlichen als Abschnitte [0083] bis [0140] und Abb. 10 ff.).



81    Auch zu dieser Anmeldung überreichen wir als Hilfestellung für die Kammer eine
      Version, in der die in der Nachanmeldung hinzugekommenen Passagen der
      Beschreibung gelb hinterlegt sind, hier als

**Anlage HE 9**.

82    Ein Konsortium nach der Lehre der WO'049, das Cyberattacken gemeinsam und
      koordiniert erkennen, bewältigen und verhindern soll, ist in der hier eingeblen-
      deten Abb. 10 in seiner Grundstruktur beschrieben, zur besseren Erkennbarkeit
      farblich hinterlegt:



*FIG. 10*

83    Es sind drei Ebenen zu unterscheiden. An der Spitze steht das Konsortiums-
      system 1002. Darunter angeordnet sind die Konsortiumsmitglieder, exemplarisch
      hier abgebildet als Firma A und Firma B, die ihrerseits aus zentralen Überwa-
      chungsstellen (*Central Monitoring Station*; s. blaues und rotes Rechteck) und lo-
      kalen Handhabungsstellen (*Local Handling Station*; s. blaue und rote Ovale)
      bestehen. Auf der dritten Ebene liegen die Kunden-Computersysteme (*CCS, Client
      Computer System*), die hier nicht farblich hervorgehoben sind. Exemplarisch sind
      in dieser Abbildung nur die Kunden-Computersysteme der Firma A 1010a bis
      1010f gezeigt, die deshalb alle grau hinterlegt sind (siehe Abschnitt [0087]: *„In this
      example, company A has its client computer systems 1010a-1010f, and company B
      has its client computer systems that are not shown."*). Die Konsortiumsmitglieder



(also Firma A und Firma B) fungieren wie unten erläutert gleichsam als externe IT-Dienstleister für ihre Kunden.

84     In den Abschnitten [0087], [0088] und [0092] bis [0101] sind die Ausstattung, Lokalitäten und interne Netzwerkverbindungen und internen Systemkomponenten der Konsortiumsmitglieder weiter beschrieben.

85     Die Grundidee der Konsortiumstechnologie ist die sich bereits aus dem Titel der Patentanmeldung ergebende gemeinsame und koordinierte Handhabung (Bewältigung) von Cyber-Angriffen, namentlich die Bereitstellung von technischen und personellen Ressourcen durch ein anderes Konsortiumsmitglied im Falle eines Cyber-Angriffs, wie beispielsweise in Abschnitt [0090] beschrieben:

> „The central monitoring station 1004a [of company A] determines that company B has a local handling station near the client computer system 1010e and informs one of company B's central monitoring stations 1006a of the need for human resources. The central monitoring station 1006a can then request the local handling station 1012a, which is located near the client computer system 1010e, to handle the attack. The local handling station 1012a then visits the client location and works directly with the client computer system 1010e."

Auf Deutsch:

> „Die zentrale Überwachungsstelle 1004a [der Firma A] stellt fest, dass Firma B eine lokale Handhabungsstelle in der Nähe des Kunden-Computersystems 1010e hat, und informiert 1006a, eine der zentralen Überwachungsstellen der Firma B, über den Bedarf an Personal. Die zentrale Überwachungsstelle 1006a kann dann die lokale Handhabungsstelle 1012a, die sich in der Nähe des Kunden-Computersystems 1010e befindet, um Handhabung des Angriffs bitten. Die lokale Handhabungsstelle 1012a besucht daraufhin den Standort des Kunden und arbeitet direkt am Kunden-Computersystem 1010e."

86     Die zentrale Überwachungsstelle eines Konsortiumsmitglieds bestimmt im Falle eines Cyber-Angriffs auf ein Kundencomputersystem aufgrund verschiedener Faktoren die angemessene Strategie, auf diesen Angriff mit technischen und personellen Ressourcen entweder vor Ort oder aus der Ferne zu reagieren, und bewältigt den Angriff entsprechend entweder mit eigenen Ressourcen und/oder den Ressourcen eines anderen Konsortiumsmitglieds oder des Konsortiumssystems (Abschnitte [0115] bis [0119]).



87    Das Konsortiumssystem registriert Konsortiumsmitglieder (Abschnitt [0097]) und assistiert ihnen in der, bzw. koordiniert die Bewältigung einer Cyber-Attacke durch ein oder mehrere Konsortiumsmitglieder. Dazu werden beispielsweise aufgrund verschiedener Faktoren die personellen und technischen Ressourcen der Konsortiumsmitglieder bestimmt und das am besten geeignete Mitglied mit elektronischen Mitteln instruiert, die Cyber-Attacke entweder vor Ort oder aus der Ferne zu handhaben (Abschnitte [0007], [0105] bis [0112], [0114]). Das Konsortiumssystem unterhält zudem eine Datenbank, in der beispielsweise Anfragen zur Unterstützung durch ein anderes Konsortiumsmitglied (Abschnitt [0090]) oder Berichte über die Bewältigung des Angriffs durch das andere Konsortiumsmitglied (Abschnitt [0091]) gespeichert werden. Diese Datenbank ist allen Konsortiumsmitgliedern zugänglich (Abschnitte [0007], [0091], [0102], [0113], [0121] u.a.), so dass beispielsweise Experten der Konsortiumsmitglieder die Daten analysieren, und daraus Schlüsse für eine zukünftig bessere Abwehr von Cyber-Angriffen ziehen können.

88    In der Zusammenfassung beschreibt die Patentanmeldung die Vorteile des Systems wie folgt in Abschnitt [0008]:

> „The monitoring consortium enables stronger capabilities than any individual monitoring company can offer by the combination and coordination of the efforts and resources of the members. Clients therefore enjoy a superior level of security for their computer systems, which maximizes the confidentiality, integrity, and availability of their data and business operations and minimizes their waste of resources and mental pain and suffering."

Auf Deutsch:

> „Das Überwachungskonsortium bietet durch die Kombination und Koordination der Maßnahmen und Ressourcen der Mitglieder mehr Möglichkeiten, als eine jede Überwachungsfirma allein bieten kann. Die Kunden genießen daher ein höheres Maß an Sicherheit für ihre Computersysteme, wodurch die Vertraulichkeit, Integrität und Verfügbarkeit ihrer Daten und Geschäftsvorgänge maximiert und die Verschwendung von Ressourcen sowie psychische Schmerzen und Leiden minimiert werden."

89    Diese Lehre ist auch in den (vorläufigen) Ansprüchen der Streitpatentanmeldung reflektiert. Der unabhängige Verfahrensanspruch 12 der WO'049 lässt sich wie folgt gliedern:

[0]  A computer implemented method of managing a consortium of monitoring systems which detect and handle cyberattacks, comprising:



[1]  registering each of a plurality of monitoring systems as a member in response to corresponding registration requests for becoming a member of the consortium of monitoring systems

[1.1]  wherein each of the monitoring systems is associated with a distinct, independent business entity

[1.2]  and each of the monitoring systems comprises one or more central monitoring stations, each of the central monitoring stations comprising

[1.2.1]  a processor and a memory

[1.2.2]  and monitoring one or more client computer systems for cyberattacks to the client computer systems

[1.2.3]  and associated with one or more specialists who can physically work with the client computer systems,

[1.3]  and wherein at least one of the monitoring systems comprises one or more local handling stations;

[1.4]  [the consortium system]

[1.4.1]  receiving a report in electronic format from a first member coupled to a computer network;

[1.4.2]  processing the electronic report to detect a cyberattack to a client computer system of the first member;

[1.4.3]  responding to the cyberattack with the first member and a second member,

[1.4.4]  wherein the second member assigns computing or human resources for mitigating the cyberattack; and

[1.4.5]  updating a repository of data related to cyberattacks accessible to members of the consortium.

90    Die Klägerin hat nicht gezeigt, dass sie eine Erfindung in Händen gehabt hätte, die all diese Merkmale vorwegnimmt, geschweige denn die in den abhängigen Ansprüchen und der Beschreibung offenbarten bevorzugten Ausführungsformen. Sie hat sich zudem, wie bereits erläutert, über die Verfügung des US-Gerichts hinweggesetzt, im von ihr selbst initiierten § 1782-Discovery-Verfahren alle relevanten Dokumente vorzulegen. Dies macht es dem Beklagten unmöglich,



(ohne Anerkennung der Beweislast) den Gegenbeweis zu führen, dass die Klägerin niemals eine solche Erfindung in Händen hatte.

91    Die von der Klägerin angeführte CyberMesh-Anwendung ist ja allein darauf gerichtet, Informationen von Dritten und von Teilnehmern (direkt, oder indirekt über eine zentrale Instanz) zusammenzuführen, um die Teilnehmer umfassender über die Charakteristika aktueller Cyber-Angriffe aufzuklären, wie etwa bekannte Computer-Viren oder die IP-Adressen von denen Angriffe ausgehen, womit ihnen eine bessere Verteidigung gegen solche Cyber-Angriffe ermöglicht wird.

92    Offenbart ist damit insbesondere nicht die dreistufige Grundstruktur des Konsortiums nach WO'049, mit dem zentralen System, das Mitglieder registriert (Merkmale [0] und [1]), mit den „monitoring systems" genannten Mitgliedern des Konsortiums, die eigenständige Unternehmen sind (Merkmale [1.1] und [1.2]), und die ihrerseits Computersysteme ihrer Kunden überwachen (Merkmal [1.2.2]). Offenbart ist auch nicht die Binnenstruktur der Konsortiumsmitglieder aus zentralen Überwachungsstellen und lokalen Handhabungsstellen (Merkmale [1.2] und [1.3]). Ebenfalls nicht offenbart ist die gemeinsame und koordinierte Bewältigung von Cyber-Angriffen durch Bereitstellung von technischen und personellen Ressourcen durch die Konsortiumsmitglieder (Merkmale [0], [1.4.3] und [1.4.4]). Das CyberMesh der Klägerin sah auch kein gemeinsames Daten-Repositorium der Teilnehmer vor, das allen Teilnehmern zugänglich ist (Merkmal [1.4.5]), denn die CyberMesh-Instanzen, einschließlich der zentralen Instanz entscheiden alle selbst über die Daten, die sie anderen Instanzen, wie den Teilnehmern zugänglich machen.

93    Aus Sicht der Klägerin liegt eine technische Lehre, und damit ein Gegenstand der grundsätzlich dem Patentschutz zugänglich sein kann, aber auch bei der WO'049 gerade in der Beschreibung (Replik, Seite 53). Dies ist zwar auch hier unrichtig (siehe zur fehlenden Patentfähigkeit **Ziffer 2.6.2**), wenn dies aber der technische „Kern" der WO'049 sein soll, müsste die Klägerin zumindest auch in dieser Hinsicht Erfindungsbesitz und Mitteilung an den Beklagten darlegen.

94    So verweist die Klägerin zuerst auf das kontinuierliche Monitoring. Wie oben unter Rz. 78 f. bereits ausgeführt, hat die Klägerin nicht substantiiert dargelegt, dass sie eine technische Lehre in Händen gehabt hätte, die ein kontinuierliche Monitoring der IT-Anlagen eines Versicherungsnehmers daraufhin vornimmt, ob eine neue IT-Anlage hinzugefügt wurde oder wieder in Betrieb genommen und ob kritische Daten auf eine andere IT-Anlage verlagert wurden (Abschnitt [0046]). Dasselbe gilt für die in Abb. 3 der WO'049 genannten Indikatoren, auf deren kontinuierliches Monitoring die Klägerin ebenfalls hinweist.



95    Die Klägerin verweist zweitens auf die Echtzeitüberwachung und die aufgrund
dieser durch das Computersystem automatisch und dynamisch angepassten
Entscheidungen. Die Klägerin hat, wie oben unter Rz. 76 f. bereits ausgeführt,
nicht substantiiert dargelegt, dass sie eine technische Lehre in Händen gehabt
hätte, die einem Produkt oder einer Dienstleistung zugeordnete Daten über-
wacht, um eine Echtzeit-Schadensbewertung hinsichtlich des Produktes oder der
Dienstleistung zu ermöglichen, und diese auch durchgeführt hätte (WO'049,
Abschnitt [0043]). Ebenso wenig hat die Klägerin Erfindungsbesitz hinsichtlich der
automatischen und dynamischen Anpassung eines Versicherungsproduktes
aufgrund von Änderungen in den Indikatoren eines der drei in Abschnitt [0046]
der WO'049 genannten Profile dargetan (vgl. Rz. 50 ff.).

96    Drittens behauptet die Klägerin, ein technischer Gegenstand läge auch in den
Kriterien wie bestimmte Anfragen innerhalb des Systems generiert werden. Sie
verweist unter anderem auf Anspruch 4 gemäß dem ein erstes Konsortiums-
mitglied eine Anfrage an ein zweites Konsortiumsmitglied zur Unterstützung
durch Ressourcen bei der Handhabung eines Cyber-Angriffs sendet, nach dem
Kriterium, dass ein Abgleich der benötigten mit den vorhandenen Ressourcen des
ersten Konsortiumsmitglieds zu dem Ergebnis führt, dass dieses den Bedarf selbst
nicht decken kann. Abschnitt [0115] der WO'049 lehrt Kriterien für eine Anfrage
an eine lokale Handhabungsstelle für Arbeiten vor Ort an einem Kunden-Compu-
tersystem, namentlich das Ausmaß der Auswirkungen des Cyber-Angriffs, den
Standort, die Art, den Umfang des Kunden-Computersystems und die Dringlichkeit
der Handhabung des Cyber-Angriffs. In Abschnitt [0118] offenbart die WO'049,
dass wenn Personalressourcen der Konsortiumsmitglieder nicht ausreichen, um
einen Cyber-Angiff abzuwehren, eine Anfrage an lokale oder nationale Sicher-
heitsbehörden gesendet wird. Abb. 16 offenbart einen umfangreichen Entschei-
dungsbaum für die Handhabung eines Cyber-Angriffs und die Kriterien für Hand-
habung vor Ort oder aus der Ferne und ggf. entsprechende Anfragen an lokale
Handhabungsstellen oder andere Konsortiumsmitglieder.

97    Und die Klägerin behauptet viertens, dass ein technischer Gegenstand auch in der
automatischen Vornahme bestimmter Gewichtungen aufgrund von Mittlungen
läge, wobei vorab gespeicherte Daten verwendet werden. Diese sind: (i) die
Anzahl früherer Cyber-Angriffe auf das Produkt oder die Dienstleistung, (ii) die
Erfolgsquote der früheren Cyber-Angriffe auf das Produkt oder die Dienstleistung,
(iii) die Höhe des Schadens an der Dienstleistung oder dem Produkt, der durch
den oder die früheren Cyber-Angriffe verursacht wurde, und (iv) die Häufigkeit
des Auftretens von Cyber-Angriffen gegen andere Unternehmen, die Produkte
oder Dienstleistungen anbieten, die dem Produkt und der Dienstleistung ähnlich
sind (WO'049, Abschnitt [0070]). Bei Versicherbarkeits-Ratings über bestimmte



Perioden hinweg sollen zudem jüngeren Versicherbarkeits-Ratings eine größere Gewichtung zugemessen werden (Abschnitt [0071]).

98    Obwohl die Klägerin argumentiert, in diesen Gegenständen läge eine technische Lehre und damit eine mögliche Grundlage für die Patentfähigkeit der WO'049, trägt sie nicht substantiiert vor, dass sie hinsichtlich aller dieser Gegenstände Erfindungsbesitz hatte.

99    Schließlich umfasst die WO'049 wie gezeigt auch den gesamten Offenbarungs-gehalt der WO'919, so dass unsere weiteren Ausführungen unter **Ziffer 2.2.4.1** zur WO'919 hier entsprechend gelten.

### 2.3    Vortrag der Klägerin zum vermeintlichen Erfindungsbesitz

100    Der Vortrag der Klägerin zum vermeintlichen Erfindungsbesitz ist somit bereits deshalb unzureichend, weil sie nicht die tatsächlichen Gegenstände der Streit-patentanmeldungen zum Maßstab genommen hat. Sie hat weder zu den Merkma-len der (unabhängigen) Ansprüche noch zu den Merkmalen der Beschreibung, die sie selbst als potentiell patentfähige technische Lehren hervorhebt, geschweige denn zu den weiteren Offenbarungen in der Beschreibung und den Abbildungen den Erfindungsbesitz substantiiert vorgetragen.

101    Zu dem was die Klägerin in der Replik zu ihrem vermeintlichen Erfindungsbesitz vorträgt ist noch Folgendes anzumerken:

### 2.3.1    *Die angebliche CyberMesh-„Erfindung" der Klägerin*

102    Der Beklagte stellt nicht in Abrede, dass die Klägerin an Cyber-Technologien gearbeitet und eine Softwareanwendung namens CyberMesh vermarktet hat. Im Gegenteil, nach diesseitigem Vortrag (KE, Rz. 117), der unbestritten geblieben ist, hat die Klägerin dieses Produkt bereits lange vor dem Prioritätstag der Streit-patentanmeldungen und auch vor dem Tag der vermeintlichen Mitteilung an den Beklagten veröffentlicht, und zwar durch das als *Anlage HE 4* vorgelegte Prospekt und in YouTube-Videos. Auch das von der Klägerin zunächst als angeblicher Beleg eines vermeintlichen Erfindungsbesitzes vorgelegte Dokument *FBD-5* ist offen-sichtlich und unstreitig ein Werbeprospekt.

HÖFFMANN EITLE

103     In ihrem Werbeprospekt aus dem Jahr 2013 (*Anlage HE 4*) zeigt die Klägerin das folgende Schema und schreibt unter anderem:



*The Palantir Cyber Mesh is a platform for secure information sharing among peers.*

**„THE CYBER MESH**

*Recognizing that commercial institutions face a shared set of cyber threats, we created the Cyber Mesh, a platform for secure information sharing among peers. Drawing on successful models within the defense and intelligence communities, the Cyber Mesh enables secure peer-to-peer sharing between enterprises with automatic redaction of sensitive data. A centrally hosted Palantir instance provides out-of-the-box cyber intelligence feeds, rolled up from suspicious activity patterns, third-party open source and licensed data feeds, and contextual data feeds. By letting organizations leverage the subject matter expertise of Palantir engineers and insights from peer institutions, the Mesh provides immense analytic value over automated black box solutions.*

**PALANTIR'S CYBER INTELLIGENCE FEED**

*Palantir's Cyber Intelligence Feed is a weighted data feed of Indicators of Compromise (IOCs) drawn from open source and Cyber Mesh participants. Palantir automatically correlates the Feed against customer‐owned data sets and presents algorithmic-based alerts for investigation.*" (Seite 4)

Auf Deutsch:

**„CYBER MESH**

*Angesichts der Erkenntnis, dass sich Unternehmen im Geschäftsverkehr mit einer Reihe gemeinsamer Cyber-Bedrohungen konfrontiert sehen, haben wir Cyber Mesh, eine Plattform zum sicheren Informationsaus-*



tausch unter Gleichrangigen (Peers), entwickelt. Aufbauend auf erfolg-
reichen Modellen in der Verteidigungs- und Nachrichtendienstbranche
ermöglicht Cyber Mesh einen sicheren Peer-to-Peer-Datenaustausch
zwischen Unternehmen, wobei sensible Daten automatisch geschwärzt
werden. Über einen zentralen Host bietet Palantir sofort einsetzbare
Cyberintelligenz-Feeds, die aus verdächtigen Aktivitätsmustern, Open-
Source- und lizenzierten Daten-Feeds von Drittanbietern sowie kontext-
abhängigen Daten-Feeds generiert werden.

Dadurch, dass Organisationen sowohl die Fachkompetenz der Palantir-
Ingenieure als auch die Erkenntnisse gleichrangiger Institutionen nutzen
können, bietet Cyber Mesh einen enormen analytischen Mehrwert
gegenüber automatisierten Black-Box-Lösungen.

**PALANTIR'S CYBER INTELLIGENZ-FEED**

Palantir's Cyberintelligenz-Feed ist ein gewichteter Daten-Feed aus
Kompromitierungs-Indikatoren (Indicators of Compromise, IOC), die aus
Open-Source-Quellen und von Cyber-Mesh-Teilnehmern stammen.

Palantir erstellt eine automatische Korrelation zwischen dem Feed und
kundeneigenen Datensätzen and liefert algorithmusbasierte Warnmel-
dungen."

104     Dies offenbart bereits, dass CyberMesh eine zentrale Instanz vorsah, die an die
Teilnehmer Informationen über Cyber-Angriffe und -Risiken in „feeds" übermit-
telt. Diese Informationen stammen von der Klägerin selbst, von Dritten oder auch
von anderen Teilnehmern. Die Software erlaubt den automatisierten Abgleich
eigener Daten mit den empfangenen Informationen über Cyber-Risiken.



105    Auch der Informationsaustausch zwischen den Teilnehmern (*peer-to-peer*) ist hier beschrieben, zum Beispiel in der oben gezeigten Grafik zwischen Bank 1 und Bank 2, mit automatischer Entfernung vertraulicher Daten. Teilnehmer können selbst darüber entscheiden, in welchem Umfang sie Daten teilen, so dass ihrem Vertraulichkeitsbedürfnis Rechnung getragen wird, wie in dieser Grafik aus demselben Dokument beispielhaft erläutert wird:

| DATA | SOURCE | BANK 1'S PERMISSIONS | BANK 2'S PERMISSIONS |
|---|---|---|---|
| SUSPICIOUS IP ADDRESS | Proxy | NO ACCESS | FULL ACCESS |
| MALICIOUS DOMAIN | Proxy | NO ACCESS | FULL ACCESS |
| SUSPICIOUS PROXY ALGORITHM | .html repository | READ ACCESS | READ ACCESS |

*The Palantir Security Model protects data from unauthorized use, allowing organizations to maintain strict access controls. Administrators can assign specific permissions to all data.*

106    Die – warum auch immer – als vertraulich gekennzeichneten internen Dokumente **FBD-V 11** und **FBD-V 12** fügen dem inhaltlich für das vorliegende Verfahren nichts Relevantes hinzu. Sie zeigen lediglich weitere Details wie etwa welche Datenquellen Dritter die Klägerin bei CyberMesh in ihren Mitteilungsstrom (*Feed*) einbinden wollte.

107    Gleiches gilt für die als **FBD 13** vorgelegte US 61/942,480, die ebenfalls ein System beschreibt, das Informationen von Teilnehmern über Cyber-Angriffe sammelt, vertrauliche Informationen redigiert, und aus den Informationen Regelsätze generiert, anhand derer die bei den Teilnehmern implementierte Anwendung Sicherheitsmaßnahmen ergreifen kann. All dies war wie gezeigt in dem Werbeprospekt aus dem Jahr 2013 (**Anlage HE 4**) ebenfalls bereits beschrieben.

108    Dieser unter C.I.1 und C.I.3 der Replik vorgetragene, dem Beklagten angeblich konkludent vertraulich mitgeteilte Inhalt der CyberMesh-„Erfindung" der Klägerin war damit zweifellos <u>nicht vertraulich,</u> sondern wurde von der Klägerin – unbestritten – bereits Monate vor einer angeblichen Mitteilung an den Beklagten im Juni 2014 auf gleich mehreren Publikationswegen öffentlich verbreitet. Die § 1782 Discovery hat bestätigt, dass die Klägerin vor und nach dem 9./10. Juni 2014 CyberMesh öffentlich beworben hat, durch eine Simulation auf ihrer Website und indem sie Prospekte wie die vorstehenden an verschiedene potentielle Kunden geschickt hat.



109    Der Begriff Konsortium wird in den Dokumenten zu CyberMesh nie erwähnt. Er wird in den Schriftsätzen der Klägerin offensichtlich nur deshalb (*ad nauseam*) wiederholt, um eine Scheinnähe zur WO'049 zu erzeugen.

110    Was sich aus den vorgelegten Dokumenten insbesondere nicht ergibt, ist die Behauptung, CyberMesh habe auch eine Komponente umfasst, *„die die [...] Abwehr von Cyber-Angriffen auf einzelne Kunden für das Konsortium steuern sollte"* (Replik, Seite 16, aber auch Seite 8 und 10). Der Vortrag der Klägerin ist – wohl aus gutem Grund – auch hier wieder sehr pauschal. Was mit *,Steuerung der Abwehr von Cyber-Angriffen'* gemeint ist, wird nicht konkretisiert, insbesondere ob es nicht doch wieder nur die Übermittlung von Informationen zu verdächtigen IP Adressen und anderen Aktivitätsmustern ist.

111    In öffentlichen Dokumenten zu CyberMesh vor und nach der vermeintlichen Mitteilung an den Beklagten wird CyberMesh jedenfalls konsistent nur als Plattform zum Informationsaustausch beschrieben. Wir legen beispielsweise eine weitere Veröffentlichung der Klägerin aus dem August 2014 über ihr gesamtes Anwendungs-Paket, mit dem Kunden Cyber-Angriffe abwehren können sollten, vor als

**Anlage HE 10.**

112    Für den Fall, dass die Kammer den Vortrag zu CyberMesh, soweit er über den Inhalt der vorgelegten Dokumente hinausgeht, als hinreichend substantiiert ansehen sollte, <u>erklären wir uns vorsorglich mit Nichtwissen</u> dazu, dass CyberMesh eine Komponente zur Steuerung der Angriffsabwehr im Sinne der WO'049 umfasste.

### 2.3.2    Die provisorische US-Anmeldung US 61/942,480

113    Auch die US-Anmeldung US 61/942,480 der Klägerin beschreibt gerade keine Zusammenarbeit bei der Handhabung von Cyber-Angriffen durch Maßnahmen an Computersystemen Dritter durch ein Konsortiumsmitglied, sondern wieder lediglich ein System durch das mehr oder weniger strukturierte Informationen über Cyber-Angriffe über ein Security Sharing System übermittelt werden. Es ist also nur in dem Sinne ein *„gemeinsames Sicherheitssystem"*, dass es wie CyberMesh ein System zum Wissensaustausch über Cyber-Angriffe ist.

114    An dieser Stelle sei darauf hingewiesen, dass diese und eine weitere Priorität auch durch die Nachanmeldung EP 2 911 078 (**„EP'078"**) in Anspruch genommen wurden. Der Offenbarungsgehalt dieser US Anmeldung wurde mit der als **Anlage HE 1** bereits überreichten EP'078 am 26. August 2015 veröffentlicht, also bevor mit der Cyber-Konsortium-(Nach-)Anmeldung WO'049 am 21. Oktober 2015 erstmals



Konsortiums-Aspekte in eine Patentanmeldung des Beklagten aufgenommen wurden.

115     Zu diesem und einem weiteren EP Mitglied derselben Patentfamilie, EP 2 911 079 („**EP'079**"), hat das Europäische Patentamt zudem Prüfungsbescheide erlassen, die wir vorlegen als

**Anlagenkonvolut HE 11.**

116     In beiden Prüfungsbescheiden zeigt das EPA auf, dass die Anmeldungen keine technischen Probleme oder Lösungen offenbaren, die über allgemeines technisches Wissen hinausgehen, weshalb sich in diesen Anmeldungen kein patentfähiger Offenbarungsgehalt finde.

117     Nach Ladung zur mündlichen Verhandlung hat die Klägerin EP'079 gleich fallen gelassen. Obwohl die Prüfungsabteilung auch in der EP'078 darauf hinweist, dass mangels Offenbarung einer über generische Konzepte und Elemente hinausgehenden technischen Lehre der Einwand des Naheliegens nach Art. 56 EPÜ nicht behebbar erscheint („*Additionally, at least the Art. 56 EPC objection appears to be unsolvable*"), wird die Klägerin im Hinblick auf das hiesige Verfahren wohl bis zum bitteren Ende an der Anmeldung festhalten, um nicht noch deutlicher zugestehen zu müssen, dass ihre vermeintliche „Erfindung" nicht mehr ist als die Software-Implementierung eines Geschäftsmodells, das auf generischen Computersystemen läuft.

### 2.3.3     Die angebliche Cyber-Versicherungs-„Erfindung" der Klägerin

118     Die Klägerin räumt auch in der Replik nicht aus, dass ihre vermeintliche Cyber-Versicherungs-„Erfindung" allenfalls eine Ansammlung von Ideen zu einer zukünftigen Entwicklung, aber keinesfalls eine fertige technische Erfindung war (KE, Ziffer 5.3). Die Email von Shyam Sankar widerlegt die Behauptung, eine solche Anwendung sei bereits entwickelt worden.

119     Die Klägerin musste auch zurückrudern, wer die Idee einer Anwendung zur besseren Bewertung von Cyber-Risiken im Rahmen einer Versicherung vermeintlich gehabt habe. Während sie sich diese Idee in der Klage (Seite 16) noch selbst zuschreibt, trägt sie nun in der Replik vor, ungenannte Kunden hätten diese Idee angeblich gehabt (Replik, Seite 16). Wenn in dieser Idee ein kreativer Beitrag oder gar eine Erfindung liegen sollte, wäre den Kunden oder deren Mitarbeitern die Rechte daran zuzuordnen, nicht der Klägerin.

120     Wir erklären uns mit Nichtwissen zu dem Vortrag, dass im Jahr 2013 Kunden an die Klägerin herangetreten und von Schwierigkeiten bei der Bestimmung von

HOFFMANN EITLE

angemessenen Preisen für Versicherungen gegen Cyber-Angriffe berichtet haben sollen und dass entsprechende Rechte an die Klägerin übergegangen sind.

121   Der Vortrag ist auch unsubstantiiert, da die Klägerin diese Kunden nicht benennt und er ist auch nicht plausibel, denn die Klägerin ist ein Software-Unternehmen, das keine erkennbare Expertise in der Bewertung von Versicherungsrisiken hat.

122   Wir erklären uns weiter mit Nichtwissen zu dem Vortrag, die Klägerin habe eine Anwendung entwickelt, die in Echtzeit solche Parameter und Risikofaktoren abrufen und bereitstellen konnte, die für die Bewertung der Sicherheitsrisiken und damit auch für die Versicherungspolice notwendig sind. Auch dieser Vortrag ist unsubstantiiert, denn die Klägerin trägt beispielsweise nicht vor, welche Parameter und Risikofaktoren bereitgestellt werden. Es ist auch bezeichnend, dass die Klägerin, die als professionelles Softwareunternehmen Entwicklungen dokumentieren wird, keinerlei Dokumente zu dieser vermeintlich marktreif entwickelten Anwendung vorlegen kann.

123   Wie bereits in der Klageerwiderung vorgetragen (Rz. 130 ff.) belegt die als **FBD 6** vorgelegte Email von Herrn Sankar im Gegenteil, dass die Klägerin zumindest im Juni 2014 nicht mehr als eine Geschäftsidee hatte. Sie zeigt nicht, dass sie eine „Anwendung" entwickelt hätte, wie sie nun behauptet. Herr Sankar schreibt, man sondiere („*we are exploring*"), ein Cyber-Versicherungs-Angebot aufzulegen (Hervorhebung hinzugefügt):

> is substantially more sophisticated (presents greater opportunities). We are exploring launching our own cyber insurance business (in partnership with a traditional insurer) that takes a more active role. We'd

124   Hierzu sei eine ungeheure Menge von operativem Know-how sowohl auf Cyber-Seite als auch auf Versicherungs-Seite erforderlich. Man sei laut Herrn Sankar (nur) hinsichtlich der Cyber-Seite zuversichtlich, über die erforderlichen Fähigkeiten zu verfügen, benötige für die Versicherungsseite aber Hilfe von Dritten (Hervorhebungen hinzugefügt):

> There is a tremendous amount of operational know how needed here on both the cyber end and the insurance end. We feel confident about what we can do on the cyber end (we just thwarted another attempt by the Iranian intelligence to get inside Palantir — using a sophisticated, brand new zero day exploit). But we need to partner with an entrepreneurial insurance or reinsurance company.

125   Man wolle Kundennetzwerke auf Attacken und Schwachstellen hin überwachen, jedes Vierteljahr den Kunden Sicherheitsmaßnahmen vorschreiben, und bei Nichtumsetzung den Versicherungsschutz erlöschen lassen (siehe auch **FBD 6**, Seite 4 und KE, Rz. 130 ff.).

126   Herr Sankar spricht eindeutig über eine zukünftige Entwicklung und er bringt in seiner Email ausschließlich Binsenweisheiten zum Ausdruck, wie sie beispielsweise



in dem oben zitierten Bericht des U.S.-Finanzministerium auch schon formuliert sind (Rz. 40 ff.).

## 2.4 Zur vermeintlichen Mitteilung des angeblichen Erfindungsbesitzes

### 2.4.1 Vortrag nicht substantiiert und auch unrichtig

127 Die Klägerin behauptet, in einem Gespräch im Juni 2014 habe Kevin Kawasaki dem Beklagten über *„Systeme zur Abwehr und Bewertung von Cyber Angriffen und entsprechenden Risiken"* berichtet, die die Klägerin vermeintlich entwickelt habe (Replik, Seite 25). Der Vortrag lässt offen, ob die Klägerin behauptet, es sei mehr gesagt worden als *‚Palantir hat Systeme zur Abwehr und Bewertung von Cyber Angriffen und entsprechenden Risiken entwickelt'*, was den behaupteten Erfindungsbesitz nicht mitgeteilt hätte.

128 Selbst wenn damit zum Ausdruck gebracht werden sollte, Kevin Kawasaki habe dem Beklagten Details über diese Systeme mitgeteilt, ist der Vortrag unsubstantiiert, denn es ist nicht gesagt, <u>wie</u> diese Abwehr erfolgen sollte, und <u>welche</u> Risiken vermeintlich bewertet wurden. Wie gezeigt hat die Klägerin keine Dokumente vorgelegt, die eine Entwicklung eines solchen Systems bestätigen würden, vor allem nicht, was in der Art und Weise der Streitpatentanmeldungen Schadensrisiken dynamisch bewertet und wobei, wie in der WO'049 gelehrt, Konsortiumsmitglieder mit personellen und technischen Ressourcen kollaborieren, um Cyber-Angriffe gegen Kunden eines Konsortiumsmitglieds zu bewältigen.

129 Vorsorglich wird <u>bestritten,</u> dass Kevin Kawasaki dem Beklagten im Juni 2014 die in den Streitpatentanmeldungen offenbarten Lehren mitgeteilt hat. Tatsächlich hat die Klägerin im US-Verfahren auch bereits zugestanden, dass Herr Kawasaki dies nicht getan hat, weshalb er für die § 1782 Discovery nicht relevant sei (Auszug aus Email von David Livshiz, Freshfields, vom 26. Mai 2020 an die US Vertreter des Beklagten; Hervorhebung hinzugefügt):

> other individual should be included, please identify them and we will consider them in good faith. <mark>As for Mr. Kawasaki, as we have previously informed you, we have determined that Mr. Kawasaki did not communicate the technology underlying the Cyber Patents to Abramowitz.</mark> The fact that Mr. Kawasaki connected Abramowitz with Mr. Sankar does not make Mr.

Auf Deutsch:

> "[…] *Was Herrn Kawasaki angeht, so haben wir festgestellt, dass er die den Cyber-Patenten zugrundeliegende Technologie Abramowitz nicht mittgeteilt hat, wie wir Sie bereits informiert haben.* […]"

130 Ebenso unsubstantiiert ist die Behauptung, Shyam Sankar habe dem Beklagten im Gespräch am 10. Juni 2014 über ‚Einzelheiten der Cyber Versicherungs- und CyberMesh Erfindungen der Klägerin berichtet' (Replik, Seite 27 f.). Diese vermeintlichen Erfindungen werden von der Klägerin hier und an anderer Stelle stets



nur völlig allgemein umschrieben und es ist nicht vorgetragen, über welche „*Einzelheiten*" berichtet worden sein soll.

131    Der Vortrag der Klägerin zur angeblichen Mitteilung solcher „*Einzelheiten*" ist auch in sich widersprüchlich. Die Klägerin betont einerseits, die Beklagte habe als Geschäftsmann und Investor überhaupt nicht die erforderlichen Kenntnisse gehabt, die Gegenstände der Streitpatentanmeldungen zu entwickeln. Andererseits will sie ihm in einem etwa einstündigen Gespräch, in dem es unstreitig zumindest auch um andere Themen ging, die umfangreichen „*Einzelheiten*" der Streitpatentanmeldungen mitgeteilt haben, obwohl er diese nach Auffassung der Klägerin nicht hätte verstehen können.

132    Soweit die Klägerin etwas konkretere Inhalte der Mitteilungen beschreibt, die „*insbesondere*" geteilt worden seien, bestätigen diese, dass die vermeintlichen Erfindungen der Klägerin sich in einem System zum Wissensaustausch über Cyber-Angriffe wie CyberMesh erschöpften, was weit entfernt ist von den Gegenständen der Streitpatentanmeldungen, und wie gesagt auch keine vertrauliche Information, sondern damals Teil des Produktportfolios der Klägerin.

133    Der Beklagte **bestreitet,** dass ihm in diesem Gespräch die Einzelheiten der Streit-patentanmeldungen mitgeteilt worden sind.

134    Sollte die Kammer zu dem Vier-Augen-Gespräch mit Shyam Sankar den benannten Zeugen vernehmen, was derzeit nicht veranlasst ist, da die Klägerin schon ihrer Darlegungslast nicht nachkommt, beantragen wir vorsorglich, aus Gründen der Waffengleichheit auch den Beklagten anzuhören.

135    Die Klägerin gesteht zu, dem Beklagten <u>nicht</u> mitgeteilt zu haben, dass den Teil-nehmern die Möglichkeit gelassen werde, selbst zu entscheiden, „*welche Daten sie teilen wollen und welche nicht*" (Replik, Seite 27). Dies sei ein Merkmal jeder damals kommerziell verfügbaren Anwendung der Klägerin gewesen. Das bedeutet aber einerseits nicht, dass es auch in der von der Klägerin angeblich beschrie-benen Anwendung möglich war und andererseits handelte es sich damit auch zumindest insoweit nicht um ein vertraulich mitgeteiltes Merkmal.

### 2.4.2    Keine vertrauliche Mitteilung

136    Wie gezeigt waren die dem Beklagten angeblich mitgeteilten Information nicht vertraulich, sondern wurden von der Klägerin Monate zuvor bereits mit der Öffentlichkeit geteilt. Spätestens aber mit der Mitteilung an den Beklagten hat die Klägerin jegliche Geheimhaltung hinsichtlich sämtlicher Gesprächsinhalte aufgege-ben, denn dieser unterlag bei dem Gespräch mit Herrn Sankar keiner Vertraulich-keitsverpflichtung.



137    Die Klägerin behauptet schlicht, ihre angeblichen Mitteilungen an den Beklagten seien vertraulich gewesen, "da letzterer schon seit vielen Jahren als Vertrauter, Investor und Berater für die Klägerin agierte und ihm bewusst war, dass er die ihm übermittelten Informationen vertraulich behandeln und ausschließlich im Interesse der Klägerin verwenden sollte" (Replik, Seite 25 unter II.). Dies ist nicht richtig. Nach dem auf diese Frage anwendbaren US-Recht kann sich eine Vertraulichkeitspflicht (*duty of confidentiality*) nur aus einem vertraglichen oder in sonstiger Weise besonderen Verhältnis der Parteien zueinander ergeben. Beides ist hier nicht der Fall:

### 2.4.2.1    Keine vertragliche Pflicht zur Vertraulichkeit

138    In der bereits in der Klageerwiderung angesprochenen US-Klage wegen angeblicher Entwendung von Geschäftsgeheimnissen (dort, Rz. 33) stützt die Klägerin ihre Behauptung zur Vertraulichkeit auf drei Verträge:

- das "**2012 Transfer Agreement**", eine Vereinbarung zur Übertragung von Aktien (Stock Transfer Agreement) vom 14. August 2012 zwischen Akkadian Ventures II, LP, der Klägerin und dem Marc Abramowitz Charitable Trust No. 2 (der "**Trust**");

- ein mit dem Beklagten nur für die Laufzeit von einem Tag abgeschlossenes, sogenannes "**Single Visit NDA**" vom 12. Juli 2014; und

- das "**2015 Transfer Agreement**", eine Vereinbarung zur Übertragung von Vorzugsaktien (Preferred Stock Transfer Agreement) vom 17. Juni zwischen Highbridge International LLC, der Klägerin und KT4 Partners LLC ("**KT4**").

Wir behalten uns vor, diese Verträge (zusammen, die "**Confidentiality Contracts**") – unter Zurückweisung der Beweislast – zu den Gerichtsakten zu reichen, sollte die Klägerin deren in den relevanten Aspekten kurz zusammengefassten Inhalt bestreiten.

139    Das 2012 Transfer Agreement wurde im Zusammenhang mit dem Verkauf von Aktien an der Klägerin durch den Trust unterzeichnet. Die Regelung zur Vertraulichkeit betrifft nur (1) Informationen, die der Trust während der Sondierung, Verhandlung, Ausfertigung und Umsetzung des 2012 Transfer Agreement ("*the exploration, negotiation, execution, and closing of this Agreement*"), erhielt sowie (2) Informationen, die der Verkäufer (Seller) – also der Trust – in seiner Eigenschaft als Gesellschafter der Klägerin <u>nach</u> dem Datum des 2012 Transfer Agreement ("*in its capacity as a stockholder of the Company <u>following</u> the date of th*[e 2012 Transfer] *Agreement*") erhielt. Der Trust schied im August 2012 als Gesellschafter der Klägerin aus. Folglich findet das 2012 Transfer Agreement keine Anwendung auf Informationen, die die Klägerin behauptet, dem Beklagten im Zusammenhang mit den Streitpatentanmeldungen mitgeteilt zu haben.



140    Das Single Visit NDA wurde vom Beklagten anlässlich eines einzelnen Besuchs in den Büroräumen der Klägerin unterschrieben. Es findet nur auf Informationen Anwendung, die der Beklagte während dieses einen Besuchs am 12. Juli 2014 erhielt. Es erstreckt sich nicht auf Informationen, die dem Beklagten an irgendeinem anderen Tag mitgeteilt wurden, und sicherlich nicht auf Informationen, die bereits zuvor ohne Vertraulichkeitsverpflichtung offenbart wurden. Das Single Visit NDA kann auch nicht rückwirkend auf die Informationen Anwendung finden, die dem Beklagten bereits am 9./10. Juni 2014 ohne jegliche Vertraulichkeitsverpflichtung mitgeteilt, und damit unmittelbar der Öffentlichkeit zugänglich gemacht wurden.

141    Das 2015 Transfer Agreement wurde – wie das 2012 Transfer Agreement – im Zusammenhang mit dem Verkauf von Aktien an der Klägerin unterzeichnet, diesmal durch KT4. Die darin enthaltene Regelung zur Vertraulichkeit entspricht der nach dem 2012 Transfer Agreement, erfasst also (1) Informationen, die KT4 während der Sondierung, Verhandlung, Ausfertigung und der Umsetzung des 2015 Transfer Agreement oder (2) in seiner Eigenschaft als Gesellschafter der Klägerin nach dem Datum des 2015 Transfer Agreement erhielt. Die Klägerin behauptet nicht – und kann auch nicht glaubwürdig behaupten – dass sie dem Beklagten im Zusammenhang mit dem Verkauf der Anteile durch KT4 vertrauliche Informationen zur Verfügung stellte. Da die vermeintliche Mitteilung des Erfindungsbesitzes am 9./10. Juni 2014 erfolgt sein soll, fallen solche Informationen auch nicht unter die zweite Alternative der nach dem Datum des 2015 Transfer Agreement erhaltenen Informationen. und selbst wenn der Vertrag dies vorsehen würde, wäre eine rückwirkende Vertraulichkeitserklärung wie gesagt auch nicht wirksam.

142    Damit kann die Klägerin keinen der Confidentiality Contracts zur Begründung einer Vertraulichkeitspflicht des Beklagten hinsichtlich der am 9./10. Juni 2014 (vermeintlich) mitgeteilten Informationen heranziehen.

143    Sollte die Klägerin dennoch versuchen, eine Vertraulichkeitspflicht mit den Confidentiality Contracts zu begründen, so würde sie sich auch in Widerspruch zu ihrem eigenen Vortrag im Verfügungsverfahren (Aktenzeichen 21 O 2568/20) setzen, wo sie vorgetragen hat, *„dass die Vertraulichkeitsvereinbarungen dem deutschen Verfahren gerade nicht entgegenstehen"* (Antrag der Klägerin vom 2. März 2020). Denn in diesem Fall wären auch die in allen drei Confidentiality Contracts enthalten Gerichtsstandklauseln zu berücksichtigen, die jeweils die ausschließliche Zuständigkeit der Gerichte in Kalifornien vorsehen für *„Klagen,* [gerichtliches] *Vorgehen oder andere Verfahren aus oder basierend auf"* (*any suit, action orother proceedings arsing from or based upon*) dem 2012 Transfer Agreement oder dem 2015 Transfer Agreement bzw. *„für jedes* [gerichtliche] *Vorgehen, das sich aus dem Gegenstand* [des Single Visit NDA] *ergibt oder mit*



diesem im Zusammenhang steht" („*for any action arising out of or relating to the subject matter action arising out of or relating to the subject matter of* [the Single Visit NDA]).

### 2.4.2.2    Keine Vertraulichkeitspflicht nach kalifornischem Recht

144    Eine Vertraulichkeitspflicht des Beklagten hinsichtlich der Kommunikation mit Herrn Sankar am 9./10. Juni 2014 ergibt sich auch nicht aus anderen Gründen.

145    Der bloße Umstand, dass der Beklagte Aktien an der Klägerin hielt, noch dazu indirekt über eine juristische Person, begründet keine Vertraulichkeitspflicht. Treuhänderische Pflichten (*fiduciary duities*), aus denen eine Vertraulichkeitspflicht erwachsen könnte, bestehen nach dem anwendbaren Recht für Minderheitsgesellschafter nicht (*Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989).

146    Nach kalifornischem Recht erwächst eine Vertraulichkeitspflicht auch nicht aus dem Umstand, dass Parteien im Laufe ihrer Geschäftsbeziehung Vertrauen zueinander gefasst haben (City Sols., Inc. v. Clear Channel Commc'ns, 201 F.Supp.2d 1048, 1050 (N.D. Cal. 2002)). Vertrauen („*trust and confidence*") entsteht in fast jeder geschäftlichen Beziehung, in der eine wechselseitig vorteilhafte Vereinbarung angestrebt wird (City of Hope Nat'l Med. Ctr. v. Genentech, Inc., 43 Cal. 4th 375, 386 (2008)). Um eine treuhänderische oder anderweitige Vertraulichkeitspflicht zu begründen muss hinzukommen, dass die Parteien nicht auf Augenhöhe miteinander agieren („*the essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms*"; City Sols., 201 F.Supp.2d at 1050). Eine Partei kann sich nur dann auf eine konkludente Vertraulichkeitspflicht berufen, wenn sie geltend machen kann, besonders schutzwürdig (vulnerabel) zu sein, so dass sie sich nicht selbst effektiv schützen konnte („*whether one party was so vulnerable that it could not effectively protect itself*"; *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, 2011 WL 3703192, at *4 (S.D. Cal. Aug. 23, 2011)).

147    Die Klägerin, ein großes Datenanalyseunternehmen mit hunderten von Mitarbeitern, kann sich nicht darauf berufen, dass sie sich gegenüber dem Beklagten, einem privaten Investor, nicht hätte effektiv selbst schützen können. Die vorgenannten Confidentiality Contracts zeigen ja gerade, dass die Klägerin, wenn es ihr darauf angekommen wäre, ohne weiteres eine Geheimhaltungsvereinbarung hätte abschließen können. Da die Klägerin gegenüber dem Beklagten somit nie „vulnerabel" war, unterlag die Kommunikation mit ihm nach dem anwendbaren Recht auch keiner impliziten Vertraulichkeitspflicht.



148    Spätestens mit der angeblichen Mitteilung an den Beklagten hätte die Klägerin somit ihre vermeintlichen Erfindungen der Öffentlichkeit zugänglich gemacht, und sich selbst diesbezüglich aller Recht auf ein Patent begeben.

149    Sollte die Kammer – ungeachtet der Beweislast – vom Beklagten weitere Unterstützung bei der Amtsermittlung zum US-Recht in diesem oder anderem Zusammenhang wünschen, <u>bitten wir höflichst um einen gerichtlichen Hinweis.</u>

## 2.5    Eigene Entwicklung des Beklagten

150    Wie in **Ziffer 2.2.3** gezeigt, lehnte sich der in **Ziffer 2.2.2** erläuterte Gegenstand der Prioritätsanmeldung der Streitpatentanmeldungen konzeptionell eindeutig an eine Patentanmeldung des Beklagten an, die bereits Anfang März 2014 eingereicht wurde, also <u>vor</u> der angeblichen Vermittlung des Erfindungsbesitzes durch die Klägerin im Sommer 2014.

151    Während der Finanzkrise von 2008 verlor der Beklagte erhebliche Geldsummen, zum Teil weil die schlechten Ratingsysteme für Anleihen dazu führten, dass die Rating-Agenturen (Moody's, Standard & Poor's und Fitch) ungenaue Bewertungen für Unternehmens- und Kommunalanleihen abgaben. Der Beklagte sah Bedarf für eine bessere Methode zur Bewertung von Anleihen.

152    Bis 2012 hat der Beklagte die Verwendung dynamischer Echtzeitdaten zur Erstellung und Verbreitung präziserer Ratings für Unternehmens- und Kommunalanleihen konzipiert. Später beauftragte der Beklagte John Squires und seine damalige Anwaltskanzlei Perkins Coie LLP damit, ihn bei der Erlangung von Patentschutz für seine Ideen zu unterstützen.

153    John Squires, heute Leiter der Emerging Companies and IP Practices im New Yorker Büro von Dilworth Paxson LLP, war einer der führenden Rechtsexperten für die Patentierung von Geschäftsverfahren. Er ist Mitverfasser mehrerer *Amicus Curiae*-Schriftsätze im bahnbrechenden Bilski-Verfahren vor dem US-Federal Circuit und dem Obersten Gerichtshof der Vereinigten Staaten (*In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) und *Bilski v. Kappos*, 561 U.S. 593 (S. Ct. 2010), in dem sich die Rechtsauffassung von John Squires zur Patentierung von Geschäftsverfahren durchsetzte. Er wurde hierzu auch als Experte vom Justizausschuss des US Senats angehört.

154    Im Jahr 2013 erörterten der Beklagte und John Squires die Ideen des Beklagten für die Verwendung dynamischer Echtzeitinformationen, insbesondere zur Bereitstellung dynamischer Anleihe-Ratings. Basierend auf den Erfindungen, die bei einem Treffen im November 2013 diskutiert wurden, reichte John Squires zunächst am 5. März 2014 die oben in **Ziffer 2.2.3** erläuterte erste Patentanmeldung des Beklagten, US'766, ein.



155     Der Beklagte hielt somit das zugrundeliegende Konzept der Streitpatentanmel-
        dungen bereits lange Zeit in Händen und hat dieses zusammen mit seinem
        Patentanwalt und dessen technisch qualifizierten Mitarbeitern zum Gegenstand
        der Prioritätsanmeldung entwickelt.

        **Beweis:**        Zeugnis John A. Squires

156     Der Gegenstand der Prioritätsanmeldung ist ohne signifikante Ergänzungen in die
        WO'919 eingegangen, ist aber auch Teil der Offenbarung der WO'049. Beide
        Nachanmeldungen wurden ebenfalls durch den Beklagten zusammen mit seinem
        Patentanwalt und dessen technisch qualifizierten Mitarbeitern ausgearbeitet.

        **Beweis:**        Zeugnis John A. Squires

157     Die Dokumente, die diese Entwicklung der Gegenstände der Streitpatentanmel-
        dungen bestätigen, mussten im § 1782-Discovery-Verfahren nicht offengelegt
        werden, da sie dem Anwaltsprivileg unterliegen. Es ist daher unrichtig zu unter-
        stellen, weil solche Unterlagen nicht vorgelegt wurden, sei bewiesen, dass der
        Beklagte die Gegenstände der Streitpatentanmeldungen nicht selbst entwickelt
        habe. Diese Dokumente im hiesigen Verfahren offenzulegen könnte den
        Beklagten weiteren missbräuchlichen prozessualen Ansprüchen der Klägerin in
        den USA aussetzen. Wir behalten uns daher vor, sie gegebenenfalls erst in der
        Verhandlung vorzulegen.

158     Die Klägerin beruft sich weiterhin darauf, dass der Beklagte als Geschäftsmann
        und Investor die Gegenstände der Streitpatentanmeldungen gar nicht habe selbst
        entwickeln können. Die Streitpatentanmeldungen sind auf Geschäftsverfahren
        gerichtet, und liegen daher im Fachgebiet des Beklagten als Geschäftsmann, der
        einen Bachelor of Arts der Universität von Kalifornien in Berkeley, ein *Juris Docto-
        rate* der Harvard Law School und einen Master-Abschluss in Betriebswirtschafts-
        lehre der Stanford University erworben hat. Darüber hinaus beschäftigte der
        Beklagte John Squires, dessen Kanzlei zahlreiche Patentanwälte und weiteres
        technisch qualifiziertes Personal beschäftigte, die dem Beklagten bei der Ausar-
        beitung einiger allgemeiner technischer Details behilflich waren. Die technischen
        Details sind in den Streitpatentanmeldungen auch nur Beiwerk der computer-
        implementierten geschäftlichen Abläufe und Organisationskonzepte, die einem
        Juristen, Geschäftsmann und Investor wie dem Beklagten natürlich ohne weiteres
        zugänglich sind.

HOFFMANN EITLE

### 2.6        Mangelnde Patentfähigkeit der Streitpatentanmeldungen

#### 2.6.1        *Parallelverfahren nicht indikativ für Patentfähigkeit eines EP/DE*

159        Der Vortrag der Klägerin unter V.1 und V.2 ihrer Replik liegt völlig neben der Sache. In Bezug auf Gegenstände, die ganz oder teilweise nach § 1 PatG bzw. Art. 52 EPÜ vom Patentschutz ausgenommene Aspekte umfassen, lassen Ergebnisse aus dem internationalen Anmeldeverfahren vor dem *koreanischen* Patentamt oder dem *US*-Verfahren keinerlei Rückschlüsse auf die Patentfähigkeit nach dem EPÜ und Patentgesetz zu. Weder das US-Patentgesetz noch das koreanische Patentgesetz kennen eine § 1 PatG bzw. Art. 52 EPÜ entsprechende Ausschlussvorschrift. Die hier als

**Anlage HE 12**

überreichte Übersicht „*A Global Perspective on Patent Subject Matter Eligibility and Software-Related Inventions*" der US-amerikanischen Intellectual Property Owners Association veranschaulicht die weltweit unterschiedliche Rechtslage und Praxis auf dem Gebiet der Patentierung von computerimplementierten Erfindungen.

160        Aufgrund der unterschiedlichen Rechtslage in den Mitgliedstaaten und da internationale Patentanmeldungen nach dem Patentzusammenarbeitsvertrag (PCT) auch in Ländern ohne eine Art. 52 EPÜ entsprechende Ausschlussvorschrift als nationale Anmeldungen verfolgt werden können, sieht das PCT keine Prüfung auf solche nationalen Regelungen vor, sondern entbindet die nationalen Patentämter, die als international Recherchen- bzw. Prüfbehörde agieren, von der Pflicht, bestimmte Erfindungen zu recherchieren bzw. zu prüfen (Regeln 39 und 67 der PCT-Ausführungsordnung).

161        Regel 39.1 lautet:

„*39.1 Begriffsbestimmung*

*Die Internationale Recherchenbehörde ist nicht verpflichtet, eine internationale Recherche für eine internationale Anmeldung durchzuführen, wenn und soweit der Anmeldungsgegenstand folgende Gebiete betrifft:*

*i) wissenschaftliche und mathematische Theorien,*

*[...]*

*iii) Pläne, Regeln und Verfahren für eine geschäftliche Tätigkeit, für rein gedankliche Tätigkeiten oder für Spiele,*



[...]

*vi) Programme von Datenverarbeitungsanlagen insoweit, als die Inter-
nationale Recherchenbehörde nicht dafür ausgerüstet ist, für solche
Programme eine Recherche über den Stand der Technik durchzuführen."*

162     Ausweislich der vorletzten Rubrik (*Subject matter that will not be searched*) des
hiermit als

**Anlage HE 13**

überreichten Auszugs aus dem PCT-Anmelderleitfaden (*PCT Applicant's Guide*),
führt das Koreanische Patentamt („KIPO") grundsätzlich keine Recherchen für
Gegenstände durch, die in Ziffern (i) bis (vi) der Regel 39.1 PCT aufgeführt sind,
vorbehaltlich nur solcher Erfindungen, die nach den nationalen koreanischen
Vorschriften recherchiert werden.

163     Wie aus der als ***Anlage HE 12*** (Seite 64 ff.) überreichten Übersicht hervorgeht,
verlangt die koreanische Praxis für computerimplementierte Erfindungen lediglich
eine ausdrückliche Nennung von Hard- und Softwareelementen im Anspruch, um
grundsätzlich der Patentierbarkeit zugänglich zu sein. Betrachtet man die Ansprü-
che der WO'919 und der WO'049, so erkennt man, dass sie den koreanischen
Anforderungen genügen. Es ist daher verständlich, dass das KIPO als inter-
nationale Recherchenbehörde eine internationale Recherche für alle Ansprüche
durchgeführt hat. Ebenso ist verständlich, warum das KIPO im schriftlichen
Bescheid („Written Opinion") keine Einwände aufgrund der Dominanz von
geschäftlichen Konzepten in den Ansprüchen erhob: eine der europäischen oder
deutschen Prüfpraxis entsprechende Handhabung gibt es vor dem KIPO nicht.

164     Aufgrund der vollkommen unterschiedlichen Rechtslage und Praxis zu Erfindun-
gen, die auf computerimplementierte geschäftliche Tätigkeiten gerichtet sind, vor
dem US-Patentamt und KIPO einerseits und dem EPA/DPMA andererseits, haben
die von der Klägerin in Bezug genommenen Dokumente aus dem internationale
Verfahren vor dem KIPO und aus parallelen US-Verfahren keinerlei Indizwirkung
für das hiesige Verfahren.

### 2.6.2     Fehlende Schutzfähigkeit

165     Ebenso neben der Sache liegt der Vortrag der Klägerin unter V.3 der Replik.

166     So rügt die Klägerin zunächst, dass es nicht statthaft sei, nur einzelne Ansprüche
bei der Begutachtung der Patentfähigkeit zu betrachten. Dem ist entgegenzuhal-
ten, dass im Patentamtsverfahren die Ansprüche stets als Antragsgesamtheit
betrachtet werden, so dass ein Mangel in nur einem einzigen Anspruch zu einer



Abweisung des gesamten Antrags führt. Zudem geben diese Ansprüche wieder, was das Anmelder als wesentliche Lehre angesehen hat. Folglich ist es auch nur sachgerecht, die Analyse anhand dieser Ansprüche durchzuführen.

167     Die ausgiebige Diskussion der Klägerin zur Technizität der Ansprüche in Abschnitt V.3.b) ist insoweit unverständlich, dass der Beklagte nicht in Abrede gestellt hat, dass die in der Klageerwiderung analysierten Ansprüche technische und nicht-technische Merkmalen umfassen, d.h. grundsätzlich im Sinne der deutschen und europäischen Praxis als technisch anzusehen sind.

168     Die Klägerin vermeidet es aber zur eigentlichen Problematik Stellung zu nehmen, nämlich dass bei einem Anspruch mit technischen und nicht-technischen Merk-malen, allein die technischen Merkmale die Patentfähigkeit begründen können. Wie in der Klageerwiderung dargelegt, weisen die analysierten Ansprüche aber keinen technischen Inhalt auf, der über vollkommen generische Datenverar-beitungskonzepte unter Verwendung notorisch bekannter Elemente (Prozessor, Computernetz, etc.) hinausginge. Mit anderen Worten: der technische Teil der Ansprüche kann eine Erfindung nicht begründen. Es sind keine technischen Probleme erkennbar, die mit technischen Mitteln gelöst würden, weshalb Patent-schutz nach dem EPÜ und Patentgesetz für die Streitpatentanmeldungen offen-kundig ausscheidet. Daran ändern auch die nunmehr angeführten, der Beschre-ibung entnommenen Elemente nichts. Auch eine kontinuierliche Überwachung, Echtzeitdatenverarbeitung, kriterienabhängige Datengeneration sowie Datenge-wichtung sind allgemeinbekannte Standardmerkmale von Computersystemen. Es fehlt an jedwedem Vortrag, und ist auch nicht aus sich selbst heraus erkennbar, wie diese Elemente einem ansonsten nicht patentfähigen Anspruch Erfindungs-höhe verleihen könnten.

169     Nachdem es der Klägerin also nicht gelingt, einen beanspruchbaren Gesamtgegen-stand zu benennen, der in technischer Hinsicht über notorisch bekannte Compu-tereigenschaften hinausgeht, bestätigt sie im Ergebnis den Beklagtenvortrag aus der Klageerwiderung.

**2.7     Das Verhältnis der Parteien bei Entwicklung des Cyber-Versicherungsgeschäfts**

170     Der wiederholte Versuch der Klägerin, den Beklagten in ein schlechtes Licht zu rücken (Replik, Seite 28 ff.), zeigt, wie wichtig das in der Klageerwiderung erläuter-te Verhältnis der Parteien zueinander und der größere Zusammenhang des Rechtsstreits – zu dem sich die Klägerin verständlicherweise lieber nicht äußern möchte – für die richtige Einordnung des klägerischen Vortrags sind.



171    Die Bemühungen des Beklagten, ein Cyber-Versicherungsgeschäft aufzubauen,
fanden mit Wissen der Klägerin außerhalb des Unternehmens der Klägerin statt.
Tatsächlich wollte es die Klägerin genau so, wie sich beispielsweise aus der
internen Kommunikation zwischen Shyam Sankar und Kevin Kawasaki (**FBD 7**)
ergibt. Darin berichtet Herr Sankar, dass der Beklagte vorgeschlagen hat, dass die
Klägerin ein Tochterunternehmen für die Entwicklung dieses Geschäfts gründet:

> Also, Abramowitz (directed to be KK) seems to want to be a part of Palantir (assume you guys are tracking
> spades). When I met him about insurance he wanted to head it up. ==Fixated on starting a subsidiary.== Or
> building a building and leasing it back to Palantir.
>
> I know he is smart and a hustler. Is the guidance here to partner with him on insurance?

Auf Deutsch:

> „*Abramowitz (von KK an mich verwiesen) möchte anscheinend Teil von
> Palantir werden ([...]). Als ich ihn bezüglich Versicherung traf, wollte er
> die Leitung übernehmen.* ==*Fixiert darauf, eine Tochtergesellschaft zu grün-
> den.*== *Oder ein Gebäude zu errichten und an Palantir zurückzuvermieten.*
>
> *Ich weiß, dass er schlau und geschäftstüchtig ist. Gibt es hier eine
> Empfehlung, sich mit ihm in Bezug auf Versicherung zusammenzutun?*"

172    Kevin Kawasaki lehnte dies ab. Er wollte, dass der Beklagte zunächst Kunden
akquiriert:

> I think we should focus Marc and ourselves on getting the first customer. Once we have a deal outlined, we
> can then move to setting up the structure or do it simultaneously. I may be out of my realm on how long it
> takes to set these things up etc….but I don't see much value in partner

Auf Deutsch:

> „*Ich denke, wir sollten uns gemeinsam mit Marc darauf konzentrieren,
> den ersten Kunden zu bekommen. Sobald ein Deal in groben Zügen steht,
> können wir dann zum Aufbau der Struktur übergehen oder dies
> gleichzeitig machen. Ich bin wohl etwas überfragt, wie lange es dauern
> würde, so etwas aufzuziehen, usw. … Aber ich sehe keinen großen
> Nutzen in ihm als Partner.*"

173    Hierfür musste der Beklagte zunächst (auf eigene Kosten und mit eigenem Zeit-
einsatz) ein überzeugendes Angebot ausarbeiten, das das Interesse eines Kunden
hätte wecken können, was ihm die Klägerin nun absurderweise als vermeintlich
unlauteres Verhalten vorwirft (Replik C.III).

174    Alex Fishman, mit dem der Beklagte dabei <u>auf Wunsch der Klägerin</u> kooperierte,
war ein früherer Mitarbeiter der Klägerin und ehemaliges Mitglied ihrer Unter-
nehmensleitung. Er war und ist ein enger Vertrauter des Vorstandsvorsitzenden
Alexander Karp. Es ist derselbe Alexander Fishman, den die Klägerin später unter



seiner Firma DTA als Makler einschalten sollte, um dem Beklagten die Käufer für seine Unternehmensanteile auszuspannen (KE, Rz. 28 f.).

175    Wie die Klägerin selbst bestätigt (Replik, Seite 32), begann sie sich im Oktober 2014 vom Beklagten zu distanzieren. Das erklärt, warum aus Sicht des Beklagten die Klägerin kein weiteres Interesse erkennen ließ, das Cyber-Versicherungsgeschäft gemeinsam weiterzuentwickeln (KE, Rz. 26 f.). Die Klägerin scheint dies auch nicht selbst weiter entwickelt zu haben, und auch das Projekt CyberMesh scheint schnell wieder aufgegeben worden zu sein. Die Klägerin hat nicht dargetan, dass sie CyberMesh als Produkt jemals lizenziert hat und bis wann oder dass sie jemals im Bereich der Cyber-Versicherungen tätig geworden wäre. Aus öffentlich zugänglichen Quellen gewinnt man den Eindruck, dass die Klägerin beide „Projekte" entweder überhaupt nicht weiterverfolgt, oder jedenfalls kurze Zeit später eingestellt hat. Es gibt keinerlei Rechtfertigung den Beklagten dafür zu kritisieren, dass er diese potentielle Geschäftschance nicht ebenfalls unmittelbar aufgegeben hat.

176    Ebenfalls unstreitig hat der Beklagte der Klägerin angeboten, ihr die damals noch nicht offengelegte Prioritätsanmeldung (**FBD-V 22**) vor ihrer Veröffentlichung bereits unter Vertraulichkeitsvereinbarung offenzulegen (KE, Rz. 26; Replik, Seite 31, **FBD-V 21**). Das Interesse der Klägerin an dieser Anmeldung ging aber offensichtlich nicht einmal so weit, dass sie dem Beklagten eine einfache Standard-Vertraulichkeitsvereinbarung zugesandt hätte. Hätte die Klägerin dies getan, dann hätte sie die Anmeldung vom Beklagten unmittelbar erhalten.

**3.    Rechtliche Würdigung**

177    Die Klage ist weiterhin unzulässig, jedenfalls aber unbegründet.

178    Die Klägerin hat auch mit der Replik die Unzuständigkeit des Gerichts nicht ausgeräumt. Unsere Stellungnahme zu den diesbezüglichen Argumenten der Klägerin haben wir hier hintangestellt, um Vorwärtsverweisungen zu vermeiden (**Ziffer 3.6**).

179    Aus denselben Gründen und zur (hoffentlich) vereinfachten Darstellung ziehen wir im Folgenden zwei Aspekte vor die Klammer, nämlich das grundlegende Missverständnis der Klägerin hinsichtlich des Regelungsgegenstandes des EPÜ und dessen Schnittstellen zum Zivilrecht der Mitgliedstaaten (**Ziffer 3.1**), sowie das Nichtentstehen der europäischen und deutschen Anmeldungen, auf denen die gesamte Klage fußt (**Ziffer 3.2**). Im Anschluss zeigen wir die weiteren Gründe auf, aus denen die Argumente der Klägerin zum mangelnden Feststellungsinteresse (**Ziffer 3.3**), zum mangelnden Rechtsschutzbedürfnis (**Ziffer 3.4**) und zur mangelnden Begründetheit (**Ziffer 3.5**) nicht überzeugen.



### 3.1    Klägerin verkennt Regelungsgegenstand des EPÜ

180    Die Klägerin will ihren Feststellungsantrag auf Art. 60 Abs. 1 EPÜ stützen und meint, dieser gebe ihr ohne Rückgriff auf nationales Recht einen Anspruch auf Feststellung ihrer vermeintlichen Berechtigung auf die Streitpatentanmeldungen (Replik, Seite 40), sogar ohne dass es auf Kausalität ankomme (Replik, Seite 43). Dies ist evident unrichtig.

181    Die Klägerin verkennt bereits ihren eigenen Feststellungsantrag, denn der lautet nicht festzustellen, dass sie Rechtsnachfolgerin der (vermeintlichen) Erfinder ist, sondern *„dass der Beklagte* als Nichtberechtigter *durch die Anmeldung der europäischen Patente [...] Erfindungen der Klägerin angemeldet hat und der* Anspruch der Erteilung dieser europäischen Patente *der Klägerin zugestanden hätte"* (Hervorhebungen hinzugefügt). Da es das Klageziel der Klägerin ist, gemäß Art. 61 Abs. 1 lit. b) EPÜ eine neue Anmeldung einzureichen, ist es auch richtig, auf das *Recht auf Erteilung des Patents* abzustellen, denn Art. 61 Abs. 1 EPÜ setzt voraus, dass

> *„[...] durch rechtskräftige Entscheidung der* Anspruch auf Erteilung des europäischen Patents *einer Person zugesprochen* [wurde], *die nicht der Anmelder ist"* (Hervorhebungen hinzugefügt).

182    Voraussetzung für eine Neuanmeldung nach Art. 61 EPÜ ist demnach, dass der Klägerin das *„Recht* auf Erteilung *des europäischen Patents"* zugesprochen wird. Art. 60 EPÜ stellt demgegenüber lediglich fest:

> *„(1) Das* Recht auf das europäische Patent *steht dem Erfinder oder seinem Rechtsnachfolger zu. [...]*
>
> *(2) Haben mehrere eine Erfindung unabhängig voneinander gemacht, so steht das Recht auf das europäische Patent demjenigen zu, dessen europäische Patentanmeldung den früheren Anmeldetag hat, sofern diese frühere Anmeldung veröffentlicht worden ist.*
>
> *(3) Im Verfahren vor dem Europäischen Patentamt gilt der Anmelder als berechtigt, das Recht auf das europäische Patent geltend zu machen."*
> (Hervorhebung hinzugefügt)

183    Unterschieden wird nach dem EPÜ somit zwischen dem *Recht auf das Patent* und dem *Recht auf Erteilung des Patents*. Das *Recht auf das Patent* steht nach Absatz 1 dem Erfinder (oder seinem Rechtsnachfolger) zu, es sei denn, ein anderer hat die Erfindung unabhängig gemacht und zuvor angemeldet (Absatz 2). Hinsichtlich des *Rechts auf Erteilung des Patents* gilt der Anmelder als berechtigt (Absatz 3).



184     Allein festzustellen, dass die Klägerin gemäß Art. 60 Abs. 1 EPÜ (angeblich) Rechts-
nachfolgerin der Erfinder ist, reicht wegen Art. 60 Abs. 2 EPÜ nicht einmal aus, der
Klägerin das *Recht auf das Patent* zuzuerkennen. Es kommt schon nach
Art. 60 Abs. 2 EPÜ auf die Kausalität an, entgegen der Nebenbemerkung der
Klägerin.

185     Insbesondere reicht die Feststellung, Rechtsnachfolgerin in das *Recht auf das
Patent* zu sein, nicht aus, der Klägerin ein Recht zur Neuanmeldung gemäß Art. 61
Abs. 1 lit. b) EPÜ zuzuerkennen, denn hierfür ist die Feststellung erforderlich, dass
der Klägerin statt des Beklagten das *Recht auf Erteilung des Patents* zusteht.

186     Unter welchen Voraussetzungen einem Anmelder das *Recht auf Erteilung des
Patents* ab- und einer anderen Person zuzuerkennen ist, regelt das EPÜ nicht. Es
war eine bewusste Entscheidung der Vertragsstaaten, dies dem nationalen Zivil-
recht zu überlassen, da man die nationalen Bestimmungen zum (geistigen)
Eigentum als nicht hinreichend harmonisiert ansah und es als eine genuin zivil-
rechtliche Frage einordnete, die den nationalen Zivilgerichten zur Entscheidung
vorbehalten bleiben sollte.

187     So ergibt sich aus dem Protokoll des 10. Treffens der Arbeitsgruppe I vom 22. bis
26. November 1971 in Luxemburg, dass bei Ausarbeitung des EPÜ die (zweite)
Option, dies zum Gegenstand der Kompetenzen des EPA zu machen, aus diesen
Gründen verworfen und die Frage, wem ein Patent zusteht, bewusst aus dem EPÜ
ausgeklammert wurde:

> A second solution might be to invest the European
> Patent Office with the central authority to decide who is
> entitled to the patent.
>
> Since it seems impossible to standardise the laws
> on ownership of inventions for all the European States which
> may become Contracting Parties to the Convention, rules
> would have to be laid down in Article 15 of the Convention
> to determine which national laws would be applicable in
> each case. The European Patent Office would then have the
> task of applying twenty or so different national laws
> according to each individual case; this would be practically
> impossible if it is desired to retain the nature and
> structure hitherto envisaged for the European Patent Office.
>
> Apart from this practical objection some delegations
> made the objection of principle to the idea that disputes
> traditionally falling within the sphere of property law
> should be dealt with by authorities other than national
> civil courts.
>
> For these reasons the Working Party considered that
> the second solution should not be adopted.



Auf Deutsch:

> *„Eine zweite Lösung könnte darin bestehen, dem Europäische Patentamt die zentrale Entscheidungsgewalt darüber zu erteilen, wem ein Patent zusteht.*
>
> *Da es unmöglich erscheint, die Gesetze zum Erfindungsbesitz für alle europäischen Staaten, die Vertragsstaaten des EPÜ werden könnten, zu vereinheitlichen, müsste in Artikel 15 des Übereinkommens geregelt werden, welche nationalen Gesetze im jeweiligen Fall anwendbar wären.*
>
> *Das Europäische Patentamt hätte somit die Aufgabe, je nach Einzelfall etwa zwanzig verschiedene nationale Gesetze anzuwenden, was prak-tisch unmöglich wäre, wenn die bisher für das Europäische Patentamt angedachte Form und Struktur beibehalten werden soll.*
>
> *Abgesehen von diesem praktischen Einwand erhoben einige Delegationen einen grundsätzlichen Einwand gegen die Vorstellung, dass sich nicht die nationalen Zivilgerichte, sondern andere Behörden mit traditionell dem Sachenrecht zuzuordnenden Streitfällen befassen sollten.*
>
> *Daher war die Arbeitsgruppe der Ansicht, dass die zweite Lösung nicht angenommen werden sollte.“*

188    Der deutsche Gesetzgeber hat diese Kompetenzzuweisung aufgenommen und es richtigerweise als erforderlich angesehen, mit Art. II § 5 IntPatÜG eine eigene Anspruchsgrundlage zu schaffen dafür, unter welchen Voraussetzungen derjenige, dem ein *Recht auf ein Patent* zusteht, gegenüber dem Nichtberechtigten geltend machen kann, ihm das *Recht auf Erteilung des Patents* zu übertragen. So heißt es in der Begründung zum Gesetzentwurf vom 2. Juni 1975 (BT-Drs. 7/3712, Seite 19):

> In Artikel 60 des Europäischen Patentübereinkom-mens wird zwar im einzelnen festgelegt, wem das Recht auf das europäische Patent zusteht. Ungere-gelt und damit der Bestimmung durch das nationale Recht der Vertragsstaaten überlassen bleibt dage-gen, in welcher Weise der hiernach Berechtigte sein Recht gegenüber dem unberechtigten Anmelder oder Patentinhaber durchsetzen soll. § 5 des Patent-

189    Es ist demnach zu unterscheiden zwischen dem Verwaltungsverfahren nach Art. 61 EPÜ, über dessen Voraussetzungen und Durchführung die Instanzen des EPA entscheiden können, und dem nationalen Zivilrecht aus dem allein sich ergeben kann, ob einer anderen Person als dem Anmelder das *Recht auf Erteilung*



*des Patents* zuzuerkennen ist. Noch deutlicher gesagt, da die Vertragsstaaten dem EPA nicht die Kompetenz übertragen haben, diese zivilrechtlichen Aspekte zu entscheiden, darf das EPA diesbezüglich das nationale Zivilrecht weder ersetzen noch behindern. Dies verkennt auch die Große Beschwerdekammer in der Entscheidung G 3/92 nicht, in der bereits eine Entscheidung der zuständigen nationalen Instanz im Vereinigten Königreich, des *Comptrollers*, vorlag, die wir überreichen als

**Anlage HE 14**.

190    Der Tenor dieser Entscheidung lautet wie folgt:

> I therefore order that Latchways Limited may make a new
> application under section 12(6) for a patent in respect of the
> matter contained in Exhibit LBN1 to Mr Ben-Nathen's
> declaration, but with the claims amended to the form
> accompanying the letter of 12 January, referred to above.  I
> further order that the new application shall be treated as
> having been filed on the date of filing of European
> application No 0163563 namely 2 May 1985.

Auf Deutsch:

> *„Daher verfüge ich, dass Latchways Limited gemäß § 12 (6) eine neue Patentanmeldung in Bezug zu dem in der Anlage LBN1 zur Erklärung von Herrn Ben-Nathan enthaltenen Gegenstand einreichen darf, wobei jedoch die Ansprüche entsprechend der Anlage zum Schreiben vom 12. Januar zu ändern sind.*
>
> *Des Weiteren verfüge ich, dass als Anmeldetag der neuen Anmeldung der Anmeldetag der europäischen Patentanmeldung 0163563, d.h. der 2. Mai 1985, zu gelten hat."*

191    Die Große Beschwerdekammer hatte demnach nur zu entscheiden, ob das EPÜ, also die patentrechtlichen Verwaltungsvorschriften, der von einem nationalen Gericht dem Antragsteller zuerkannte Eigentum in Form einer Neuanmeldung unter Inanspruchnahme der Priorität einer nicht mehr anhängigen Anmeldung nach Art. 61 Abs. 1 lit. b) EPÜ entgegenstehen.

192    So ist Ausgangspunkt der Entscheidungsgründe der G 3/92, dass das EPA nicht die rechtliche Kompetenz hat zu entscheiden, ob einem Anmelder das *Recht auf Erteilung des Patents* zusteht, sondern dies dem nach dem Anerkennungspro-tokoll zuständigen nationalen Gericht obliegt (G 3/92, Gründe, Rz. 2 und 3). Das nationale Gericht wendet dabei das aufgrund seines nationalen Kollisionsrechts anwendbare (nationale) Recht an (Gründe, Rz. 3.4). Es wird der Fall betrachtet,



dass eine solche Entscheidung vorliegt und daher als die von der Großen Beschwerdekammer zu beantwortende Frage herausgearbeitet, ob eine solche Entscheidung eines nationalen Gerichts eine im Sinne des Art. 61 EPÜ ist (Gründe, Rz. 4, 2. und 3. Absatz) oder ob ihre Umsetzung im patentrechtlichen Verwaltungsverfahren versagt werden kann.

193    Es obliegt somit aus Sicht der Großen Beschwerdekammer – richtigerweise – dem nationalen Gericht zu entscheiden, ob ein zu langer Zeitraum zwischen dem Verfallen der Anmeldung und der Neuanmeldung besteht (Gründe, Rz. 4.4). Und, es widerspreche der Kompetenzverteilung zwischen nationalen Gerichten und EPA, wenn das EPA einer Entscheidung eines nationalen Gerichts, die einer anderen Person als dem Anmelder das Recht auf Erteilung des Patents zuspricht, die Durchsetzung verweigere, indem der anderen Person verwehrt wird, das zentralisierte Verfahren des Art. 61 Abs. 1 EPÜ zu nutzen:

> patent. This system of jurisdiction, in combination with the provisions of Article 61 EPC and the Rules which are intended to implement it, provides a co-ordinated legal process for granting the appropriate remedy, in a case where an unlawful applicant has applied for a European patent contrary to the legal rights of the inventor or his successors in title which are set out in Article 60(1) EPC. It would be contrary to such legal process if a lawful applicant who has established his right to the grant of a European patent in a final decision by the appropriate national court in accordance with the Protocol on Recognition, was thereafter excluded from using the centralised procedure of Article 61(1) EPC.

Auf Deutsch:

> „Dieses System der Rechtsordnungen, dem zufolge die Entscheidung von Rechtsstreitigkeiten über den Anspruch auf Erteilung eines europäischen Patents den nationalen Gerichten der Vertragsstaaten obliegt, gewährleistet in Verbindung mit den Bestimmungen des Artikels 61 EPÜ und den zu ihrer Ausführung aufgestellten Regeln ein abgestimmtes rechtliches Verfahren für die Gewährung angemessener Rechtsbehelfe in Fällen, in denen ein unberechtigter Anmelder unter Missachtung der in Artikel 60 (1) EPÜ vorgesehenen Rechte des Erfinders oder seines Rechtsnachfolgers ein europäisches Patent angemeldet hat. Es liefe diesem rechtlichen Verfahren zuwider, wenn der berechtigte Anmelder, dem das nach dem Anerkennungsprotokoll zuständige nationale Gericht in einer



*rechtskräftigen Entscheidung den Anspruch auf Erteilung eines euro-*
*päischen Patents zugesprochen hat, danach das zentralisierte Verfahren*
*gemäß Artikel 61 (1) EPÜ nicht in Anspruch nehmen könnte."*

194     Das EPA erkennt somit an, dass es ihm nicht in vollem Umfang obliegt zu ent-
scheiden, ob nach Wegfall einer Patentanmeldung einem Berechtigten noch das
Recht auf Erteilung eines Patents zugesprochen werden kann. Das EPA sah im
Gegenteil keine Kompetenz, einer Entscheidung nach nationalem Recht die Um-
setzung zu verweigern.

195     Das nationale Recht im Vereinigten Königreich sah mit § 12(6) Patents Act ein
solches Recht auf Anmeldung eines Patents und Inanspruchnahme des Prioritäts-
tages nach Widerruf oder Fallenlassen einer Anmeldung ausdrücklich vor (**Anla-
ge HE 14**, Seite 2f.).

196     Da das im hiesigen Verfahren anwendbare Recht eine solche Anspruchsgrundlage
hingegen nicht vorsieht, versucht die Klägerin die G-Entscheidung in ihr Gegenteil
zu verkehren, und meint, das nationale Gericht müsse einen solchen Anspruch
zusprechen, da das EPA ihn anerkenne. Dies verkennt die Kompetenzverteilung
zwischen EPÜ und nationalem Recht. Der Umstand, dass es nach dem an-
wendbaren nationalen Recht keine Anspruchsgrundlage gibt, lässt sich nicht durch
eine auf Art. 60 EPÜ oder auch Art. 61 EPÜ gestützte Feststellungsklage umgehen.

### 3.2     Patentanmeldungen waren weder beim EPA noch DPMA anhängig

197     Die europäischen Streitpatentanmeldungen (Klageanträge 1) und 2)) sind nie an-
hängig geworden, da der Beklagte die europäische Phase nicht eingeleitet hat,
weshalb allein die Vorschriften des PCT anwendbar sind (siehe **Ziffer 3.2.1**). Deut-
sche Patentanmeldungen (Klageantrag 3) hätten aus den PCT-Anmeldungen nicht
einmal hervorgehen können, da die Bestimmung *DE* in der PCT-Anmeldung nach
Art. 4 Abs. 1 ii) Hs. 3 PCT als Wunsch auf ein regionales (hier: europäisches) Patent
behandelt wird (siehe **Ziffer 3.2.2**)).

### 3.2.1     *EP Anmeldungen wurden nie anhängig – Klageanträge 1) und 2)*

198     PCT-Anmeldungen mit der Bestimmung EP gelangen erst mit Einleitung der euro-
päischen Phase als europäische Patentanmeldungen zur Entstehung und werden
daher auch erst mit Einleitung der europäischen Phase vor dem EPA als Patent-
erteilungsbehörde anhängig (vgl. bereits KE, Rz. 152). Die Vorschriften des EPÜ,
einschließlich Art. 61 EPÜ, finden erst Anwendung, wenn die Anmeldung anhängig
geworden ist.

199     Die Geltung einer PCT-Anmeldung als europäische Anmeldung nach Art. 11 Abs. 3
PCT und Art. 153 Abs. 2 EPÜ ist nicht mehr als eine juristische Fiktion, die erst



<u>nach</u> Einleitung der nationalen bzw. regionalen Phase zur Geltung gelangt (vgl. Singer/Stauder/*Hesper*, EPÜ, 7. Aufl. 2016, Art. 153 Rn. 196). Dies folgt aus der Konzeption des PCT: Vor Ende der nach Art. 22 Abs. 1 und 3 PCT i.V.m. Regel 159 Abs. 1 EPÜ geltenden 31-Monatsfrist darf das EPA eine PCT-Anmeldung nicht bearbeiten, es sei denn der Anmelder hat einen ausdrücklichen Antrag gestellt (vgl. Art. 23 Abs. 1 bzw. Art. 40 Abs. 2 PCT).

200    Die Unterschiede zwischen einer regulären EP-Anmeldung und einer internatio- nalen Anmeldung, die auch das EP bestimmt, betont die juristische Beschwerde- kammer des EPA in der als

**Anlage HE 15**

überreichten Entscheidung J 18/09 vom 1. September 2010:

> „9. [...] *It is the very essence of the unitary filing system drawn up by the PCT that in the international phase the international application is subject to the procedural rules of the PCT and <u>not to those of the national laws</u> (possibly divergent from those of the PCT) which may become applicable once the international application has entered the national or regional phase before the competent national or regional office."*

Auf Deutsch:

> „9. [...] *Es ist das Wesen des vom PCT bereitgestelltem einheitlichen Anmeldesystems, dass in der internationalen Phase die internationale Anmeldung den prozessualen Regeln des PCT unterliegt und <u>nicht den- jenigen der nationalen Rechtsordnungen</u> (die möglicherweise vom PCT abweichen), welche anwendbar werden können, wenn die internationale Anmeldung in die nationale oder regionale Phase vor dem zuständigen nationalen oder regionalen Amt eingetreten ist."*

201    Nach der Entscheidung J 18/09 kann bei Einreichung einer Teilanmeldung nach Art. 76 EPÜ nicht die Priorität einer internationalen (Euro-PCT) Patentanmeldung in Anspruch genommen werden, die vor Einleiten der europäischen Phase fallengelassen wurde. Die juristische Fiktion des Art. 11, Abs. 3 PCT ändert nämlich nichts daran, dass das Verfahren vor dem EPA erst mit der Einleitung der europäischen Phase beginnt (Hervorhebung diesseits):

> „13. *The wording in Article 11(3) PCT '...shall have effect of a regular national application in each designated State as of the international filing date...' is a legal fiction which does not lead to the result that the proceedings under the PCT become national ones. On the contrary, the*



> proceedings in the international phase under the PCT are special ones
> and are governed by the provisions of the PCT. Proceedings under
> national law are expressly excluded during the international phase of an
> international application. [...] As regards an international patent applica-
> tion designating EP, proceedings before the PCT authorities are initiated
> as from the filing date and proceedings before the European Patent
> Office _only as from the day on which the requirements for entering the_
> _regional phase prescribed by Article 22(1) PCT have been fulfilled."_

Auf Deutsch:

> „13. Der Wortlaut des Artikel 11(3) PCT ‚hat ... in jedem Bestimmungs-
> staat die Wirkung einer vorschriftsmäßigen nationalen Anmeldung mit
> dem internationalen Anmeldedatum' ist eine rechtliche Fiktion, die nicht
> dazu führt, dass Verfahren nach dem PCT zu nationalen Verfahren
> werden. Im Gegenteil, Verfahren in der internationalen Phase sind
> besondere Verfahren und unterliegen den Vorschriften des PCT.
> Verfahren nach den nationalen Vorschriften sind in der internationalen
> Phase einer internationalen Anmeldung ausdrücklich ausgeschlossen. [...]
> Was eine internationale Anmeldung anbelangt, die EP bestimmt, ist das
> Verfahren vor den PCT-Behörden mit dem Anmeldetag eingeleitet und
> das Verfahren vor dem Europäischen Patentamt _erst ab dem Tag, an_
> _dem die von Artikel 22(1) PCT vorgesehenen Voraussetzungen zum_
> _Eintritt in die regionale Phase erfüllt sind."_

202    Da der Beklagte die europäische bzw. nationale Phase nicht eingeleitet hat, be-
schränkte sich auch die Bearbeitung des EPA auf die Feststellung, dass die Fiktion
der PCT-Anmeldung als europäische Anmeldung weggefallen ist (Art. 24 Abs. 1 (iii)
PCT, Regel 160 EPÜ). Die Zuweisung einer Anmeldenummer und die Mitteilung
nach Regel 112, Abs. 1 EPÜ, nach der die Anmeldung als widerrufen gilt, macht
aus der vor den PCT-Behörden anhängigen PCT-Anmeldung noch keine vor dem
EPA anhängige europäische Anmeldung. Es ist ein lediglich deklaratorischer Reflex
der PCT-Anmeldung. Hierzu die juristische Beschwerdekammer in der Entschei-
dung J 18/09 (**Anlage HE 15**, Hervorhebungen diesseits):

> „18. Furthermore, it is true that the European Patent Office issued a
> communication in relation to the earlier application indicating: 'The
> European patent application cited above is deemed to be withdrawn'.
> However, even if the use of the term "European patent application" in
> that statement corresponds to the wording in Rule 160(1) EPC, the
> statement that the European patent application was deemed to be
> withdrawn was not a constitutive procedural act but _only a declaratory_



*one with respect to the non-pendency of the proceedings before the European Patent Office. Such a statement did not initiate grant procee-dings before the European Patent Office as is required by Rule 36(1) EPC for the International Application but made it clear that the International Application was not being proceeded with under the EPC and only informed the applicant that the International Application had not become pending before the European Patent Office to be further prosecuted as a European patent application."*

Auf Deutsch:

*„18. Weiter ist zutreffend, dass das Europäische Patentamt eine Mittei-lung mit Bezug auf die frühere Anmeldung versandte, die angab: ‚Die europäische Patentanmeldung gilt als zurückgenommen'. Selbst wenn die Benutzung des Begriffs ‚europäische Patentanmeldung' in dieser Aussage mit dem Wortlaut in Regel 160 Abs. 1 EPÜ übereinstimmt, ist die Aussage, dass die europäische Patentanmeldung als zurückgenom-men gilt dennoch kein konstitutiver prozessualer, sondern nur ein dekla-ratorischer Akt bezogen auf die Nicht-Anhängigkeit des Verfahrens vor dem Europäischen Patentamt. Solch eine Aussage initiierte kein Ertei-lungsverfahren, wie nach Regel 36 Abs. 1 EPÜ für die internationale Anmeldung erforderlich, sondern stellte klar, dass die internationale Anmeldung nicht unter dem EPÜ bearbeitet wird und informierte den Anmelder, dass die internationale Anmeldung nicht anhängig geworden ist, um weiter als europäische Patentanmeldung bearbeitet zu werden."*

### 3.2.2    Deutsche Anmeldungen nie wirksam beantragt – Klageantrag 3)

203    Die angeblichen deutschen Streitpatentanmeldungen, die Grundlage des Klage-antrags 3) sind, sind noch nicht einmal als internationale Patentanmeldung wirksam beantragt worden.

204    Das DPMA ist nach der Regelung des Art. III § 4 Abs. 1 Satz 2 IntPatÜG nicht Bestimmungsamt im Sinne des PCT, wenn – wie in der WO'919 und WO'049 – zugleich auch ein europäisches Patent nachgesucht wird.

205    Entsprechend wird die Bestimmung „DE" in der PCT-Anmeldung gemäß Art. 4 Abs. 1 ii) Hs. 3 PCT als Wunsch interpretiert, ein regionales (hier: europäisches) Patent zu erhalten. Die Bestimmung zieht daher nicht einmal eine rechtliche Fiktion einer Anmeldung nach sich. Sie hatte keinerlei rechtlich Auswirkung und eine deutsche Anmeldung hätte hieraus nicht hervorgehen können.



### 3.3        Kein Feststellungsinteresse

#### 3.3.1        Klageantrag 1)

206        Auch nach den weiteren Ausführungen der Klägerin verbleibt es dabei, dass sie kein Feststellungsinteresse für ihren Klageantrag 1) dargetan hat. Neben den in der Klageerwiderung angeführten Gründen ist Folgendes zu berücksichtigen:

##### 3.3.1.1        Kein Feststellungsinteresse hinsichtlich derzeitiger Antragsfassung

207        Die Klägerin vermag nicht überzeugend darzulegen, aus welchen Gründe sie ein rechtliches Interesse an ihrem Antrag zu haben meint, festzustellen *„dass der Beklagte als Nichtberechtigter durch die Anmeldung der europäischen Patente [...] Erfindungen der Klägerin angemeldet hat und der Anspruch der Erteilung dieser europäischen Patente der Klägerin zugestanden hätte"*.

208        Der Antrag ist bereits nicht hinreichend bestimmt. Es ist nicht klar, für welchen Zeitpunkt die Klägerin die Feststellung ihrer Rechte beantragt.

209        Ein Feststellungsinteresse hinsichtlich dieser Anspruchsfassung lässt sich jedenfalls nicht mit Art. 61 Abs. 1 EPÜ begründen, denn dieser verlangt, dass das <u>Recht auf Erteilung des Patents</u> **gegenwärtig** der anderen Person als dem Anmelder zusteht, nicht zu einem beliebigen früheren Zeitpunkt einmal zugestanden hat. Dies ergibt sich aus der englischen Sprachfassung der Vorschrift am deutlichsten („*a person other than the applicant* <u>is entitled to the grant</u> *of the European patent*"). Es ist aber auch selbstverständlich, denn eine Person, der dieses Recht zwar in der Vergangenheit zustand, die es aber zwischenzeitlich an einen Dritten übertragen oder anderweitig verloren hat, soll nicht als neuer Anmelder die Rechte aus Art. 61 EPÜ geltend machen können.

210        Die Antragsfassung bestätigt vielmehr, dass auch aus Sicht der Klägerin kein gegenwärtiges Rechtsverhältnis mehr besteht, da das Recht des Beklagten auf Erteilung der europäischen Patente aus den Streitpatentanmeldungen endgültig erloschen ist. Es handelt sich somit um ein abgeschlossenes Rechtsverhältnis, dessen Feststellung nur dann in Betracht kommt, wenn sich aus der Feststellung noch Rechtsfolgen für die Gegenwart und die Zukunft ergeben können (ständige Rechtsprechung, etwa *BGH*, NJW-RR 2016, 1404, Rn. 13). Dies ist hier nicht gegeben, da Art. 61 EPÜ eine gegenwärtige Rechtsinhaberschaft erfordert.

211        Solange eine europäische Patentanmeldung anhängig ist, hat es der nach Art. 60 Abs. 1 Satz 1 EPÜ (vermeintlich) Berechtigte selbst in der Hand, seine Rechte an der betreffenden Anmeldung im Wege des Art. 61 Abs. 1 EPÜ zu sichern. Unterlässt er dies und erlischt die Anmeldung, so steht ihm nur noch die Möglichkeit offen, Schadensersatz zu verlangen (vgl. *BGH*, GRUR 1997, 890 [891] –



*Drahtbiegemaschine*). Genau dieses Interesse verfolgt die Klägerin auch mit ihren Klageanträgen 2) und 3). Das schließt aber eine gesonderte Feststellung nach Klageantrag 1) aus, denn ein Interesse an der Klärung abstrakter Vorfragen besteht nicht (*BGH*, NJW-RR 2016, 1404, Rn. 15). Dass *„der Beklagte die Begründetheit der Anträge zu 2) und 3) aus verschiedenen Gründen in Zweifel zieht"* (vgl. Replik, Seite 37), also beispielsweise, dass kein Schaden entstanden ist, begründet kein Interesse der Klägerin an der Feststellung eines Teilaspekts.

### 3.3.1.2    Kein Feststellungsinteresse aus Art. 60 Abs. 1 EPÜ

212    Ein Feststellungsinteresse für Klageantrag 1) lässt sich auch nicht auf Art. 60 Abs. 1 Satz 1 EPÜ stützen, denn aus dieser Vorschrift ergibt sich, wie oben unter **Ziffer 3.1** dargelegt, alleine, wem das *Recht <u>auf ein Patent</u>* zusteht, nicht aber ein Anspruch auf das *Recht <u>auf Erteilung des Patents.</u>*

213    Da die Klägerin die Feststellung eines *Rechts <u>auf Erteilung des Patents</u>* beantragt, kann eigentlich bereits dahinstehen, ob die Klägerin ein rechtliches Interesse an der Feststellung hat, dass ihr die Erfinderrechte zustehen oder dass der Beklagte als (vermeintlich) Nichtberechtigter gehandelt hat. Es sei nur kurz darauf hingewiesen, dass die Entscheidung *Aufwärmvorrichtung* des BGH sich auf das Recht des *„Erfinder*[s] [...] *auf Anerkennung seiner Erfindereigenschaft in Bezug auf eine bestimmte Erfindung streitig gemacht wird"* (*BGH*, NJW 1979, 269, 271), also auf das Erfinderpersönlichkeitsrecht bezog, das der Klägerin als juristische Person ohnehin nicht zustehen kann.

### 3.3.1.3    Kein Feststellungsinteresse aus Art. 61 Abs. 1 EPÜ

214    Ein Feststellungsinteresse lässt sich auch nicht auf Art. 61 Abs. 1 EPÜ stützen. Wie oben unter **Ziffer 3.1** dargelegt, ergibt sich aus dieser Vorschrift nicht, unter welchen Voraussetzungen einer anderen Person als dem Anmelder das *Recht auf Erteilung des Patents* zusteht, sondern sie setzt lediglich voraus, dass dieses Recht einer anderen Person zugesprochen wurde.

215    Schon aus diesem Grund kommt es vorliegend auch nicht auf die G 3/92 an, denn diese Entscheidung setzte ebenfalls voraus, dass das anwendbare nationale Recht dem Dritten das *Recht auf Erteilung des Patents* zuordnet und das zuständige Gericht ihm dieses Recht zugesprochen hat (siehe oben **Ziffer 3.1**). Die Entscheidung G 3/92 ist vorliegend auch deshalb nicht einschlägig da die Streitpatentanmeldungen nie als Europäische Anmeldungen anhängig geworden sind. Die Entscheidung entfaltet für das deutsche Gericht zudem keine Bindungswirkung und ist, wie in der Klageerwiderung (KE, Ziffer 3.1.2.1) dargelegt, unrichtig entschieden worden, woran auch die von der Klägerin vorgebrachten Argumente nichts ändern.



Im Einzelnen:

216    Die G 3/92 ist nicht einschlägig. Die Klägerin geht in ihrer Argumentation davon aus, dass die Entscheidung G 3/92 auch für PCT-Anmeldungen einschlägig ist, die nie die europäische Phase erreicht haben. Hierüber hat die Große Beschwerde-kammer aber nicht entschieden. Die Große Beschwerdekammer hat lediglich festgestellt, dass ein Vorgehen nach Art. 61 Abs. 1 lit. b EPÜ nicht erfordere, *„daß zum Zeitpunkt ihrer Einreichung die ältere, widerrechtliche Anmeldung <u>noch</u> vor dem EPA anhängig ist"* (Leitsatz G 3/92, Unterstreichung diesseits). Dies impliziert, dass die betreffende ältere Anmeldung jedenfalls einmal beim EPA anhängig ge-wesen sein muss. Die Streitpatentanmeldungen sind aber nie anhängig geworden (oben **Ziffer 3.2**).

217    Der Begriff der Anhängigkeit einer europäischen Patentanmeldung verlangt, dass das EPA die Anmeldung in ihrer Eigenschaft als Patenterteilungsbehörde (*patent grant authority*) behandelt. In der bereits zitierten J 18/09 (**Anlage HE 15**) hat die juristische Beschwerdekammer daher entschieden, dass eine (Euro-)PCT-Anmeldung, für die Anmeldegebühren nicht gezahlt wurden und die damit gemäß Regel 160 EPÜ als zurückgenommen gilt, keine Basis für eine Teilanmeldung nach Art. 76 Abs. 1 EPÜ sein kann. Hintergrund ist, dass Regel 36 EPÜ eine anhängige frühere europäische Patentanmeldung voraussetzt (Hervorhebung diesseits):

> *„14. The reasoning of the Receiving Section that the term 'pending earlier European patent application' refers to proceedings pending before the European Patent Office as the competent authority to decide on the earlier application under the EPC is, therefore, absolutely correct. The procedural term 'pendency' in the sense of Rule 36 EPC implies that the European Patent Office <u>has become competent</u> to decide on the request for grant."*

Auf Deutsch:

> *„14. Die Begründung der Eingangsstelle ist daher absolut korrekt, dass der Begriff 'früher anhängige Europäische Patentanmeldung' sich bezieht auf anhängige Verfahren vor dem Europäische Patentamt als die für die Entscheidung über die frühere Anmeldung nach dem EPÜ kompetente Behörde. Der prozessuale Begriff 'Anhängigkeit' im Sinne der Regel 36 EPÜ impliziert, dass das Europäische <u>Patentamt zuständig geworden ist</u>, über den Antrag auf Erteilung zu entscheiden."*

218    Art. 61 Abs. 1 i.V.m. Art. 60 Abs. 3 EPÜ lässt sich auf eine niemals anhängig gewordene Anmeldung nicht anwenden. Dies wird für Art. 61 Abs. 1 lit. b EPÜ auch dadurch bestätigt, dass nach Art. 61 Abs. 2 EPÜ auf die Einreichung einer



neuen europäischen Anmeldung nach Art. 61 Abs. 1 lit. b EPÜ die Regeln für die europäische Teilanmeldung nach Art. 76 Abs. 1 EPÜ entsprechend anzuwenden sind, und zwar ausdrücklich nach *„Maßgabe der Ausführungsordnung"* (Art. 76 Abs. 1 Satz 1 EPÜ). Auch nach den Prüfungsrichtlinien des EPA ist eine Anmeldung nach Art. 61 Abs. 1 lit. b EPÜ – bis auf die Jahresgebühren – *wie eine europäische Teilanmeldung zu behandeln, und es gelten die entsprechenden Vorschriften"* (Teil A, Kapitel IV, Regel 2.5; der G 3/92 lag in dieser Hinsicht auch noch eine im Detail abweichende Rechtslage zugrunde).

219     Die G 3/92 ist für das deutsche Gericht ferner nicht bindend und auch unrichtig entschieden worden. Wie in der Klageerwiderung ausgeführt (KE, Ziffer 3.1.2.1), begründet das EPÜ keine Entscheidungsprärogative des EPA gegenüber den nationalen Gerichten. Das hiesige Gericht muss daher seine eigene Entscheidung treffen, es kann die Rechtsauffassung der Großen Beschwerdekammer nicht unbesehen übernehmen. Aus den in der Klageerwiderung angeführten Gründen ist diese Entscheidung auch nicht überzeugend.

220     Entgegen der Behauptung der Klägerin hat der BGH in der Entscheidung *Draht-biegemaschine* (*BGH*, GRUR 1997, 890, 892) nicht entschieden, ob nach Art. 61 Abs. 1 lit. b) EPÜ eine neue Anmeldung eingereicht werden kann, denn Gegen-stand des dortigen Verfahrens war ein deutsches Patent. Der BGH hat aber festge-halten, dass die von der Mindermeinung in der G 03/92 angeführten *„gewichtigen Gegenargumente"* im Rahmen einer Analogie-Betrachtung stärkeres Gewicht haben. Von einer *„ausdrücklichen Würdigung und Anerkennung"* der Entschei-dung G 3/92, wie sie die Klägerin erkennen will (vgl. Replik, Seite 38, 3. Absatz), kann keine Rede sein.

221     Ebenso wenig überzeugend ist das Argument der Klägerin, die Vertragsstaaten hätten es unterlassen, das EPÜ mit Blick auf die G 3/92 abzuändern (Replik, Seite 38). Denn zum einen setzt die Anwendung der G 3/92 die Bereitschaft der Gerichte voraus, über die Berechtigung an einer Anmeldung im Hinblick auf Art. 61 Abs. 1 EPÜ auch dann zu entscheiden, wenn diese Anmeldung gar nicht mehr anhängig ist. Zum anderen ist dem Beklagten und seinen Vertretern schlicht kein Beispiel für ein tatsächlich auf Basis der G 3/92 erteiltes europäisches Patent bekannt. Und schließlich folgt aus dem Umstand, dass ein völkerrechtlicher Vertrag nicht geändert wurde auch nicht, dass jede unter ihm ergangene Entscheidung inhaltlich bestätigt wird.

### 3.3.1.4     Kein Feststellungsinteresse bei bloßer Mitinhaberschaft

222     Ein Feststellungsinteresse der Klägerin besteht auch dann nicht, wenn sie allenfalls ein Mitinhaberrecht am Recht auf Erteilung der Patente geltend machen kann. Denn wie in der Klageerwiderung unter Ziffer 3.1.2.3 ausgeführt, würde die



Einreichung einer Patentanmeldung durch die Klägerin ohne Zustimmung des Beklagten in die Rechte des Beklagten eingreifen. Und ob in einem solchen Fall der frühere Anmelder, der die Anmeldung fallen gelassen hat, wieder Mitinhaber einer neu eingereichten Anmeldung unter Inanspruchnahme der Priorität werden kann, ist auch von der Großen Beschwerdekammer in G 3/92 nicht entschieden worden.

223    Insbesondere eine Vollvindikation scheidet hier nach den Ausführungen unter Ziffer 2.2 bis 2.4. zweifellos aus. Hierfür spricht auch, dass die Klägerin im US-Geschäftsgeheimnisverfahren nicht einmal selbst hinsichtlich aller Patentansprüche den eigenen Geheimnisbesitz geltend macht und dass das *Patent Trials and Appeals Board* („**PTAB**") des *US Patent and Trademark Office* schon die Eröffnung eines *Derivation*-Verfahrens hinsichtlich des US-Pendants zur WO'049 zurückgewiesen hat, da die hiesige Klägerin und dortige Antragstellerin nicht einmal glaubhaft gemacht hat, dass die im dortigen Patent beanspruchte Lehre auf sie zurückgeht. Im Einzelnen:

224    Es bleibt trotz der gegenteiligen Darstellung der Klägerin in der Replik eine Tatsache, dass die Klägerin im Verfahren vor dem Kalifornischen Gericht nicht geltend gemacht hat, dass die Patentanmeldungen des Beklagten vollständig auf sie zurückgehen. So macht sie in ihrem *Trade Secret Disclosure Statement* vom 28. Februar 2018 zur Klage vom 1. September 2016 (dort Seite 13) hinsichtlich der Patentanmeldung US 2016/0110819 (US 14/918,398, **FBD 29**), deren Patentansprüche und Beschreibung der WO'919 entsprechen, keine Ansprüche hinsichtlich der Patentansprüche 5 bis 7, 9, 15, 23 bis 25, 27, 31 und 33 geltend.

225    Auf das *Derivation*-Verfahren haben wir bereits in der Klageerwiderung hingewiesen (dort Rz. 35). Dieses Verfahren ist das prozessuale Gegenstück nach US-Recht zur Vindikationsklage (so auch die Klägerin, Seite 6 der Klage). Der Antrag bezog sich auf die US-Patentanmeldung US 14/919,506 (US 20160112445; **FBD 28**), die der WO'049 entspricht.

226    Ein *Derivation*-Verfahren wird nur dann eröffnet, wenn der Antragsteller glaubhaft macht, dass (i) er selbst oder sein Rechtvorgänger eine zu den erteilten Patentansprüchen im Wesentlichen ähnliche Erfindung (*substantially similar invention*) gemacht hat, (ii) und dass er diese dem Antragsgegner mitgeteilt hat. Die Klägerin hat sich hierzu auf die eidesstattliche Erklärung von Herrn Sankar gestützt, die die Klägerin im hiesigen Verfahren vermeintlich wegen „besonderer Geheimhaltungsbedürftigkeit" nicht vorlegen wollte (Replik, Seite 27). Dass diese Erklärung nicht das belegt was die Klägerin behauptet, hat ihr das PTAB mit seiner Entscheidung vom 13. März 2020 bereits schwarz auf weiß gegeben, in der die juristisch und technisch qualifizierten Richter des PTAB den Antrag mangels



hinreichender Glaubhaftmachung für eine Verfahrenseröffnung zurückgewiesen haben.

227 Wenn sich die Klägerin durchringt, das „Geheimnis" des Inhalts der Sankar-Erklärung zu lüften, wird sich auch die Kammer davon überzeugen können, dass diese Erklärung die mangelnde Schlüssigkeit der Klage nur noch offensichtlicher werden lässt. Wir behalten uns selbstverständlich auch Sachvortrag zu dieser bislang nicht ins Verfahren eingeführten Erklärung vor.

228 Da es für eine Vollvindikation schon an schlüssigem Klagevortrag fehlt sowie aus den weiteren vorgenannten Gründen mangelt es hier für Klageantrag 1 bereits am Feststellungsinteresse.

### 3.3.2    Klageanträge 2) und 3)

229 Auch hinsichtlich der Klageanträge 2) und 3) fehlt es bereits am Feststellungsinteresse, denn schon die Wahrscheinlichkeit eines Schadenseintritts ist weder dargetan, noch plausibel. Die Klägerin weicht einem Vortrag hierzu weiter aus indem sie vorträgt, die „bloße Möglichkeit" eines Schadenseintritts reiche aus (vgl. Replik, Seite 37). Das ist jedoch zum einen unzutreffend, zum anderen besteht vorliegend noch nicht einmal die theoretische Möglichkeit eines Schadenseintritts – schon weil die vorgeblichen „Erfindungen" nicht patentfähig sind.

230 Nach ständiger Rechtsprechung des BGH sind Feststellungsklagen, mit denen die Ersatzpflicht für Vermögensschäden festgestellt werden soll, nur zulässig, wenn eine „hinreichende Wahrscheinlichkeit" eines auf die Verletzungshandlung zurückzuführenden Schadenseintritts besteht (vgl. BGH, NJW 2015, 1683, Rn. 15). Die Klägerin müsste die Wahrscheinlichkeit eines Schadenseintritts also substanziiert dartun (BGH, id.), was sie nicht getan hat.

231 Die Klägerin verweist demgegenüber darauf, dass bei Verletzung absoluter Rechte eine bloße Möglichkeit eines zukünftigen Schadens im Rahmen des Feststellungsinteresses ausreichend sein soll. Selbst wenn man dies genügen lassen will, besteht diese hier nicht. Die Anmeldung einer nicht patentfähigen „Erfindung" kann keinen Schaden verursachen, insbesondere dann nicht, wenn die Klägerin – wie hier – nicht einmal behauptet, den Gegenstand der Anmeldungen genutzt zu haben.

### 3.4    Kein Rechtsschutzbedürfnis aufgrund zögerlichen Verhaltens

232 Unabhängig vom fehlenden Feststellungsinteresse sind jedenfalls die Aspekte zu berücksichtigen, die von der Mehrheitsmeinung in der G 3/92 als prüfungsbedürftig eingeordnet werden, da das EPA selbst keine Überprüfung der Berechtigung des Anmelders vornimmt, solange dieser ein ihn legitimierendes Urteil vorlegt.

HOFFMANN EITLE

233     So obliegt es nach der G 3/92 (Abschnitt 4.4, Hervorhebung diesseits) den natio-
        nalen Gerichten zu entscheiden, wie sie

        *„bei der Entscheidung gemäß Artikel 1 (1) des Anerkennungsprotokolls in*
        *Fällen, in denen die frühere Anmeldung bereits erloschen ist, einen*
        *etwaigen Verzug des berechtigten Anmelders bei der Einleitung und*
        *Abwicklung des Verfahrens zur Feststellung seines Anspruchs und die*
        *Möglichkeit einer Beeinträchtigung Dritter berücksichtigen.“*

        Mit *„bei der Entscheidung gemäß Art. 1 Abs. 1 des Anerkennungsprotokolls“* ist
        zweifellos in einem Verfahren wie dem Vorliegenden gemeint.

234     Wie in der Klageerwiderung ausgeführt, hatte die Klägerin auch mehr als genug
        Gelegenheit, ihre vermeintlichen Rechte geltend zu machen, solange eine Einlei-
        tung der regionalen Phase beim EPA noch möglich gewesen wäre.

235     So hat die Klägerin beispielsweise in ihrer Klage vom 1. September 2016 zum Kali-
        fornischen Bundesgericht geltend gemacht, dass die Einreichung der Prioritäts-
        anmeldungen einen Verstoß des Beklagten gegen Vertraulichkeitsverpflichtungen
        und verschiedene gesetzliche Vorschriften darstelle. Die Klägerin hat dabei aber
        keine Rechte hinsichtlich den damals noch anhängigen internationalen Anmeldun-
        gen geltend gemacht.

236     Nach ihren eigenen Angaben hatte einer der Mitarbeiter der Klägerin sogar vor
        dem 23. September 2014 erfahren, *„dass der Beklagte entweder bereits Patentan-*
        *meldungen betreffend Cyber-Versicherungen angemeldet hatte oder vorbereitete“*
        (Replik, Seite 30). Sie hatte demnach konkreten Anlass, das Register zu über-
        wachen und hinreichend Gelegenheit Schritte zur Sicherung ihrer Position auch
        mit Blick auf die Streitpatentanmeldungen einzuleiten (im Einzelnen hierzu bereits
        KE, Ziffer 4). Sie hat auch das konkrete Angebot des Beklagten nicht aufgenom-
        men, ihr die Anmeldungen unter Vertraulichkeitsvereinbarung unmittelbar nach
        Einreichung, und vor deren Offenlegung zugänglich zu machen.

237     Mit Blick auf die klaren Aussagen der Mehrheitsmeinung in der G 3/92 greift es zu
        kurz, wenn die Klägerin die schutzwürdigen Interessen Dritter allenfalls im
        Rahmen einer späteren Verletzungsklage, etwa analog einem Vorbenutzungs-
        recht, berücksichtigen will. Mit dieser Position ignoriert die Klägerin die im EPÜ
        angelegte Kompetenzverteilung. Das europäische Patent gewährt dieselben
        Rechte wie ein nationales Patent (Art. 64 Abs. 1 EPÜ). Das schließt eine Befugnis
        der Großen Beschwerdekammer oder auch des nach dem Anerkennungsprotokoll
        zuständigen Gerichts aus, die (anderen) Mitgliedsstaaten zur Rechtsfortbildung
        anzuhalten. Allenfalls lässt sich den vagen Überlegungen der Mehrheitsmeinung
        der G 3/92 in deren Abschnitt 6 ein gewisses Problembewusstsein für die



erheblichen Nachteile für unbeteiligte Dritte entnehmen, die eine Erteilung eines Europäischen Patents auf Basis der Priorität einer längst erloschenen Anmeldung haben kann.

238    Dass das Erlöschen der WO'049 für jedermann aus dem Register ersichtlich war, stellt auch die Klägerin nicht in Frage. Für die WO'919 geht aus dem von der Klägerin selbst vorgelegten Registerauszug ohne Weiteres hervor, dass das EPA am 11. August 2017 wegen Nichtzahlung der Anmeldegebühr eine Mitteilung nach Regel 112(1) EPÜ versandt hat, wonach die Anmeldung als zurückgenommen gilt:

| Examination procedure | 11.08.2017 | Despatch of communication that the application is deemed to be withdrawn, reason filing fee / search fee not paid in time |
|---|---|---|
| | Noting of loss of rights pursuant to Rule 112(1) EPC , EPO Form 1205A dated 11.08.17. | |
| Public notifications | Abramowitz, Marc Lauren<br>1029 Ramona Street<br>Palo Alto, CA 94301 / US | |
| | [2017/52] | |

Auf Deutsch:

| Prüfungsverfahren | 11.08.2017 | Absendung der Mitteilung, wonach die Anmeldung als zurückgenommen gilt, Grund: Anmeldegebühr/Recherchengebühr nicht fristgerecht entrichtet |
|---|---|---|
| | Noting of loss of rights pursuant to Rule 112(1) EPC , EPO Form 1205A dated 11.08.17. | |
| Öffentliche Zustellungen | Abramowitz, Marc Lauren<br>1029 Ramona Street<br>Palo Alto, CA94301 / US | |
| | [2017/52] | |

239    Eine „*genaue Auseinandersetzung mit der hinterlegten Korrespondenz und den im Anmeldeverfahren hinterlegten Fristen*" (vgl. Replik, Seite 39) ist damit gerade nicht erforderlich. Für jedermann ist klar ersichtlich, dass die Anmeldung als zurückgenommen gilt und die darin beschriebene Erfindung frei benutzt werden darf.

240    Die Folgen eines unter Anwendung von Art. 61 Abs. 1 lit b) erteilten Europäischen Patents betreffen potentiell alle Mitgliedsstaaten des EPÜ, nicht nur einen etwaigen Verletzungsprozess in Deutschland. Aber auch die von der Klägerin angedachte Verhältnismäßigkeitsprüfung im Rahmen des § 139 PatG bei Vertrauen auf das Erlöschen einer Anmeldung hat allenfalls eingeschränkte Folgen für den Unterlassungsanspruch (vgl. die Überlegungen bezüglich einer Aufbrauchfrist in *BGH*, Urteil vom 10. Mai 2016, X ZR 114/13 – *Wärmetauscher*, Rn. 41), ändern aber nichts an dem Vorwurf einer (vorsätzlichen) Patentverletzung.

241    Die Geltendmachung von Ansprüchen erst nachdem auch die letzte Gelegenheit die europäische Phase einzuleiten verstrichen war, schließt daher hier ein Rechtsschutzbedürfnis aus. Selbst wenn man grundsätzlich eine Geltendmachung nach diesem letzten Zeitpunkt für möglich halten sollte, wäre zumindest die gesetzgeberische Wertung zu berücksichtigen, dass dies allenfalls in einer sehr kurzen Frist möglich sein darf. In der Klageerwiderung haben wir hierzu bereits auf die zwei-



monatige Ausschlussfrist des EPÜ bei Wiedereinsetzungen in Unkenntnis eines Rechtsverlust verwiesen (KE, Rz. 115). Der deutsche Gesetzgeber sieht in § 7 PatG nur einen Monat vor.

### 3.5 Feststellungsanträge sind unbegründet

242     Eine überzeugende Rechtsgrundlage für ihr Klagebegehren vermag die Klägerin weiterhin nicht darzutun. Wie gezeigt scheidet das EPÜ als Rechtsgrundlage für eine Zuweisung des Rechts auf Erteilung des Patents aus.

243     Eine Rechtsgrundlage für das von der Klägerin behauptete Rechtsverhältnis kann sich daher allenfalls aus nationalem Recht ergeben. Hierzu ist zunächst das anwendbare Recht zu bestimmen, hier kalifornisches Recht (**Ziffer 3.5.1**). Die Klägerin bleibt weiterhin jeden Vortrag schuldig, ob und wie sich aus US und kalifornischem Recht ihre Klageanträge begründen ließen (**Ziffer 3.5.2**). Nach deutschem Recht jedenfalls fehlt es an einem Eingriff in Erfinderrechte, sowie an einer Rechtsgrundlage für Klageantrag 1). Klageanträge 2) und 3) sind unbegründet, da die Streitpatentanmeldungen nicht patentfähig sind, und es auch an jeglichem schlüssigen Vortrag hinsichtlich eines Schadens und einer Anspruchsgrundlage für Herausgabeansprüche fehlt (**Ziffer 3.5.3**).

### 3.5.1 Kollisionsrecht führt zur Anwendung von US-Recht

244     Das auf alle Klageanträge anwendbare Recht bestimmt sich nach der allgemeinen Kollisionsnorm des Art. 4 Abs. 2 Rom II-VO. Daher ist US-amerikanisches, und zwar kalifornisches Recht als das Recht des gemeinsamen Aufenthaltsortes von (vermeintlichem) Schädiger und Geschädigtem anwendbar, wobei für Gesellschaften der Sitz der Hauptverwaltung entscheidend ist (Art. 23 Abs. 1 Rom II-VO). Eine Sonderanknüpfung nach dem Schutzlandprinzip (Art. 8 Abs. 1 Rom-II-VO) oder dem Handlungsort bei Verletzung gemeinschaftsweit einheitlicher Rechte des geistigen Eigentums (Art. 8 Abs. 2 Rom-II-VO) scheidet aus, wobei letzteres ebenfalls zum US-Recht führen würde.

245     Die Klägerin wirft dem Beklagten vor, durch die Einreichung einer PCT-Anmeldung beim US Patentamt in ihre Erfinderrechte eingegriffen zu haben, weshalb ihr ein Anspruch auf Herausgabe des Rechtes auf Erteilung der europäischen Patente sowie Ansprüche auf Schadensersatz oder auf Herausgabe des Erlangten aus GoA oder Eingriffskondiktion aufgrund der europäischen und deutschen Patentanmeldungen zustehe. Wie oben unter **Ziffer 3.2** ausgeführt, ist eine deutsche Patentanmeldung nie wirksam beantragt worden und zunächst sind auch nur internationale Patentanmeldungen entstanden, die als europäische Anmeldungen niemals anhängig geworden sind.



246    Die Klägerin argumentiert nun, im Hinblick auf Klageantrag 2) ergebe sich das anwendbare Recht aus Art. 8 Abs. 2 Rom-II-VO, da eine künstliche Aufsplittung der einheitlichen europäischen Anmeldung und damit mosaikartige Zersplitterung in Rechte verschiedener Mitgliedstaaten vermieden werden solle. Daher sei es interessengerecht, an den einheitlichen Handlungsort anzuknüpfen. Diese Argumentation führt aus zwei Gründen ebenfalls zum US-Recht:

247    Zum einen wäre aus denselben Gründen die PCT-Anmeldung als einheitliches Recht zu behandeln, womit die USA sowohl Handlungs- als auch Erfolgsort sind. Zum anderen ist der *„Ort, in dem die Verletzung begangen wurde"* nicht der Erfolgsort, sondern der Handlungsort. Nach EuGH *„ist eine Gesamtwürdigung seines Verhaltens vorzunehmen, um den Ort zu bestimmen, an dem die ursprüngliche Verletzungshandlung, auf die das vorgeworfene Verhalten zurückgeht, <u>begangen worden</u> ist oder droht"* (vgl. *EuGH*, GRUR 2017, 1120 – *Nintendo/BigBen*, Rn. 103; Hervorhebung hinzugefügt). Gehandelt hat der Beklagte unstreitig nur in den USA.

248    Das OLG München hat in der Entscheidung vom 7. Dezember 2017 (6 U 4503/16, BeckRS 2017, 152300) eine Anwendung von Art. 8 Abs. 2 Rom-II-VO nicht für überzeugend gehalten (Rn. 121, Hervorhebung diesseits):

> *„Europäische Patente und sonstige ausländische Anmeldungen/Patente unterliegen indessen nicht dem Einheitsgrundsatz, es handelt sich hierbei vielmehr um eine Vielzahl von einzelnen Schutzrechten, die im jeweiligen Schutzland Geltung beanspruchen. Im Hinblick darauf <u>erscheint zweifelhaft,</u> ob die Entscheidung des EuGH in „Nintendo/BigBen" zu Art. 8 Abs. 2 der Rom-II-VO in Richtung auf die streitgegenständlichen Auslandsanmeldungen/-schutzrechte hier Geltung beanspruchen würde. Ob der Klägerin darin zu folgen wäre, dass praktische Bedürfnisse des Anmelders eine entsprechende Anwendung gebieten würden, kann aus den vorgenannten Gründen im Hinblick auf die vorstehenden Ausführungen zu I. im Streitfall dahinstehen."*

249    Dass man richtigerweise nicht nach Art. 8 Abs. 1 Rom-II-VO am Schutzlandprinzip anknüpfen kann, vertritt demnach für die Klageanträge 1) und 2) auch die Klägerin. Dies auch zurecht, denn hinsichtlich des Rechts an der Erfindung gilt das Schutzlandprinzip gerade nicht (BFH, Urteil vom 26. August 1993, I R 86/92, BStBl. 1994 II Seite 168; *Busse/Keukenschrijver*, PatG, 8. Aufl. (2016), § 6 Rz. 8). Weder der BGH in der Entscheidung *Beschichtungsverfahren* (hierzu bereits KE, Rz. 121) noch das OLG München in seinem Urteil vom 7. Dezember 2017 haben die Vindikation von Rechten aus einer europäischen Patentanmeldung im Ergebnis dem Schutzlandprinzip unterworfen.



250    Der temporale Anwendungsbereich der Rom II-VO auf den sich die Klägerin hinsichtlich der BGH Entscheidung *Beschichtungsverfahren* beruft, ist bereits deshalb unerheblich weil Art. 8 Abs. 1 Rom II-VO lediglich eine Kodifikation eines lang anerkannten Rechtsgrundsatzes ist (vgl. Erwägungsgrund (26) Rom II-VO). Die Gründe aus denen der BGH nicht an das Schutzlandprinzip angeknüpft, sondern mit Art. 40 EGBGB an das Recht des Staates, in dem der Ersatzpflichtige gehandelt hat, geltend für die Rom-II-VO daher fort.

251    In *Steuervorrichtung* hat der BGH auch in der Vornahme von Auslandsanmeldungen beim EPA einen Eingriff in das im Inland entstandene Erfinderrecht gesehen, *„weil das Recht an der Erfindung auch deren Anmeldung im Ausland umfasst"* (BGH, Urteil vom 18. Mai 2010, X ZR 79/07, Rn. 33) und daher auch auf diese Auslandsanmeldungen deutsches Recht angewandt. Liegt wie hier der umgekehrte Fall vor, dass die angeblichen Erfinderrechte allenfalls in den Vereinigten Staaten entstanden sind, schließt dies eine Anwendung deutschen Rechts dementsprechend aus.

252    Es ist schließlich auch interessengerecht, einheitlich das Recht des gemeinsamen, gewöhnlichen Aufenthaltsortes anzuwenden, denn andernfalls unterlägen die Klageanträge unterschiedlichen Rechtsordnungen, obwohl sie auf ein und dieselbe Handlung zurückgehen.

### 3.5.2    Nach US Recht bestehen geltend gemachte Ansprüche nicht

253    Wie erwähnt ist das Äquivalent zur Vindikation im US Recht die *Derivation*. Diese kann sowohl zur Entscheidung durch das oben (Rz. 223) erwähnten PTAB (§ 135) oder zur Entscheidung der Zivilgerichte (§ 291) gestellt werden. Die Vorschriften sind im Folgenden im hier relevanten Umfang reproduziert:

*„35 U.S. Code § 135. Derivation proceedings*

*(a) Institution of Proceeding. —*

*(1) In general.—*

*An applicant for patent may file a petition with respect to an invention to institute a derivation proceeding in the Office. The petition shall set forth with particularity the basis for finding that an individual named in an earlier application as the inventor or a joint inventor derived such invention from an individual named in the petitioner's application as the inventor or a joint inventor and, without authorization, the earlier application claiming such invention was filed. Whenever the Director determines that a petition filed under this subsection demonstrates that*



*the standards for instituting a derivation proceeding are met, the Director may institute a derivation proceeding.*

*[…]*

*(d) Effect of Final Decision.—*

*The final decision of the Patent Trial and Appeal Board, if adverse to claims in an application for patent, shall constitute the final refusal by the Office on those claims. The final decision of the Patent Trial and Appeal Board, if adverse to claims in a patent, shall, if no appeal or other review of the decision has been or can be taken or had, constitute cancellation of those claims, and notice of such cancellation shall be endorsed on copies of the patent distributed after such cancellation.*

**35 U.S. Code § 291. Derived patents**

*(a) In General.—*

*The owner of a patent may have relief by civil action against the owner of another patent that claims the same invention and has an earlier effective filing date, if the invention claimed in such other patent was derived from the inventor of the invention claimed in the patent owned by the person seeking relief under this section."*

Auf Deutsch:

**„35 U.S. Code § 135. Derivation Verfahren**

*(a) Einleitung des Verfahrens.—*

*(1) Allgemeines.—*

*Der Anmelder eines Patents kann für eine Erfindung einen Antrag auf Einleitung eines Derivation Verfahrens beim* [US Patent- und Marken-] *Amt stellen. Der Antrag soll insbesondere die Grundlagen für die Fest-stellung darlegen, dass eine Person, die in einer früheren Anmeldung als Erfinder oder Miterfinder genannt ist, diese Erfindung von einer Person, die in der Anmeldung des Antragstellers als Erfinder oder Miterfinder genannt ist, abgeleitet hat und die frühere Anmeldung ohne Genehmi-gung des Antragstellers eingereicht wurde. Entscheidet der Direktor, dass ein nach den Bestimmungen dieses Unterabschnitts eingereichter Antrag darlegt, dass die Anforderungen für die Einleitung eines Derivation Verfahrens erfüllt sind, kann der Direktor ein Derivation Verfahren jederzeit einleiten.*



[...]

*(d) Wirkungen einer endgültigen Entscheidung. —*

*Die endgültige Entscheidung des Patent Trial and Appeal Board stellt, wenn sie die Ansprüche [in] einer Patentanmeldung ablehnt, die endgültige Zurückweisung dieser Ansprüche durch das Amt dar. Wenn sie die Ansprüche [in] einer Patentanmeldung ablehnt, bewirkt die endgültige Entscheidung des Patent Trial and Appeal Board die Löschung dieser Ansprüche, sofern keine Berufung oder andere Überprüfung dieser Entscheidung eingelegt wurde oder möglich ist, und ein Hinweis auf diese Lösung ist auf den nach der Löschung veröffentlichten Kopien des Patents zu vermerken.*

**35 U.S. Code § 291. Abgeleitete Patente**

*(a) Im Allgemeinen. —*

*Der Inhaber eines Patents kann gegen den Inhaber eines anderen Patentes, dass dieselbe Erfindung beansprucht und ein früheres effektives Anmeldedatum hat, Zivilklage erheben, falls die in einem solchen Patent beanspruchte Erfindung von einer in einem Patent beanspruchten Erfindung abgeleitet wurde, das der Person gehört, die Rechtsbehelf nach diesem Abschnitt erhebt.*

254    Voraussetzung für einen solchen Derivation-Anspruch ist somit erstens, dass die Partei, die einen solchen Anspruch geltend macht, ein eigenes Patent hinsichtlich derselben Erfindung hält.

255    Der Anspruchsgegner muss zweitens Inhaber eines (anhängigen) Patents mit früherem effektivem Anmeldedatum sein.

256    Der Anspruchssteller muss drittens beweisen, dass er selbst oder sein Rechtsvorgänger die im Wesentlichen ähnliche Erfindung gemacht und mitgeteilt hat. Erforderlich ist „conception" (Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227–1228 (Fed. Cir. 1994)):

> *„Thus, the test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure. An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue. The conception*



> *analysis necessarily turns on the inventor's ability to describe his invention with particularity. Until he can do so, he cannot prove possession of the complete mental picture of the invention. These rules ensure that patent rights attach only when an idea is so far developed that the inventor can point to a definite, particular invention."*

Auf Deutsch:

> *„Die Prüfung einer ‚Conception' bestehen also darin, ob der Erfinder eine Idee hatte, die definitiv und beständig genug war, dass ein Fachmann die Erfindung verstehen konnte; der Erfinder muss seine ‚Conception' durch bestätigende Beweismittel beweisen, vorzugsweise durch eine kontemporäre Offenbarung. Eine Idee ist definitiv und beständig, wenn der Erfinder eine bestimmte, feststehende Idee hat, eine bestimmte Lösung für das vorliegende Problem, nicht nur ein allgemeines Ziel oder einen Forschungsplan, den er zu verfolgen hofft. Die Analyse einer ‚Conception' dreht sich notwendigerweise um die Fähigkeit des Erfinders, seine Erfindung in ihren Einzelheiten beschreiben zu können. Solange er dies nicht tun kann, kann er nicht nachweisen, dass er im Besitz des vollständigen geistigen Bildes der Erfindung war. Diese Regeln stellen sicher, dass Patentrechte erst dann entstehen, wenn eine Idee so weit entwickelt ist, dass der Erfinder eine definitive, bestimmte Erfindung aufzeigen kann."*

257    Abgesehen davon, dass – wie oben ausgeführt – die Klägerin dem Beklagten die in den Streitpatentanmeldungen offenbarten Erfindungen nicht mitgeteilt hat, steht der Klägerin nach US Recht auch aus gleich mehreren Rechtsgründen kein Derivation-Anspruch zu: Der Beklagte ist nicht gegenwärtiger Inhaber der Streitpatentanmeldungen, da diese niemals als Europäische Anmeldungen anhängig geworden sind und auch die Fiktion einer Anmeldung zwischenzeitlich weggefallen ist. Die Klägerin ist nicht Inhaberin eigener Anmeldungen, die zu den Gegenständen der WO'049 und der WO'919 im Wesentlichen ähnliche Erfindungen beanspruchen würden (im Hinblick auf die WO'919 hat die Klägerin dies im Verfahren vor dem PTAB nicht einmal hinreichend glaubhaft machen können, um die Einleitung eines *Derivation*-Verfahrens zu erwirken, oben Rz. 226). Insbesondere hinsichtlich der WO'049 fehlte es auch an der „Conception". Ausweislich der Email von Herrn Sankar hatte er hinsichtlich Cyber-Versicherungen allenfalls den Plan einer Entwicklung und Ziele, aber noch keine definitive und beständige Lösung (Rz. 123f.). Die Klägerin hat zur „Conception" auch keine bestätigenden Beweismittel, vorzugsweise eine kontemporäre Offenbarung, vorlegen können.



258    Des weiteren hat eine Person nach 35 U.S.C. § 102(a) auch keinen Anspruch mehr auf ein Patent, wenn die Erfindung der Öffentlichkeit zugänglich gemacht worden ist:

>*„A person shall be entitled to a patent unless—*
>
>*(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention"*

Auf Deutsch:

>*„Eine Person hat Anspruch auf ein Patent, sofern nicht…*
>
>*(1) die beanspruchte Erfindung vor ihrem effektiven Anmeldetag patentiert, in einer gedruckten Veröffentlichung beschrieben oder durch öffentliche Verwendung, durch Verkaufsangebot oder anderweitig der Öffentlichkeit zugänglich war"*

259    Nach US Recht besteht daher kein Anspruch der Klägerin, ihr das Recht auf Erteilung der Streitpatentanmeldungen zuzuordnen.

### 3.5.3    <u>Hilfsweise:</u> Auch nach deutschem Recht bestehen Ansprüche nicht

260    Sollte das Gericht zur Anwendung deutschen Rechts gelangen, sind die Klageanträge aus den folgenden Gründen zumindest als unbegründet abzuweisen.

#### 3.5.3.1    Kein Eingriff in Erfinderrechte der Klägerin

261    Der Beklagte hat nicht in Erfinderrechte der Klägerin eingegriffen, weshalb nach deutschem Recht die Klageanträge bereits aus diesem Grund unbegründet sind.

262    Die geltend gemachten Ansprüche würden voraussetzen, dass die Klägerin vor dem Prioritätsdatum im Besitz fertiger Erfindungen war, die die Gegenstände der Streitpatentanmeldungen vorwegnehmen, und diese dem Beklagten mitgeteilt hat, ohne dass der Beklagte diese Erfindungen durch eigene Überlegungen und unabhängig von der Mitteilung entwickelt hätte. Keine dieser Voraussetzungen liegt hier vor.

263    Die von Shyam Sankar in der Email vom 9. Juni 2014 zu einer Cyber-Versicherung geäußerten ersten Gedanken waren bereits keine fertige Erfindung. Sie gingen auch nicht über das hinaus, was zum damaligen Zeitpunkt bereits so notorisch bekannt war, dass es sich schon in Regierungsprogrammen wiederfand.

264    Die Klägerin war allenfalls im Besitz ihrer CyberMesh-Anwendung, die aber von der Klägerin bereits umfangreich publiziert worden war (**Ziffer 2.3**).

HOFFMANN EITLE

265     Die Übermittlung von reinem Fachwissen stellt keinen schöpferischen Beitrag dar (LG München I, Urteil v. 22.2.2018 – 7 O 4209/17).

266     Wie gezeigt (**Ziffern 2.2.4.1** und **2.2.4.2**) nehmen CyberMesh und die Gedanken zu Cyber-Versicherungen aber auch die Gegenstände der Streitpatentanmeldungen nicht vorweg, und zwar weder die Merkmale der unabhängigen Ansprüche, noch die von der Klägerin als technische Lehre aus der Beschreibung herausgehobenen weiteren Merkmale.

267     Wie die Prüfungsbescheide der EPA-Prüfungsabteilungen hinsichtlich der eigenen Anmeldungen der Klägerin zu CyberMesh belegen (oben, **Rz. 115 ff.**), ist Cyber-Mesh auch keine „Erfindung", zumindest keine hinsichtlich derer der Klägerin Rechte zustehen würden. Es handelt sich lediglich um ein Geschäftskonzept, das durch generische und notorisch bekannte Datenverarbeitungskonzepte und Bau-teile implementiert wurde. Gleiches gilt für Cyber-Versicherungen. Die Klägerin kann nicht geltend machen, diese notorisch bekannten Datenverarbei-tungskonzepte und Bauteile erfunden zu haben, und sie ist auch nicht „Erfinderin" der Geschäftskonzepte, schon deshalb nicht, weil diese grundsätzlich nicht als Erfindung anzusehen sind (Art. 52 Abs. 2 lit c) EPÜ, § 1 Abs. 3 PatG).

268     Zudem wären jegliche Rechte der Klägerin an der Erfindung und damit auch auf ein Patent jedenfalls mit der Mitteilung an den Beklagten, der keiner Vertraulich-keitsverpflichtung unterlag (**Ziffer 2.4.2**), erloschen (Benkard/Melullis Patent-gesetz, 11. Aufl. 2015, § 6 PatG, Rn. 28):

        *„Das Recht an der Erfindung erlischt, wenn die Erfindung durch eine schriftliche oder mündliche Beschreibung oder durch eine Benutzung oder in sonstiger Weise der Öffentlichkeit zugänglich gemacht, d. h. veröffentlicht wird."*

269     Dies bestätigt der BGH in der Entscheidung *Steuervorrichtung*, denn das *Recht an einer Erfindung* ist nur geschützt solange die Erfindung ausschließlich *„unter Wah-rung einer die Öffentlichkeit hiervon ausschließenden Vertraulichkeit"* mitgeteilt wird; das *Recht auf ein Patent* setzt wiederum das *Recht an der Erfindung* voraus (BGH, a.a.O., Rn. 28).

270     Auch hinsichtlich der vermeintlichen Mitteilung der Klägerin an den Beklagten fehlt es bereits an einem einlassungsfähigen Sachvortrag. Der Beklagte **bestreitet,** dass ihm die Lehren der Streitpatentanmeldungen von Herrn Sankar mitgeteilt wurden.

271     Wie in **Ziffern 2.2.3** und **2.5** gezeigt, geht der Gegenstand der Streitpatentan-meldungen auf eine eigene Idee des Beklagten zurück, die in einer Ausführungs-form bereits zum Gegenstand einer Anfang März 2014 eingereichten Patentan-



meldung gemacht worden war. Eine etwaige spätere Mitteilung der Klägerin kann daher nicht kausal für diese Überlegungen des Beklagten gewesen sein.

### 3.5.3.2    Keine Rechtsgrundlage für Zuerkennen eines Rechts auf Erteilung

272    Klageantrag 1) ist weiterhin unbegründet, da das deutsche Patentrecht – anders als das englische Patentgesetz – keine Rechtsgrundlage bereitstellt, nach der der Klägerin die Rechte auf Erteilung der europäischen Streitpatentanmeldungen nach deren Wegfall noch zugesprochen werden könnten.

273    Das Recht aus § 7 Abs. 2 PatG bei Widerruf oder Verzicht auf ein Patent aufgrund eines auf widerrechtliche Entnahme gestützten Einspruchs innerhalb eines Monats die Erfindung selbst anzumelden und die Priorität des früheren Patents in Anspruch zu nehmen, ist vorliegend aus mehreren Gründen nicht anwendbar. Es findet nur auf deutsche Patente Anwendung, es setzt einen auf widerrechtliche Entnahme gestützten Einspruch voraus und gewährt nur dem Einsprechenden das Recht zur Neuanmeldung, und dies auch nur innerhalb einer Frist von einem Monat.

274    Art. II § 5 Satz 1 IntPatÜG setzt zum einen voraus, dass eine europäische Patent-anmeldung anhängig geworden ist (wie hier nicht, oben **Ziffer 3.2.1**), und zum Zeitpunkt der mündlichen Verhandlung auch noch anhängige Anmeldung ist (,,[...] *dessen Erfindung angemeldet* _ist_, *kann* _vom Patentsucher_ *verlangen, daß ihm der Anspruch auf Erteilung des europäischen Patents abgetreten wird*"). Ein Kläger kann durch Antrag auf Aussetzung des Erteilungsverfahrens nach Regel 14 EPÜ verhindern, dass der Patentsucher die streitgegenständliche Anmeldung fallen lässt, bevor er eine eigene Anmeldung nach Art. 61 Abs. 1 lit. b) EPÜ einreichen konnte. Regel 14 Abs. 2 EPÜ gewährt ihm hierfür eine dreimonatige Frist nach Rechtskraft der Entscheidung während dieser der Anmelder weiter keine Handlungen im Erteilungsverfahren vornehmen kann:

> *,,(2) Wird nachgewiesen, dass eine rechtskräftige Entscheidung im Sinne des Artikels 61 Absatz 1 ergangen ist, so teilt das Europäische Patentamt dem Anmelder und gegebenenfalls den Beteiligten mit, dass das Erteilungsverfahren von dem in der Mitteilung genannten Tag an fortgesetzt wird, es sei denn, nach Artikel 61 Absatz 1 b) ist eine neue europäische Patentanmeldung für alle benannten Vertragsstaaten eingereicht worden. Ist die Entscheidung zugunsten des Dritten ergan-gen, so darf das Verfahren frühestens drei Monate nach Eintritt der Rechtskraft dieser Entscheidung fortgesetzt werden, es sei denn, der Dritte beantragt die Fortsetzung."*



275     Ein Abtretungsanspruch nach verfallen lassen der Anmeldung wäre auch dogma-
tisch nicht begründbar, insbesondere dann, wenn man mit Krasser („*Vindikation
im Patentrecht und rei vindication*", FS von Gamm, 1990, Seite 405 ff.) und wohl
auch der Kammer das *Recht auf Erteilung des Patents* als originär durch die
Anmeldung beim Anmelder entstehenden öffentlich-rechtlichen Anspruch
einordnet, und den Abtretungsanspruch aus Art. II § 5 Satz 1 IntPatÜG somit als
bereicherungsrechtlichen Anspruch charakterisiert. Denn die öffentlich-recht-
lichen Ansprüche des Beklagten auf Erteilung der Patente sind, soweit sie über-
haupt jemals entstanden sind, mit Nichteinleiten der regionalen Phase jedenfalls
erloschen, eine Abtretung dieser Ansprüche an die Klägerin ist objektiv unmöglich.

276     Eine analoge Anwendung der vorgenannten Vorschriften kommt auch nicht in
Betracht. Es fehlt hier bereits an einer für die Analogie erforderlichen plan-
widrigen Regelungslücke, jedenfalls aber an einer vergleichbaren Interessenlage.

277     Mit Art. II § 5 Satz 1 IntPatÜG schuf der deutsche Gesetzgeber neben § 8 PatG
eine besondere Regelung, um auch für europäische Patente unter bestimmten
Voraussetzungen einen Vindikationsanspruch zu gewähren (BT-Drs. 7/3712,
Seite 19, oben Rz. 188). Wie § 7 Abs. 2 PatG zeigt, war dem deutschen Gesetz-
geber dabei durchaus bewusst, dass ein Nichtberechtigter auf eine Patentan-
meldung verzichten kann, und dem Berechtigten damit seinen Anspruch aus § 8
PatG nehmen, und dies weit vor dem EPÜ oder der G 3/92 (vgl. Begründung zu § 4
Abs. 3 Satz 2 PatG 1936, BlPMZ 1936, 104). Eine planwidrige Regelungslücke ist
daher nicht gegeben.

278     Die strengen Voraussetzungen des § 7 Abs. 2 PatG, wie das Erfordernis die Nach-
anmeldung binnen eines Monates nach Rücknahme der betreffenden Patentan-
meldung vorzunehmen, tragen den Interessen der Allgemeinheit nach Rechts-
sicherheit Rechnung. Daher hat der BGH in der Entscheidung *Drahtbiegemaschine*
festgestellt, wie bereits ausführlich dargelegt (KE, Rz. 94 f.), dass auch die in der
G 3/92 vorgebrachten Gründe keine analoge Anwendung dieser Vorschrift in
Situationen rechtfertigen, in denen auf die Anmeldung bereits vor Einlegen des
Einspruchs verzichtet wurde.

279     In gleicher Weise schließen die Interessen Dritter auch eine analoge Anwendung
des Art. II § 5 Satz 1 IntPatÜG – zumal weit nach Ablauf der strengen Monatsfrist
des § 7 Abs. 2 PatG – in Situationen aus, in denen die Patentanmeldung bereits
erloschen ist bevor eine Vindikationsklage anhängig gemacht wurde. Erst recht
muss dies gelten, wenn die betreffenden Patentanmeldungen nie zur Entstehung
gelangt sind.

280     Selbst wenn sich der Klageantrag 1) allein auf Art. 60 Abs. 1 Satz 1 EPÜ und/oder
auf einen Eingriff in die Erfinderrechte der Klägerin stützen ließe, wie nicht, wäre



der Antrag unbegründet, da die Streitpatentanmeldungen nie als europäische Patentanmeldungen anhängig geworden sind (oben **Ziffer 3.2.1**). Erst dem Anmelder einer europäischen Patentanmeldung steht nach Art. 60 Abs. 2 EPÜ das Recht auf Erteilung des europäischen Patents und damit eine Vorzugsstellung zu, die als Grundlage für einen etwaigen Eingriff überhaupt in Frage käme (vgl. BGH, *Steuervorrichtung*, a.a.O., Rn. 28). Und auch eine solche Vorzugsstellung wäre jedenfalls mit der Beseitigung der Fiktion einer Anmeldung durch Nichteinleiten der regionalen Phase erloschen, und die Herausgabe dieser Stellung gemäß § 818 Abs. 2 und 3 BGB ausgeschlossen.

### 3.5.3.3    Kein Anspruch auf Feststellung einer Schadensersatzpflicht

281    Auch ein Anspruch nach §§ 823 Abs. 1, 249 BGB scheitert bereits daran, dass deutsche Patentanmeldungen nie wirksam beantragt wurden (Klageantrag 3)) und europäische Patentanmeldungen nicht anhängig geworden sind (Klageantrag 2)).

282    Zum anderen bestätigt der BGH in der Entscheidung *Steuervorrichtung*, *„dass das Recht auf das Schutzrecht als Immaterialgüterrecht gem. § 823 Abs. I BGB gegen Eingriffe Dritter nur geschützt ist, wenn die Erfindung schutzfähig ist"* (BGH, a.a.O., Rn. 28). Dass *„das Patent bereits vor der Anmeldung als Erfindung eine geschützte Rechtposition und sonstiges Recht i.S.d. § 823 Abs. 1"* darstellen würde, wie die Klägerin meint (Replik, Seite 36), ist damit unzutreffend.

283    Es gelingt der Klägerin auch weiterhin nicht, auch nur die Möglichkeit eines Schadens irgendwie plausibel zu machen. Ihre kurzen Bemerkungen zu dieser wesentlichen Voraussetzung für die von ihr behaupteten Schadensersatzansprüche bleiben weit hinter den Anforderungen an einen substanziierten Sachvortrag zurück und sind zudem in hohem Maße widersprüchlich.

284    So behauptet die Klägerin in der Klageschrift ihr *wird* aufgrund der Anmeldungen des Beklagten ein Schaden entstehen, der sich allerdings zum damaligen Zeitpunkt noch nicht beziffern lasse. Der angebliche Schaden soll, so meinte die Klägerin, in den Kosten für die Rechtsverfolgung und der Verzögerung der Patentanmeldung und -erteilung bestehen (vgl. Klage, Seite 24).

285    Nunmehr behauptet die Klägerin, sie *habe bereits* einen Schaden dadurch erlitten, dass sie die Streitpatentanmeldungen zwischen Oktober 2015 und dem „zweiten" Anmeldetag nicht nutzen konnte (vgl. Replik, Seite 39). Das geht in mehrerlei Hinsicht an der Sache vorbei.

286    Erstens sind Feststellungsanträge unzulässig, soweit sie auf Schäden bezogen sind, die die Klägerin bereits erlitten hat. Diese müsste sie vielmehr beziffern. Auch eine darauf gerichtete Leistungsklage wäre jedoch abzuweisen, weil die Klägerin einen angeblich bereits erlittenen Schaden nicht dargelegt oder gar bewiesen hat.



287     Zweitens spricht der Umstand, dass sie den von ihr angeblich bereits seit Oktober 2015 erlittenen Schaden nicht auch nur ansatzweise darlegen kann, klar dagegen, dass ein solcher vorgeblicher Schaden selbst in der Zukunft noch eintreten wird.

288     Drittens ist unklar, warum die Klägerin die in den Streitpatentanmeldungen offenbarte Technologie angeblich nicht nutzen konnte. Weder deren internationale Anmeldung, noch dass später keine Europäische Phase eingeleitet wurde, hinderte die Klägerin zu irgendeinem Zeitpunkt daran diese selbst zu nutzen. Der Verweis auf etwaige Exklusivrechte geht ebenfalls fehl, schon weil die Streitpatentanmeldungen ganz offensichtlich nicht patentfähig sind.

289     Auch kann die Klägerin keinen Schaden aufgrund einer „verzögerten Nutzung" dartun. Doch selbst wenn man unterstellt, ein solcher Anspruch würde bestehen, wäre der Klägerin die ganz erhebliche Verzögerung bei der Verfolgung ihrer vermeintlichen Erfinderrechte als Mitverschulden gemäß § 252 BGB entgegenzuhalten.

### 3.5.3.4     Kein Anspruch auf Feststellung eines Herausgabeanspruchs

290     Mit den Klageanträgen 2) und 3) begehrt die Klägerin die Feststellung, dass der Beklagte angeblich verpflichtete sei, der Klägerin einen Schaden zu ersetzen.

291     Sofern die Ausführungen in der Replik zu einer angeblichen Herausgabepflicht als Klageänderung auszulegen sind, ist die Klage insoweit kostenpflichtig abzuweisen. Eine Klageänderung wäre schon nicht sachdienlich.

292     Auch ein Anspruch aus GoA oder Eingriffskondiktion ist vorliegend aber nicht substantiiert worden, da der Beklagte durch seine internationalen Patentanmeldungen unstreitig nichts erlangt hat. Eine gemäß § 812 Abs. 1 Satz 1 Alt. 2 BGB geschützte Vermögensposition würde eine „Erfindung" voraussetzen, also die Lösung eines konkreten technischen Problems mit bestimmten technischen Mitteln (vgl. *BGH*, a.a.O. – *Steuervorrichtung*, Rn. 28).

293     Der Beklagte hat den Gegenstand der Streitpatentanmeldungen auch nicht selbst genutzt, was für einen Bereicherungsanspruch erforderlich wäre (vgl. *BGH*, a.a.O. – *Steuervorrichtung*, Rn. 29f.).

294     Zudem haben die Streitpatentanmeldungen schon mangels Patentfähigkeit keinen gemäß § 818 Abs. 2 BGB ersetzbaren Wert. Die Klägerin hat zum Wert der angeblich schutzfähigen Streitpatentanmeldungen nichts vorgetragen. Weder zeigt sie auf, dass sie selbst zu irgendeinem Zeitpunkt den Gegenstand der Anmeldungen selbst verwertet hat oder dass konkrete Pläne für eine eigene Verwertung in absehbarer Zeit bestehen, noch dass irgendwer sonst diesen Gegenstand kommerziell genutzt hat, nutzt oder nutzen wird.



### 3.5.3.5    Mangelnde Schutzfähigkeit steht Klageanträgen entgegen

295    Auch die mangelnde Patentfähigkeit der Streitpatentanmeldungen ist bei den
Klageanträgen in der vorliegenden speziellen Situation zu berücksichtigen. Dies
hat der BGH für den Fall einer Klage auf Schadensersatz wegen Vornahme einer
unberechtigten Patentanmeldung, die später fallengelassen wurde, ausdrücklich
entschieden (*BGH*, NJW 1995, 696 – *gummielastische Masse*, hierzu bereits KE
unter Rz. 125 ff.).

296    Statt sich mit den dahinterstehenden Gründen auseinanderzusetzten, verweist die
Klägerin pauschal darauf, dass die Streitpatenanmeldungen *„erneut von der
Klägerin beim EPA anhängig gemacht werden sollen und infolge dessen auch im
regulären Erteilungsverfahren geprüft werden"* Auch sei *„noch nicht absehbar"*,
wie die Klägerin die erneut aufgegriffenen Streitpatentanmeldungen im weiteren
Erteilungsverfahren anpassen werde (Replik, Seite 6). Genauso wenig absehbar ist
aber, ob die Klägerin mit Blick auf die nicht bestehende Patentfähigkeit der
Streitpatentanmeldungen nicht darauf verzichtet, neue Patentanmeldungen unter
Inanspruchnahme der Priorität der Streitpatentanmeldungen einzulegen.

297    Gerade weil es keine Instanz gibt, die mit Sicherheit über die Patentfähigkeit der
Streitpatentanmeldungen entscheiden wird, ist zum Schutz des Beklagten vor
willkürlichen Klagen zwingend auch zu berücksichtigen, ob das Objekt des Klage-
antrags patentfähig ist. Denn die Beklagte übersieht, dass der Verzicht auf die
Prüfung der Patentfähigkeit gerade auch mit dem Verhalten des Anmelders
begründet wird, der an seiner Patentanmeldung festhält (vgl. *BGH*, GRUR 2001,
823 [825] – *Schleppfahrzeug*; Hervorhebung diesseits):

> *„Maßgebend hierfür ist die Erwägung, dass die Prüfung der Patentfähig-
> keit den Patentbehörden und -gerichten obliegt und die ordentlichen
> Gerichte nicht das Ergebnis eines <u>anhängigen Prüfungsverfahrens</u> vor-
> wegnehmen sollten. Im Übrigen erschiene es in der Regel auch wider-
> sprüchlich und treuwidrig, wenn der in Anspruch genommene Patent-
> anmelder einerseits geltend macht, die streitgegenständliche Lehre sei
> nicht patentfähig, <u>gleichwohl aber seine eigene Patentanmeldung
> weiterverfolgt.</u>"*

298    Hintergrund des vorliegenden Streites ist aber, dass der Beklagte selbst gerade
nicht von der Patentfähigkeit der Streitpatentanmeldungen nach den strengen
europäischen Maßstäben ausging. Gerade deshalb hat er hinsichtlich der Streit-
patentanmeldungen auf die Einleitung der europäischen Phase verzichtet.



### 3.6 Fehlende Zuständigkeit

299 Es fehlt, wie bereits in der Klageerwiderung geltend gemacht, an der Zuständigkeit des Landgerichts. Diese käme für alle Klageanträge ohnehin nur nach § 32 ZPO in Frage (siehe **Ziffer 3.6.2**). Das Anerkennungsprotokoll findet auf den vorliegenden Fall keine Anwendung (siehe **Ziffer 3.6.1**).

### 3.6.1 Anerkennungsprotokoll setzt Anhängigkeit der Anmeldung voraus

300 Für Klageanträge 2) und 3) ist das Anerkennungsprotokoll bereits grundsätzlich ohne jede Relevanz und auch hinsichtlich Klageantrag 1) ergibt sich aus dem Anerkenntnisprotokoll keine Zuständigkeit, denn außerhalb seines Anwendungsbereichs kann das Anerkennungsprotokoll eine solche nicht begründen (KE, Rz. 147).

301 Bereits nach dem Wortlaut seines Art. 1 Abs. 1 betrifft das Anerkennungsprotokoll nur Klagen gegen einen (gegenwärtigen) Anmelder, *"mit denen der Anspruch auf Erteilung eines europäischen Patents für einen oder mehrere der in der <u>europäischen Patentanmeldung</u> benannten Vertragsstaatengeltend gemacht wird"*. Vor Einleitung der europäischen Phase gibt es noch nicht einmal eine europäische Patentanmeldung, auf die das Anerkennungsprotokoll Anwendung finden könnte (oben **Ziffer 3.2.1**). Der Anspruch auf Erteilung eines europäischen Patents ist damit niemals entstanden, und selbst wenn er entstanden wäre, durch Nichteinleiten der regionalen Phase zumindest weggefallen.

302 Das Anerkennungsprotokoll soll dem EPA ermöglichen, Fragen der Berechtigung aus dem laufenden Verfahren auszuklammern, keinesfalls aber, wie die Klägerin meint, allgemein eine Regelung für alle Situationen schaffen, *"die eine Entscheidung über die materiell-rechtliche Berechtigung in Vorbereitung auf oder im Zusammenhang mit Europäischen Patenten bzw. Patentanmeldungen erfordern"* (Replik, Seite 35). Deutlich wird dies aus der Zielsetzung des Anerkennungsprotokolls, wie aus **Anlage HE 2** unter Rn. 13 f. ersichtlich (Hervorhebung diesseits):

> *"13. [...] It is completely functional to the specific needs of the EPO under the Convention, i.e. the Contracting States are required to mutually recognise decisions on entitlement to the European patent application, only to the extent necessary for the EPO to be able to deal with one and the same party. [...]*
>
> *14. Article 1 of the Protocol, disposing of the Protocol's field of application, states in paragraph 1 that 'the courts of the Contracting States shall ... have jurisdiction to decide claims, <u>against the applicant,</u> to the right to the grant of a European patent ...' (emphasis added).* [sic!]



> The defendant is, therefore, clearly the applicant. _The status of_
> _applicant,_ however, is obtained with the filing of an application and
> _ceases to exist once the application has been disposed of either through_
> _withdrawal or through refusal or through grant of a patent._ If there is no
> longer an applicant for whichever of the aforementioned reasons, then
> there is also no defendant for the entitlement claim. Also, the right to the
> grant of a European patent comes into existence with the application. If
> the application is disposed of, in whichever way, there is nothing to claim
> anymore, no object to the entitlement claim. It follows that the
> provisions of Article 1(1) of the Protocol cannot apply anymore."

Auf Deutsch:

> „13.  […] _Es_ [das Anerkennungsprotokoll] _ist funktional vollständig auf_
> _die besonderen Bedürfnisse des EPA unter dem Übereinkommen_ [zuge-
> schnitten]_, d.h. die Vertragsstaaten sind verpflichtet, Entscheidungen_
> _über die Berechtigung zur europäischen Patentanmeldung gegenseitig_
> _anzuerkennen, und zwar nur insoweit, als dies erforderlich ist, damit das_
> _EPA sich mit ein und derselben Partei befassen kann._ […]
>
> 14.  Artikel 1 des Protokolls, der den Anwendungsbereich des Protokolls
> definiert, bestimmt in Absatz 1, dass ‚die Gerichte der Vertragsstaaten'
> zuständig sind ‚für Klagen _gegen den Anmelder,_ mit denen der Anspruch
> auf Erteilung eines europäischen Patents … geltend gemacht wird'
> (Hervorhebung hinzugefügt). [sic!]
>
> Beklagter ist daher eindeutig der Anmelder. _Der Status des Anmelders_
> wird jedoch mit dem Einreichen einer Anmeldung erlangt und _erlischt,_
> _sobald sich die Anmeldung entweder durch Rücknahme oder durch_
> _Ablehnung oder durch Erteilung eines Patents erledigt hat._ Gibt es aus
> welchem der oben genannten Gründe auch immer keinen Anmelder
> mehr, so fehlt es auch an einem Beklagten für den Anspruch auf die
> Berechtigung. Zudem, das Recht auf Erteilung eines europäischen
> Patents entsteht mit der Anmeldung. Erledigt sich die Anmeldung, auf
> welche Weise auch immer, fehlt es an etwa zu beanspruchen, einem
> Objekt für den Antrag auf Berechtigung. Daraus folgt, dass die Bestim-
> mungen des Artikels 1 Absatz 1 des Protokolls nicht mehr anwendbar
> sind."

303     Auch das systematische Argument der Klägerin, Art. 61 EPÜ bringe eine allgemei-
ne Kompetenzverteilung zum Ausdruck, die wiederum zentral im Anerkennungs-
protokoll „als integralem Bestandteil des EPÜ" geregelt sei (Replik, Seite 35), geht



fehl: Die Gefahr widerstreitender Entscheidungen und ein damit einhergehendes Interesses an einer einheitlichen Regelung der Berechtigung an einer europäischen Patentanmeldung besteht nur, soweit diese Anmeldung auch anhängig ist. Auf Fragen der Inhaberschaft erteilter europäischer Patente findet das Anerkennungsprotokoll daher beispielsweise keine Anwendung (vgl. *EuGH*, GRUR Int. 1984, 693 [695] – Duijnstee/Goderbauer; *LG München I*, Urteil vom 21. November 2018, 21 O 11279/17). Die Schlussfolgerung der Klägerin, das Anerkennungsprotokoll solle eine umfassende Zuständigkeitsregelung schaffen, ist somit unrichtig.

304    Auf die Mehrheitsmeinung der Großen Beschwerdekammer in der G 3/92 kann sich die Klägerin zur Begründung ihrer Position nicht stützen. Denn die allgemeinen Ausführungen zur Kompetenzverteilung in den Abschnitten 3 ff., auf die die Klägerin verweist (vgl. Replik, Seite 34), geben für die Frage der Zuständigkeit bei Klagen gegen den ehemaligen Anmelder einer erloschenen PCT-Anmeldung nichts her. Über die Auslegung des Anerkennungsprotokolls hat die Große Beschwerdekammer gar nicht entschieden, wie sich aus den Feststellungen der Mindermeinung in G 3/92 ergibt (Hervorhebung diesseits):

> „8.8 Auch dem Anerkennungsprotokoll über die gerichtliche Zuständigkeit und die Anerkennung von Entscheidungen über den Anspruch auf Erteilung eines europäischen Patents kann nicht entnommen werden, daß die neue Anmeldung gemäß Artikel 61 (1) b) EPÜ noch eingereicht werden könnte, wenn die frühere Anmeldung im Zeitpunkt ihrer Einreichung nicht mehr anhängig ist. Das Anerkennungsprotokoll regelt lediglich die Zuständigkeit der Gerichte für Klagen gegen Anmelder, mit denen ein Anspruch auf Erteilung eines europäischen Patents geltend gemacht wird, sowie die Anerkennung der in einem Vertragsstaat ergangenen rechtskräftigen Entscheidung in den anderen Vertragsstaaten. Mit diesen Fragen ist die Große Beschwerdekammer durch die Vorlageentscheidung nicht befaßt. Die vorlegende Kammer hat nämlich selbst entschieden, daß der Comptroller zum Erlaß einer Entscheidung über den Anspruch auf Erteilung eines europäischen Patents zuständig war. *Die Anerkennung dieser Entscheidung in den anderen benannten Vertragsstaaten ist nach der Entscheidung der vorlegenden Kammer nicht zweifelhaft. Daher wurden diese Fragen der Großen Beschwerdekammer auch nicht zur Entscheidung vorgelegt.* Für die der Großen Beschwerdekammer vorgelegte Frage läßt sich somit aus dem Anerkennungsprotokoll nichts entnehmen, da das Anerkennungsprotokoll diese Frage nicht regelt."



305     Die Auslegung des Anerkennungsprotokolls steht damit, anders als die Klägerin in ihrem Sinne meint (Replik, Seite 35), in keiner Weise fest. Sie ist von der Kammer zu bestimmen.

306     Für die von der Klägerin herangezogene, angebliche „*Auffangzuständigkeit*" nach Art. II § 10 Abs. 1 Satz 2 IntPatÜG (vgl. Replik, Seite 36 unter 1.bb)) gilt nichts anderes. Denn bereits tatbestandlich setzt diese Regelung eine Begründung der internationalen Zuständigkeit nach dem Anerkennungsprotokoll voraus.

### 3.6.2     Keine Zuständigkeit nach den allgemeinen Regeln

307     Aus den bereits in der Klageerwiderung angeführten Gründen (KE, Ziffer 6.2) be-steht auch unter dem allgemeinen Zuständigkeitsregime der ZPO keine Zuständig-keit des Landgerichts für die geltend gemachten Klageanträge.

308     In Frage kommt hier allenfalls eine Anknüpfung an den Erfolgsort im Rahmen des Gerichtsstands der unerlaubten Handlung nach § 32 ZPO. Nach der Argumenta-tion der Klägerin wurde dieser bereits durch Einreichen der internationalen Patentanmeldungen WO'919 und WO'049 beim US-amerikanischem Patentamt ausgelöst, da seitens des EPA Registereintragungen und Benachrichtigungen vorgenommen wurden (Replik, Seite 36 oben).

309     Auch der Gerichtsstand der unerlaubten Handlung setzt zumindest die Möglich-keit einer vollendeten Rechtsverletzung voraus (vgl. *BGH*, NJW 2005, 1435). Das Rechtsgut, um das es hier geht, ist nach dem Vortrag der Klägerin das angebliche Recht der Klägerin auf das europäische Patent und die damit einhergehende Befugnis zur Vornahme von Patentanmeldungen (vgl. Replik, Seite 46 f.).

310     Die Streitpatentanmeldungen sind indes als europäische Patentanmeldungen nie zur Wirkung gelangt (siehe oben **Ziffer 3.2.1**), sondern galten bereits vor Einlei-tung der europäischen Phase als zurückgenommen. Die Bestimmung EP in der internationalen Phase schließt die Entstehung etwaiger deutscher Patentanmel-dungen aus (siehe oben **Ziffer 3.2.2**). Die Annahme eines Erfolgsorts im Sinne des § 32 ZPO scheidet demnach aus.

311     Die von der Klägerin zitierte Entscheidung (*LG München I*, BeckRS 2018, 29526, Urteil vom 21. November 2018, 21 O 11279/19, vgl. Replik, Seite 36) trifft für die Zuständigkeit des Landgerichts im vorliegenden Fall keine Aussage. Denn dieser Entscheidung lag eine Klage auf Vindikation zur Entstehung gelangter Patent-rechte aus einer europäischen Patentanmeldung zugrunde, also ein Fall des Art. II § 5, Abs. 1 Satz 2 IntPatÜG. Ein solcher Erfolg ist hier schon deshalb ausgeblieben, da die Streitpatentanmeldungen ein entsprechendes Stadium nie erreicht haben.



312    In der ebenfalls zitierten Entscheidung *Steuervorrichtung* (a.a.O.) hatte der BGH
gerade nicht über Fragen der internationalen Zuständigkeit zu entscheiden. Dort
hatte der BGH einem (deutschen) Arbeitnehmer ermöglicht, Nutzungen wie insbe-
sondere Lizenzeinahmen zu kondizieren, die der (deutsche) Arbeitgeber aufgrund
einer Anmeldung zu einer nicht wirksam in Anspruch genommenen Dienst-
erfindung erlöst hat. Dabei bezog er Eingriff und Bereicherung auch auf Auslands-
anmeldungen, *„weil das Recht an der Erfindung auch deren Anmeldung im
Ausland umfasst"* (BGH, a.a.O., Rn. 33), sah den Eingriff in das Recht auf das
Patent mithin bereits mit der Handlung in Deutschland vollendet. Übertragen auf
den hier streitigen Fall einer Anmeldung beim US-amerikanischen Patentamt,
schließt dies einen Erfolgsort in Deutschland aus.

### 4.    Antrag auf vertrauliche Behandlung / Ausschluss der Öffentlichkeit

313    Der Antrag, die in der Replik als vertraulich gekennzeichneten Ausführungen und
Anlagen von einer Akteneinsicht und aus dem Urteil auszunehmen sowie die
Öffentlichkeit bei der Verhandlung auszuschließen, ist unbegründet.

314    Es ist ein Mysterium wie die Klägerin begründen will, dass die sechs Jahre zurück-
liegenden Vorgänge und zusammenhanglosen Informationen zu einem Produkt,
das soweit erkennbar nie erfolgreich vermarktet wurde und lange eingestellt ist,
heute noch vertraulich sein sollen. Dies gerade in der sich schnell bewegenden IT
Industrie, wo Informationen nach Wochen und Monaten bereits veraltet sind,
nicht erst nach Jahren.

315    Aus diesseitiger Sicht ist dies genau wie der absurd übersetzte Streitwert lediglich
Theater, der Versuch Substanz vorzutäuschen, wo offensichtlich keine besteht.

* * *

316    Es verbleibt somit dabei, dass die Klage unzulässig, jedenfalls aber unbegründet
ist.

Dr. Clemens Tobias Steins
Rechtsanwalt



# Anlagenliste

| | |
|---|---|
| **HE 6** | Bericht des US Finanzministeriums und Pressemitteilung |
| **HE 7** | US 2015/0254766, *Generating a Dynamic Credit Risk Rating for a Debt Security* |
| **HE 8** | WO'919 mit gelb hervorgehobenen Ergänzungen gegenüber der US 62/066,716 |
| **HE 9** | WO'049 mit gelb hervorgehobenen Ergänzungen gegenüber der US 62/066,716 |
| **HE 10** | Palantir Cyber – An End-to-End Cyber Intelligence Platform |
| **HE 11** | Prüfungsbescheide zu EP'079 (15 156 004) und EP'078 (15 155 845) |
| **HE 12** | IPO, A Global Perspective on Patent Subject Matter Eligibility and Software-Related Inventions, 2019, ipo.org/wp-content/uploads/2019/12/IPO_elegibility_whitepaper11-20-19.pdf |
| **HE 13** | Auszug aus PCT Applicant's Guide, wipo.int/export/sites/www/pct/guide/en/gdvol1/annexes/annexd/ax_d_kr.pdf |
| **HE 14** | Entscheidung des Comptrollers in Sachen Latchways Ltd. |
| **HE 15** | EPA, Juristische Beschwerdekammer, Entscheidung J 18/09 vom 1. September 2010 |